ORIGINAL

1  BRIAN S. KABATECK (SBN 152054)
   bsk@kbklawyers.com
2  ANASTASIA K. MAZZELLA (SBN 245201)
   am@kbklawyers.com
3  SERENA VARTAZARIAN (SBN 303260)
   sv@kbklawyers.com
4  **KABATECK LLP**
   633 West Fifth Street, Suite 3200
5  Los Angeles, CA 90071
   Telephone:    (213) 217-5000
6  Facsimile:    (213) 217-5010
   *Attorneys for the Jones Class*

7

**FILED**
Superior Court of California
County of Los Angeles

**NOV 22 2019**

Sherri R. Carter, Executive Officer/Clerk of Court
By _____ Deputy
        Isaac Lovo

8                 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                          **COUNTY OF LOS ANGELES**

10

11  ANTWON JONES, on behalf of himself, and    Lead Case No.: BC577267 [Related to Case Nos.
    all others similarly situated,              BC536272, BC565618, BC568722, BC571664,
12                                              BC594049, BC574690]
              Plaintiff,
13                                              **NEW CLASS COUNSEL'S REPORT**
         v.                                     **REGARDING THE STATUS OF ITS**
14                                              **EVALUATION OF THE CLASS ACTION**
                                                **SETTLEMENT (210 DAYS POST-**
15  CITY OF LOS ANGELES, by and through         **APPOINTMENT).**
    the Los Angeles Department of Water and
16  Power; and DOES 1 through 50, inclusive,    **[FILED CONCURRENTLY HEREWITH:**
                                                **DECLARATION OF GREGG THERRIEN**
17            Defendants.                        **AND EXHIBITS THERETO]**

18
                                                Dept.:        6
19                                              Judge:        Honorable Elihu M. Berle

20  AND RELATED CASES

21

22

23

24

25

26

27

28  **NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF**
    **THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
    Case No. BC577267

Exhibit 13
546

New Class Counsel, Kabateck LLP (hereinafter "Class Counsel"), hereby submit the following report regarding the status of its review and evaluation of the Revised Class Action Settlement Agreement ("RCAS" or "settlement") in the above-entitled matter.

## I.

## EXECUTIVE SUMMARY

### A.    *Summary of Class Counsel's 90-Day Report*

On July 25, 2019, Class Counsel submitted a report to the Court which detailed what Class Counsel had learned through its investigations and research in the first ninety-days since its appointment. The "90-Day Report" contained a number of Class Counsel's opinions, conclusions, and goals for the days ahead.  It also provided a summary of the lengthy history of the *Jones* action and the various related actions[1], the circumstances surrounding the settlement, the key terms of the settlement, and the potentially improper/unethical, activities of former special counsel for the City of Los Angeles ("the City"), Paul Paradis and Paul Kiesel, former class counsel Jack Landskroner, and possibly other individuals currently and formerly employed by the City and/or the Los Angeles Department of Water and Power ("LADWP"). [*See generally*, Class Counsel's 90-Day Report "90-Day Report," on file with the Court.]

Because the Court is well-aware of the *Jones* history, Class Counsel will not reiterate the details again here. Suffice it to say, the information Class Counsel learned in its first 90 days led them to reasonably conclude that potential refunds/credits had been overlooked, carved out, and/or deliberately omitted from the settlement to the detriment of the class. As such, Class Counsel concluded the entire *Jones* settlement must be evaluated for fairness, vetted by independent experts/consultants, and potentially amended to ensure the class receives the refunds and credits that were promised by the City when it vowed to make ratepayers 100% whole. [90-Day Report at

---

[1] *Kimhi, et al. v. The City of Los Angeles, et al.* (Case No. BC536272) (filed February 13, 2014) ("*Kimhi*"); *Bransford, et al. v. City of Los Angeles, et al.* (Case No. BC565618) (filed December 4, 2014) ("*Bransford*"); *Morski, et al. v. Los Angeles Department of Water and Power* (Case No. BC568722) (filed January 7, 2015) ("*Morski*"); *Fontaine, et al. v. City of Los Angeles et al.* (Case No. BC571664) (filed on February 5, 2015) ("*Fontaine*"); *Macias, et al. v. Los Angeles Department of Water & Power, et al.* action (Case No. BC594049) (filed September 10, 2015); and *City of Los Angeles v. Pricewaterhouse Coopers, LLP, et al.* (Case No. BC574690) (filed March 6, 2015) – hereinafter collectively "the related actions."

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

1

Exhibit 13
547

pp.1-8.] In fact, Class Counsel's 90-Day Report estimated there could be an additional $50 million in refunds/credits for the following claims which Class Counsel contends were improperly excluded from the original settlement: (1) zero-bill/zero consumption claims for the time period of September 3, 2013 – January 24, 2019 and (2) back-billing claims for the time period of September 3, 2013 – September 10, 2015. [90-Day Report at 1:11-15.] Class Counsel based the $50 million estimate on the following: (1) there is evidence the City withheld $8 million in refunds/credits for zero bill/zero consumption claims for the time period of September 11, 2015 – January 24, 2019, which Class Counsel has demanded be immediately returned to the affected class members and (2) refunds/credits under the amended Rule 17 for the time period of September 11, 2015 – January 2019 is approximately $38.4 million; thus, it is reasonable to conclude there may be a similar amount owed for the 2013-2015 time period. These numbers are, of course, subject to confirmatory discovery.

Against this backdrop, Class Counsel vowed in the 90-Day Report to continue their review and investigation into all aspects of the settlement, which it has done as outlined below.

**B.      *Summary of Work Performed Since the 90-Day Report and Additional Findings***

Since their appointment on April 17, 2019, Brian Kabateck, his partner Anastasia Mazzella, and various associates, law clerks and paralegals, have spent well over 2,000 hours learning every nuance of the *Jones* action and settlement.[2] They have obtained and reviewed tens of thousands of pages of documents that have been filed with the Court, produced in discovery or by Court Order; interviewed scores of individuals currently or formerly connected to the case (some individuals have been interviewed multiple times); participated in bi-weekly meetings with the court appointed monitor Paul Bender and the LADWP; responded to customer inquiries/complaints; and written several briefs at both the trial and appellate levels.

Nothing Class Counsel has learned since the 90-Day Report has caused them to doubt or retract their initial conclusions. To the contrary, additional facts have come to light in the last three and a half months that have solidified Class Counsel's belief that certain aspects of the settlement,

---

[2] Class Counsel will make an application for fees at some point in the future but does not believe it is appropriate to make a claim for fees or costs at this time.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

2

Exhibit 13
548

specifically the back-billing issues, were manipulated by former class counsel Jack Landskroner (and potentially others) and should be remedied in favor of the class. To that end, Class Counsel has focused much of their time in the recent months on mediating the back-billing issues with the City and Mr. Himmelfarb (counsel in the *Macias/Morski* actions). Additionally, the results of Class Counsel's investigation have further cemented the need for independent consultants to evaluate and verify the methodologies and assumptions the LADWP used to identify refunds/credits and for Class Counsel to propound confirmatory discovery on all aspects of the settlement. In short, Class Counsel stands by their initial conclusions and is moving full-steam ahead in fulfilling their obligations to the class.

This 210-Day Report[3] updates the Court on the status of Class Counsel's investigation and covers the following issues:

1. **Independent Consultants/Experts**: Class Counsel has retained an outside independent consultant experienced in public utilities and billing systems (Concentric Energy Advisors, "Concentric") to conduct an evaluation of all aspects of the settlement, including a review of the methodologies and assumptions the LADWP self-selected to determine refunds/credits and verification of refunds/credits issued to all subclasses. Class Counsel is also in the process of retaining a statistician from Cal Tech to assist Concentric, if needed, in their work.

2. **Rule 17 Claims Excluded from the Settlement**: During the course of its investigation, Class Counsel concluded that certain Rule 17 claims, specifically back-billing (i.e., "no bills"), zero-bill, and zero consumption claims for the time period of September 3, 2013-September 10, 2015, as well as $8 million in zero bill/zero consumption credits for the time period of September 11, 2015 – January 24, 2019, were improperly excluded from the *Jones* settlement in the form of a "carve-out" for the *Macias* action. Class Counsel actively tried to resolve this issue with the City and class counsel in the *Morski/Macias* actions (Alan Himmelfarb). Since late August 2019, Class Counsel has attended two mediation sessions

---

[3] This Report was initially due on October 27, 2019 (i.e., approximately 180 days post-appointment); however, due to pending negotiations with the City, Class Counsel requested, and was granted, an additional 30 days.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267                                                                                    3

Exhibit 13
549

with the City and Mr. Himmelfarb in an attempt to resolve the aforementioned Rule 17 issues. Class Counsel and Mr. Himmelfarb also jointly sent a settlement demand to the City. However, on November 22, 2019, shortly before this Report was filed, the City rejected Class Counsel and Mr. Himmelfarb's attempts to resolve the excluded claims for the period of 2013-2015. The City stated it was willing to continue mediating the $8 million in zero bill/zero consumption claims; however, Class Counsel contends there is nothing left to mediate on that issue. The disputed Rule 17 issues will need to be litigated and presented to the Court.

3. **Current Rule 17 Refunds/Credits**: as stated in the Joint Status Report filed on November 22, 2019 and in Court Monitor Paul Bender's Declaration filed on November 22, 2019, approximately $38.4 million has been returned to class members under the Rule 17 provisions of the settlement (i.e., for the time period of September 11, 2015 – January 2019).

4. **Review of LADWP Remediation Efforts**: Class Counsel is working with the City, the Independent Court Monitor, and the CC&B systems auditor, KPMG, to assess whether the LADWP's remediation efforts have been effective. Specifically, Class Counsel is investigating the following:

      i. Is the LADWP complying with the Amended Rule 17? The LADWP recently identified approximately $3 million in potential Rule 17 violations over the last 10 months. Class Counsel is working with the LADWP and the Court Monitor to investigate this issue and, if refunds/credits are owed, Class Counsel will also ensure they are paid.

      ii. Is the CC&B system functioning correctly so that it meets the performance metrics established under the settlement? It is integral to LADWP's future success that the CC&B system functions as intended.

      iii. Is the LADWP meeting performance metrics outlined in the settlement and if not, why not? Class Counsel is working with the City to assess whether certain metrics are realistic and attainable or if amendments to this part of the settlement are needed.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

4

Exhibit 13
550

5.  **Refunds/Credits to Subclasses**: The City has voluntarily provided Class Counsel with the amounts paid in refunds and credits for other aspects of the settlement including the overbilled class, the solar panel class, and the omnibus claims made class. The total amounts are detailed herein.  Class Counsel will propound confirmatory discovery in the coming months to confirm the figures provided.

6.  **Special Masters, Court Appointed Monitor, KPMG, etc**: Class Counsel works regularly with Barbara Barkovich, the Special Master in charge of claims reviews, Paul Bender, the Independent Court Monitor, and his colleague Siva Thoppe, to ensure that the settlement, as it currently stands, is being properly administered. Class Counsel has also met twice with KPMG which is performing an audit of the CC&B system. Class Counsel is also cooperating with Special Master Ed Robbins and will continue to do so moving forward.

7.  **Issues Related to Prior Class Counsel, Class Liaison, and former Special Counsel**: As detailed herein, there have been several roadblocks created by former class counsel, Jack Landskroner, class liaison Michael Libman, and former special counsel for the City, Paul Paradis, that have caused Class Counsel to spend time operating defensively on what it considers collateral issues as opposed to working on behalf of the class. Nevertheless, Class Counsel is taking steps to resolve all outstanding issues with former counsel, including but not limited to obtaining Mr. Landskroner's personal accounting, disgorging fees paid to Landskroner, Libman, and possibly Paradis, and resolving work product disputes with Paradis.

8.  **Bradshaw Class Action**: Class Counsel is monitoring the Bradshaw action that was filed in federal court and believes it is likely barred by the *Jones* settlement.

9.  **The Pansky Report**: Class Counsel has reviewed the report of outside ethicist Ellen Pansky hired by the City. Class Counsel believes that, while much of the report is accurate, there are some fatal assumptions concerning the class settlement.

**C.**   ***Anticipated Next Steps***

This Report also outlines in greater detail below the next steps in Class Counsel's investigation and evaluation of the *Jones* settlement, including but not limited to conducting

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

5

Exhibit 13
551

confirmatory discovery with the assistance of Concentric, verifying the accuracy and fairness of refunds/credits disbursed to date, tolling the statutory requirement of bringing a case to trial in five years, continued work with the various special masters, court appointed monitors, and outside consultants/auditors, and further evaluation into other aspects of the settlement including but not limited to the solar panel class, the claims made provision, and the remediation and performance metrics.

Additionally, Class Counsel wants to make clear that it does not believe, based on what it knows thus far, that the settlement should be completely unwound or "blown up." This will only invite further problems, delay and likely spawn multiple new lawsuits that will go on for another half-decade. The LADWP customers do not deserve further delay. Class Counsel is confident the existing settlement can be reviewed and amended as needed. There may be some components that are fair and reasonable. Only time and investigation will tell.

In short, there is still much work for Class Counsel to do to fulfill its duty of evaluating whether the *Jones* settlement was fair, reasonable, and adequate.

## II.

## THE RETENTION OF INDEPENDENT CONSULTANTS TO INVESTIGATE THE SETTLEMENT

Early on, Class Counsel expressed the need for a set of independent consultants/experts to evaluate the methodologies and refund/credit calculations employed by the LADWP. The use of third-party experts with no ties to the City, the LADWP, former class counsel, or former special counsel, is imperative in light of the fact that the LADWP was allowed, in part, to self-identify the class members who received a refund/credit. The fact the LADWP was allowed to devise its own methodologies, queries, assumptions, etc. was hotly contested by counsel in the related class actions. Class Counsel believes it is in the best interests of the class to verify the LADWP's work as well as the work of the court appointed monitor Paul Bender and his colleague Siva Thoppe. As discussed below, Class Counsel conducted a thorough search for the right set of experts and believes it has established a qualified team with no conflicts with any party, individual, or entity currently or formerly involved in the *Jones* case.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

6

Exhibit 13
552

*A.*      *The Process of Vetting and Selecting Outside Experts*

Class Counsel initially engaged The Expert Institute to identify potential candidates. Class Counsel instructed The Expert Institute to provide candidates with extensive experience with public utilities, their billing practices and procedures, implementation of billing software, industry standards, solar credits, etc. The Expert Institute ultimately recommended five (5) well-rounded candidates whom Class Counsel vetted and individually interviewed.

Class Counsel also conducted its own independent search after speaking to other class action attorneys and researching experts who have written white papers on utility issues, testified on behalf of utilities for establishing rates, offer ratemaking consulting services, etc. Through this process, Class Counsel identified and interviewed three (3) potential candidates with sufficient experience to tackle this project. From these three candidates, Concentric Energy Advisors stood out from the rest both in terms of breadth of relevant experience and a large enough team to handle a variety of issues.

In addition to engaging The Expert Institute and doing their own expert search, Class Counsel also met telephonically with Dr. Fred Pickel, the ratepayer advocate in the Office of Public Accountability. He recommended two additional consultants who Class Counsel vetted and interviewed. Dr. Pickel also recommended John Reed from Concentric Energy Advisors (who Class Counsel had already identified) and understood them to be well-qualified.

For each and every candidate, including Concentric, Class Counsel conducted a conflict check to ensure the candidates had no prior relationships with the City Attorney Office, Jack Landskroner, Michael Libman, Paul Paradis, Paul Bender, Siva Thoppe, Aventador or Ardent Cyber Solutions.

After eliminating consultants that had potential prior working relationships with the City or were ill equipped to handle a project of this size and complexity, Class Counsel narrowed the list, ultimately selecting Concentric Energy Advisors.

*B.*      *Concentric Energy Advisors*

On November 4, 2019, Class Counsel retained Concentric Energy Advisors ("Concentric"), a well-established regulatory and utility consulting firm with offices throughout the East Coast, to

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

7

Exhibit 13
553

assist in evaluating the overall fairness of the settlement and verifying the work of the LADWP and the court appointed monitor (Bender).

### 1.     Concentric's Project Team

The project team assigned to the *Jones* case is comprised of team leader Gregg Therrien, a former utility rates director with extensive experience implementing new billing systems and rate changes for regulated utilities. He also has experience with forensic billing investigations that required developing extensive databases and analysis to determine the affected population of customers and the amount of over-or-under billing charges. Mr. Therrien is supported by Ben Davis and Marisa Ihara.

Mr. Davis has extensive experience with utility regulation and is uniquely qualified to assist in solar panel matters. Ms. Ihara has extensive and deep understanding of customer systems and database tools. One of Ms. Ihara's past engagements required the consolidation of several rate divisions into a consolidated rate class. This required multiple rate and bill impact iterations, overall revenue analysis, and comprehensive regulatory compliance filings. Additionally, Concentric's Chairman and Chief Executive Officer, John Reed, will serve as Senior Advisor and provide oversight and guidance on the project.

Concentric routinely supplements the team with qualified advisors, consultants and analysts as the scope and nature of the engagement develops. The team's curriculum vitaes are attached to the accompanying Declaration of Gregg Therrien as Exhibits 1, 2 and 3.

### 2.     Scope of Work – Phase One

Concentric's current scope of work includes an investigation into the following:

i.      whether the population of affected LADWP customers has been accurately determined;

ii.     whether the affected customers' rate credits have been calculated accurately and fully, including whether the methodologies and assumptions employed by the LADWP were reasonable and fair to the consumers and whether the data used to calculate refunds/credits was viable and accurate to begin with (to the extent it can be determined);

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

8

Exhibit 13
554

iii.    whether the refunding of these credits has been performed accurately and fully, and

iv.    whether the affected solar customers' bills are accurate and whether solar interconnection delays caused by the LADWP were properly compensated to those affected solar customers.

Concentric will also perform the following work in the course of their investigation:

i.    Test the 100% refund promise by selecting a statistically relevant sampling to make certain that the LADWP properly read meters, properly evaluated its own service, and properly issued bills to its own customers;

ii.    Review a certain set of pre-September 2013 billing records of LADWP customers to make certain that, before September of 2013, LADWP customers were receiving accurate bills, and

iii.    Evaluate every aspect of the settlement, including a review of refunds/credits to the following subclasses and Rule 17 recipients:

a)    *Overbilled Subclass* – all LADWP customers that were overbilled as a result of being charged an icorrect rate, incorrect amount of consumption, incorrect utility tax rate, or who did not have a discount applied;

b)    *Incorrect Fee Subclass* – all LADWP customers who were charged an incorrect fee, including but not limited to late payment fees, reconnect fees, and/or start service fees;

c)    *Unrefunded Balance Subclass* – all LADWP customers who had closed accounts with credit balances and are owed refunds that have been withheld during the period of September 3, 2013 to the date of final approval;

d)    *Solar Subclass* – all LADWP customers who have solar systems and applied to participate in the Solar Photovoltaic Incentive Program from February 13, 2010 to the date of final approval and (i) experienced delay beyond 30 days after submission of the complete Incentive Application and

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

9

Exhibit 13
555

Supporting Documentation and/or indication that the solar system was fully permitted and ready for inspection in receiving a reservation confirmation and/or connecting to the solar system; and/or (ii) have not been billed for energy consumed and/or generated; and/or (iii) have not been credited for excess energy generated by the customer's solar power system. Specific to the consultant's potential role, this will also include a review of the solar refunds to make certain those harmed customers were properly compensated (including, but not limited to, generation provided by those solar facilities).

e)      *Premise Condition/Estimated Bill Subclass* – all LADWP customers that (i) unbeknownst to the customer, had a premise condition that caused excessive consumption of water and/or power; (ii) received estimated bills for multiple billing periods after September 3, 2013; (iii) because of these estimated bills were prevented from timely discovering the premise condition; and (iv) were charged greater quantities of water, power or sewage than they otherwise would have been charged.

f)      *Automatic Bill Payment/Bank Overdraft Charge Subclass* – all LADWP customers that (i) enrolled in automatic bill payment plan with a bank and (ii) were charged overdraft fees because the LADWP charged the customer an incorrect amount, which caused the customer's bank account to be overdrawn;

g)      *Omnibus Subclass* – all LADWP customers who believe they were (i) incorrectly assessed a charge for power, water, sewage or sanitation services at any time between September 3, 2013 – the date of final approval that is not covered by any of the Subclasses listed herein; or (ii) otherwise damaged as a result from their participation in the LADWP's solar incentive program at any time between February 13, 2010 to the date of final approval;

h)      *Amended Rule 17* – all LADWP residential and commercial customers who have been back-billed (i.e., received no bill for more than

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

10

Exhibit 13
556

one billing cycle) at any time between  September 11, 2015 through January

2019 who should have received a refund or credit for any amounts billed in

excess of 3 billing cycles (customers billed bi-monthly) or 6 billing cycles

(customers billed monthly);

    iv.     Concentric will also assist Class Counsel in developing confirmatory

discovery that is sufficiently tailored to obtain the responses necessary to

confirm the City has complied with the provisions of the settlement.

Naturally, as their investigation proceeds, there maybe adjustments to the scope of work,

but this initial proposal sets the stage for verifying the refunds/credits that have been disbursed thus

far, which will go a long way toward helping Class Counsel evaluate the overall fairness of the

settlement.

**3.**    <u>**Plan for Concentric in Next 90 Days**</u>

The duration of Phase One has yet to be determined. Per their agreement, Concentric will

estimate the duration of Phase One in approximately thirty days which gives them sufficient time

to bring themselves up to speed. However, Class Counsel has demanded that Concentric move as

quickly as possible to fulfil Phase One objectives with a 90-day target in mind. Whether Concentric

is able to meet these goals within 90-days depends largely on how quickly the City can provide

Concentric with the access it needs to do its job. Class Counsel has already requested access for

Concentric; however, the City requires further detail about the type of information Concentric

needs  before it can grant access to data and LADWP employees. To resolve this issue, the

immediate plan is for Concentric to meet with Mr. Thoppe to learn more about the technical

aspects of the refund/credit methodologies and process. Then, Concentric will meet with the City's

outside counsel to identify the specific information they need to perform their tasks.

Assuming the City cooperates fully with Concentric and in a timely manner, Class Counsel

has requested that in the next 90-days Concentric dissect each subclass and make determinations on

whether the stated goals of the settlement have been met.  As Concentric reaches final conclusions

on any portion of the settlement, Class Counsel will advise the Court either on an ad hoc basis or in

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

11

Exhibit 13
557

their regularly scheduled reports to the Court (e.g., Joint Status Reports and quarterly reports). Class Counsel will continue to outline plans for future work as the project unfolds.

In the event Concentric identifies areas where the class has not been fully or fairly compensated, the goals of the settlement have not been reached, or other problems or flaws exist, Class Counsel will propose a plan for remediation and correction which can become part of any final resolution or amendment to the settlement.  In the event that Concentric concludes the class, or any subclass, has been fairly compensated, the terms have been adequately complied with, and there are no substantial problems, Class Counsel will outline a plan of action for closure and finalization of these issues.

In addition, and as discussed in greater detail herein, Concentric is also involved in checking the work of Bender and the City with respect to Rule 17.  Because Class Counsel has already identified, with the assistance of Bender and Thoppe, areas where Rule 17 claims were excluded (September 3, 2013 – September 10, 2015), withheld (zero bill/zero consumption) or otherwise not fully and fairly compensated, Class Counsel will endeavor to resolve these issues with the City or, if resolution is unsuccessful, continue litigating these claims.

4.   **Neutrality and Payment**

Class Counsel has filed concurrently herewith a declaration from Gregg Therrien indicating that Concentric has done no prior work for the City, has no prior relationships with any party, individual, or entity currently or formerly involved or associated with the *Jones* action, and are free of any influence from the City.

The City has agreed to pay Concentric's fees for Phase One; however, Class Counsel has executed the contract with Concentric and is initially responsible for paying Concentric's fees to ensure there is no legal relationship between Concentric and the City. Class Counsel will seek reimbursement from the City as the fees are owed. Class Counsel is responsible for developing the goals and tasks of this project and for supervising Concentric's work. The City has no control or influence over the project. Moreover, Class Counsel has specifically directed Concentric that they are to have no preconceived direction on the outcome and that their work is to be neutral.  It is the goal of Class Counsel to make certain that Concentric does their work in a fair and equitable

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

12

Exhibit 13
558

manner with an eye towards a fair result.  Moreover, as Class Counsel stated before, settlements are not necessarily perfect. The goal is not to identify nominal errors, but instead evaluate the best result possible that can be achieved under the circumstances.  This goal has been communicated to Concentric.

**C.     *Statistician***

Class Counsel reported in its 90-Day Report that there may be a need for a statistician to help identify a statistically relevant sampling of customers and ratepayers.  Concentric has not yet determined whether it needs a statistician.  They have indicated that it may be necessary for them to check all of the accounts and not just a statistically relevant sample. Nevertheless, Class Counsel has selected an experienced statistician from Cal Tech who has agreed to work on this project if needed. Class Counsel will refrain from identifying this expert until and unless he is called upon.

**III.**

**RULE 17: DISPUTED ISSUES**

**A.     *Recap of Rule 17 Issues Outlined in the 90-Day Report***

In the 90-Day Report, Class Counsel provided a thorough overview of the issues arising from the Amended Rule 17 (also  known as "back-billing") provisions of the settlement. Specifically, Class Counsel expressed concern about the following issues which are still relevant today:

**1.     The Case of the Mysteriously Increasing Rule 17 Refunds**: Shortly before Class Counsel was appointed, Paul Bender attended a meeting with the LADWP on or about April 9, 2019 wherein he learned for the first time that the Rule 17 credits/refunds were estimated at $24 million, or more. (Declaration of Independent Court Monitor, Post April 9-11, 2019 Site Visit, 4:24-5:6, on file with the Court.) Prior to that meeting, the LADWP calculated the payments at approximately $950,000. On April 17, 2019, new Class Counsel was appointed and began working with Mr. Bender. Shortly thereafter, the LADWP determined the total amount of Rule 17 credits/refunds was closer to $39 million.[4]

---

[4] At one point in April 2019, Rule 17 refunds/credits were approximately $50 million but deductions were made for the zero bill/zero consumption credits ($8M), accounts that were potentially fraudulent and other

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

13

Exhibit 13
559

This huge jump in value within a short period of time was a mystery to Class Counsel at the 90-Day mark and remains a mystery to this day. If the LADWP grossly underestimated the amount of Rule 17 refunds the first time around, what other claims were underestimated and escaped detection?  Class Counsel will invest significant time in the months ahead investigating this issue through confirmatory discovery and with Concentric's assistance. Obviously, this mysterious jump factored heavily into Class Counsel's decision to retain independent consultants to verify the LADWP and Bender's work.

     **2.**     **The Excluded Back-Billing Claims**: Another area of concern was the express exclusion of back-billing claims for the period of September 3, 2013 – September 10, 2015. These were back-billing claims that fell squarely within the Amended Rule 17 definition of back-billing and the alleged class period.  The carve-out for this time period was a red-flag to Class Counsel from the start.  As discussed below, evidence has recently come to light that potentially explains why these extremely valuable back-billing claims were excluded: Mr. Landskroner appears to have used his insider knowledge of these claims to leverage significantly more attorney fees than his Lodestar could justify. The City continues to deny that it excluded this time period because of Landskroner's demands, but an August 1, 2015 email from the City's outside counsel suggests otherwise. Class Counsel intends to further investigate the reasons why this time period was excluded.

     **3.**     **The Abandoned $8 Million**: A third area of concern was the City's decision to pull the plug on $8 million in credits/refunds owed on zero-bill/zero-consumption claims.  The *"Zero Bill"* and *"Zero Consumption Bill"* scenarios refer to instances where (1) – the charges for electric and water services are listed as zero dollars (zero bills) or (2) a bill contains minimum fees and charges but shows "zero" for electricity or water consumption ("zero consumption"). The City claims it stopped deployment of these refunds/credits because they were rectified through the cancel-rebill process and, the City argued, cancel-rebill claims are carved out for the *Macias* action. Class Counsel argued in the 90-Day Report (and in several briefs filed since then) that there is no

---

"exceptions" such as credits/refunds that were already applied by the LADWP because customers had called to complain.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

14

Exhibit 13
560

significant difference between receiving no bill at all and receiving a bill that says "zero" for either charges or consumption. Both scenarios undermine the stated purpose behind amended Rule 17 which is to provide timely and accurate bills. The "cancel-rebill" component should not factor into providing these refunds/credits to the customers under Rule 17.

**B.**     ***There is Substantial Evidence that Supports Class Counsel's Conclusion that Certain Claims Were Intentionally Excluded from Jones.***

After expressing initial concerns in the 90-Day Report about potentially excluded claims, Class Counsel did a deep dive into the pleadings, correspondence, demand letters, and numerous revisions to the settlement to determine that the *Jones* action always contemplated claims going back to September 3, 2013 and had alleged back-billing, zero-bill/zero consumption (among other claims eventually excluded) from the start. This supports Class Counsel's argument that certain key claims were alleged and then abandoned. The question is why? The answer to that question came in the form of an explosive email from the City's outside counsel on August 1,2015 which essentially establishes that former class counsel Jack Landskroner knew the back-billing claims would have a huge financial impact on the City if the City were forced to issue refunds, and he used that knowledge to his advantage.

**1.     The Original and Amended Jones Complaints contained allegations of Back-Billing and Zero Bill/Zero Consumption during the relevant class period of September 3, 2013 forward.**

When the *Jones* action was filed on April 1, 2015, the original complaint – which everyone now knows was largely drafted by Paradis/Kiesel and handed on a silver platter to Landskroner and Libman – was specifically designed to consume each and every claim that were in the four previously filed actions: *Kimhi, Bransford, Morski, and Fontaine* (see fn. 1, *infra*.) As such, the original *Jones* complaint contained every possible claim, even ones that were eventually excluded from the final-approved settlement. For example, the original *Jones* complaint contained allegations of "delayed billing" which is the same as "back-billing."  The original *Jones* complaint also alleged the problematic billing existed *before* and *after* the CC&B system took effect on September 3, 2013.  (See *Jones* Complaint, filed April 1, 2015, at ¶¶ 2-5, on file with the Court.)

---

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

15

Exhibit 13
561

However, the demand letter, sent the very next day, did not reference delayed billing (i.e., back-billing) as one of the subclasses. Why allege "delayed billing" claims in the complaint but not include them as a subclass in the demand letter?

On or about June 12, 2015, Landskroner and the City had reached a settlement, except for the issue of attorney fees. We do not know what happened during those 71 days of negotiations with respect to back-billing claims and the time period of September 3, 2013 – September 10, 2015. All we know is that on August 17, 2015, Landskroner filed an Amended Complaint that continued to allege problems with "delayed billing" (aka Back-billing) but conveniently omitted victims of said billing from the list of subclasses (like the demand letter), and it blamed every problem exclusively on the CC&B system (i.e., no mention of problems existing before September 3, 2015). (See generally, Amended Complaint, filed August 17, 2015, on file with the Court.) Interestingly, the Amended Complaint did contain a subclass called "Estimated Electric Bills with "Minimum Charge" Subclass" which encompassed "all LADWP residential and small commercial customers: (i) *whose consumption was estimated to be zero.*" (Amended Compl., pp.24-25.) This subclass was also included in the initial version of the settlement submitted to the Court for preliminary approval on August 17, 2015. However, the subclass is missing from the Revised Settlement that obtained final approval. This "minimum charge" subclass essentially mirrors the zero bill/zero consumption claims at issue today.

### 2. Landskroner Leveraged Back-Billing Claims to Negotiate Attorney Fees.

Sometime between June 12, 2015 and August 1, 2015 discussions commenced regarding attorney fees. This is apparent because on August 1, 2015, outside counsel for the City sent an email to the City which reveals the City was faced with considerable financial/economic impact if forced to reimburse "back-billed" accounts, which Paradis valued at the time to be in the range of $80-120 million. (See Exhibit 83 to the Deposition of Eskel Solomon, on file with the Court.) The August 1, 2015 email also establishes that Landskroner threatened "to leverage the back-billed accounts issue" to secure attorney fees that would be indefensible given the amount of time/effort he put into the case; City's outside counsel deems Landskroner's maneuvers tantamount to "blackmail." (Id.)

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

16

Exhibit 13
562

It is obvious, based on what it has reviewed thus far, that the City and Landskroner ultimately compromised on the back-billed account issue by excluding the 9/3/2013-9/10/2015 time period (which would minimize the financial impact on the City) and including the 9/11/2015 – 11/18/2016 time period (which would increase the overall value of the settlement and help justify Landskroner's fees). It is equally apparent that the September 11, 2015 date which kicked off the current refunds/credits was arbitrary (it happens to be the date of the first preliminary approval hearing – but the Court did <u>not</u> approve the settlement at that time).

In short, Landskroner did not act in the best interests of the class and the City did not act in furtherance of its goal to fully refund the ratepayers when they agreed to exclude these claims from the *Jones* Settlement. In an effort to find a remedy for the class on these issues, Class Counsel initiated mediation with the City and invited Mr. Himmelfarb, counsel in the *Macias/Morski* class actions to join in the negotiations. Class Counsel included Mr. Himmelfarb because he eventually incorporated the excluded claims and time period into the *Macias* action. The purpose of mediation was to find a resolution to the disputed Rule 17 issues: (1) back-billing and zero-bill/zero-consumption from September 3, 2013 – September 10, 2015 and (2) immediate payment of the $8 million in zero-bill/zero-consumption for September 11, 2015 – January 24, 2019.

## C.     The Dispute Over Class Counsel's Authority to Investigate the Excluded Claims.

On August 27, 2019, the City, Class Counsel in *Jones*, and Mr. Himmelfarb attended a mediation with Hon. Carl West. At first it appeared that Mr. Himmelfarb was amenable to working with Class Counsel to settle the disputed Rule 17 issues. However, after the August 2019 mediation, things fell apart when Mr. Himmelfarb tried to settle all of his claims directly with the City and filed a request for clarification from the Court regarding Class Counsel's authority to examine claims intentionally omitted from the class settlement, including the aforementioned Rule 17 issues. Specifically, Mr. Himmelfarb argued that he negotiated the carved-out claims and that Class Counsel exceeded the scope of their authority by investigating and attempting to resolve them.

After extensive briefing and oral argument, the Court ruled on October 18, 2019 that his order appointing Class Counsel clearly and unambiguously granted Class Counsel the power to

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

17

Exhibit 13
563

investigate all aspects of the settlement, including whether prior class counsel acted in the best interest of the class and whether the settlement was fair, reasonable and adequate. (See Notice of Ruling re October 18, 2019 Hearing, on file with the Court.)  Thereafter, Mr. Himmelfarb agreed to return to mediation with Class Counsel and the City.

**D.      The Current Status of the Disputed Rule 17 Issues.**

Class Counsel has spent the majority of the last four months investigating and mediating these Rule 17 issues with the City and Mr. Himmelfarb. Class Counsel attended multiple mediation sessions with the City and two day-long mediations with the City and Mr. Himmelfarb. Class Counsel and Mr. Himmelfarb also sent the City a joint settlement demand on the disputed Rule 17 issues, which the City presented to the Board on November 19, 2019. On November 22, 2019, the City responded to the settlement demand by rejecting Class Counsel's proposed resolution for the excluded time period of 2013-2015. The City is willing to continue mediating the $8 million in zero-bill/zero consumption claims for the time period of September 2015 – present. Class Counsel contends there are no issues left to mediate. Class Counsel will now move forward with formal discovery on these issues and will bring the disputed legal issues to the Court for resolution.

Lastly, as indicated above, there are numerous other issues about the settlement which have not yet been addressed by the consultants or Class Counsel and, it is possible but not certain, that other areas of the settlement will need clarification or amendment.  The disputed Rule 17 issues are only a small slice of the settlement that Class Counsel is addressing at this moment in time.  Class Counsel will continue to investigate the other aspects of the settlement, both what the settlement includes and potentially excludes, in due course and with due diligence.

## IV.

## <u>CREDITS AND REFUNDS PAID TO CLASS MEMBERS TO DATE</u>

Part of our duties as Class Counsel is to ensure that credits and refunds identified prior to our appointment were appropriately distributed to the class members. Additionally, Class Counsel is obligated to ensure the LADWP and its billing system is operating efficiently and in compliance with the settlement, particularly Rule 17. To that end, Class Counsel has requested from the City a complete report of all credits/refunds paid to class members to date. Part of Concentric's work will

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

18

Exhibit 13
564

focus on verifying that the refunds/credits were identified using the appropriate methodologies and assumptions.

**A.      Overview of Amounts Paid to Each Subclass**

According to the City, the LADWP has issued approximately $106 million in refunds/credits to the following subclasses:

| SUBCLASS | TOTAL AMOUNT APPLIED | REFUNDS/CREDITS COMPLETE? |
|---|---|---|
| **Pre-Identified** | | |
| 1. Overbilled | $25,284,733.03 | Yes |
| 2. Incorrect Fee | $18,774,920.09 | Yes |
| 3. Unrefunded Balance | $17,002,451.43 | Yes |
| 4. Solar | $5,582,075.53 | Yes |
| **Claims Made** | $942,785.22[5] | |
| 5. Premise Condition/Estimated Bill | | Yes |
| 6. Automatic Bill Payment/Bank Overdraft | | Yes |
| 7. Omnibus | | Yes |
| 8. Rule 17 (September 11, 2015 – Present) | $38,434,658.90 | Ongoing but nearly complete[6] |
| **TOTAL CREDITS/REFUNDS APPLIED TO DATE** | **$106,021,624.20** | |

These numbers are, of course, subject to confirmatory discovery.

**B.      Continuing Rule 17 Violations**

In his report filed on November 22, 2019, Court Monitor Paul Bender Class Counsel reported:

> It is our understanding that, in January 2019, LADWP implemented the necessary CC&B system and manual processes to attempt to ensure that there are no ongoing violations of Rule 17. All credit amounts referenced above were calculated as of the January 2019 cut-off date. Therefore, as we recommended, LADWP recently queried the billing system to determine if there were any more Rule 17 violations since January 2019. *Three million dollars, an average of $300,000 per month, of additional potential Rule 17 violations were discovered through this process over a 10-month period*, which the LADWP is now reviewing. We will monitor this review

---

[5] The total amount of refunds/credits for all claims-made subclasses is approximately $900,000; however, Class Counsel does not yet know how that total breaks out for each claims-made subclass.
[6] Further detail about the current Rule 17 refunds/credits is provided in the Joint Status Report and Court Monitor Paul Bender's Quarterly Declaration filed on November 22, 2019.

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

19

Exhibit 13
565

process to ensure that Rule 17 violations are identified and credited appropriately. (Declaration of Court Monitor, November 22, 2019, ¶ 7, on file with the Court) (emphasis added).

The City reports that it is conducting a manual review of the $3 million to ascertain whether they are true Rule 17 violations. In any event, Class Counsel believes these potential violations – to the tune of $3 million over 10 months – is a serious concern, particularly given the overall distrust the LADWP customers have of the department and its billing practices in general. Class Counsel will continue to work with the LADWP, the Court Monitor, Concentric, and KPMG to determine whether these "potential" violations are actual violations that need to be refunded/credited to the customers.

## V.

## <u>REPORT ON CLASS COUNSEL'S WORK WITH</u>

## <u>SPECIAL MASTERS, AUDITORS, AND THE COURT MONITOR</u>

**A.** *Special Master Barbara Barkovich, Ph.D.*

Under the terms of the settlement, Barbara Barkovich, Ph.D., was appointed as the independent Special Master responsible for conducting all reviews requested class members of their individual claims ("Special Master Review"). (RCAS, 53-54.) The settlement further provides that Dr. Barkovich is to obtain the information necessary to review the claims de novo and make a decision based on a preponderance of the evidence. (Id.) The Special Master is to mail her determination letters to the individual class members and submit all determinations to the Court in the form of a "Report and Recommendation." (Id.) Additionally, any class member who wishes to appeal Dr. Barkovich's determination shall submit a letter to the court requesting a review. (Id.)

Class Counsel is included in the daily emails between Dr. Barkovich and the City. The City appears to cooperate with Dr. Barkovich, promptly providing her with the requested documentation and/or answers to her questions. Class Counsel has also reviewed final determinations issued by Dr. Barkovich. While Dr. Barkovich appears to do a thorough analysis of each claim, the vast majority of the determinations thus far have been in favor of the LADWP. It is entirely possible these determinations are fair and accurate; however, Class Counsel will investigate this issue

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

20

Exhibit 13
566

further with the assistance of Concentric. One of the questions Class Counsel has is whether the documentation and bills submitted to Dr. Barkovich is correct/accurate in the first place.

The following is an update on Dr. Barkovich's work as of November 22, 2019[7]:

| | |
|---|---|
| Total Number of Claims Received for Review | 267 |
| Total Number of Determinations Made (as of Nov. 22, 2019) | 185 |
| Total number of reviewed claims deemed in favor of DWP | 152 |
| Total number of reviewed claims deemed in favor of customers | 33<br><br>Note: the LADWP reported in April 2019 there were approximately $1200 in credits paid to the claims sent for review; however, it is unknown at this time whether additional credits are owed. |
| Total number of decision letters sent out to date: | 131<br><br>Note: per the City: 43 of the remaining 54 determinations will be sent out by November 27, 2019; the remaining 11 are being held pending a further response or determination by the LADWP. |
| Total number of customers who have requested an appeal to the court: | 5 |

Dr. Barkovich's work is nearly complete. Once she has made final determinations on all of the claims she has received, per the Court's prior direction, the parties will file Special Master Barkovitch's Report and Recommendation. At that time, the appeals will also be presented to the Court, under seal, for determination.

---

[7] These numbers differ slightly from those reported by Mr. Bender in his Declaration of November 22, 2019. Mr. Bender did not have the most recent numbers (his numbers are from November 6, 2019). The City was able to obtain the most recent numbers from Ms. Barkovich and KCC.

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

21

Exhibit 13
567

***B.***      ***Special Master Ed Robbins***

Class Counsel has been cooperative with the Special Master Robbins and provided him and his team with whatever they need.  The respect and relationship between Mr. Robbins and Class Counsel has been mutual. Class Counsel will continue to cooperate fully with Mr. Robbins' investigation.

***C.***      ***KPMG***

Pursuant to the terms of the settlement, the City engaged the services of KPMG to audit the CC&B System to test whether it is billing customers timely and accurately.  KPMG began its work with the City in April 2019.  Since their appointment, Class Counsel has met with KPMG twice and received updates that appear to confirm that the CC&B System is operational. However, Class Counsel reserves any final observations until KPMG issues its final report in December 2019.

***D.***      ***Independent Court Monitor Paul Bender***

1.      <u>**Observations on the Court Monitor's Performance**</u>

Paul Bender was appointed as the Independent CC&B Billing System Monitor pursuant to the terms of the settlement.  Class Counsel has interviewed both Mr. Bender and his colleague Siva Thoppe on numerous occasions and has seen first hand how he works with Mr. Thoppe to ensure the City is meeting the goals set forth in the settlement, including issuing nearly $38 million in Rule 17 refunds/credits for the September 11, 2015 – January 2019 period.  Mr. Bender and Mr. Thoppe appear relentless in their oversight of the City, requiring detailed explanations of why certain refunds/credits have not been paid and demanding answers as to how the City intends to manage phase 2 of the CC&B system implementation. On the last point, the City has repeatedly assured Class Counsel that the LADWP will not upgrade the CC&B system (phase 2) until the Rule 17 credits/refund process is complete. Furthermore, the City has assured Class Counsel that it will keep both Mr. Bender and Class Counsel updated on the status of the phase 2 implementation. Class Counsel (and Mr. Bender) believe it is imperative that any upgrade to the CC&B system be done with proper oversight both internally and with outside consultants to ensure that the CC&B fiasco that occurred in 2013 does not occur again. Additionally, Mr. Bender and Mr. Thoppe alerted Class Counsel about certain Rule 17 issues, including the $8 million in refunds/credits for

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

22

Exhibit 13
568

zero bill/zero consumption class members that were slated to be disbursed but then withdrawn by the City at the last minute.[8]

While Mr. Bender and Mr. Thoppe have appeared diligent in performing their duties, Class Counsel believes it is necessary for Concentric to review Mr. Bender and Mr. Siva's work to ensure they did not simply rubber stamp whatever methodologies the LADWP devised to identify affected accounts. Class Counsel made this intention clear to Mr. Bender from the start. Mr. Thoppe has already met with Concentric to begin this process.

### 2.   Opinions/Recommendations re Issues Raised in Pansky's Report re Bender.

Recently, Ellen Pansky, an ethicist retained by the City of Los Angeles to offer opinions concerning ethical issues involved in this case, released a report which will be discussed in some detail below.  However, a portion of that report raised questions about Mr. Bender's impartiality because one of his declarations to the Court was prepared by Paul Paradis.  It is Class Counsel's opinion that this single declaration, by itself, is insufficient evidence of any wrongdoing by Mr. Bender. Attorneys prepare declarations for experts all the time. Nevertheless, the fact that Paradis was involved with a declaration definitely warrants further investigation. However, Class Counsel believes the job of investigating Mr. Bender's impartiality/veracity should be left to Special Master Robbins. Class Counsel will reserve any judgment until Special Master Robbins and/or the Court render an opinion.

Additionally, Class Counsel believes terminating Mr. Bender at this late stage would be disruptive to the class, particularly if the Special Master or the Court have not yet weighed in on the matter.  Mr. Bender and Mr. Thoppe will soon conclude their work on current Rule 17 credits for the  September 11, 2015 – January 2019 time period. Little remains in Mr. Bender's scope of work and contract budget. Class Counsel also believes that Mr. Bender should be paid for his work until and unless he is removed by the Court.  While Class Counsel does not support Mr. Bender's removal at this time, Class Counsel may recommend retaining the services of Mr. Thoppe (without Mr. Bender) to work on final details of the settlement, including any settlement involving

---

[8] The City clams it stopped short of issuing the $8 million in zero bill/zero consumptions credits because there was ambiguity as to whether the refunds/credits were part of the *Jones* or *Macias* action.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

23

Exhibit 13
569

additional Rule 17 credits/refunds for the 2013-2015 period (if resolution is successful). In any

event, Concentric will act as a check and balance system with respect to Mr. Bender and Mr. Siva's

work.

In short, Class Counsel believes that removing Mr. Bender this close to the finish line is not

in the best interests of the class, and once Mr. Bender has completed his current work, which will

be in the near future, there will be no need for his services. However, Class Counsel reserves the

right to change this plan depending on what may occur going forward.

### VI.

### STATUS OF CLASS COUNSEL'S WORK RELATED TO PRIOR COUNSEL FOR THE
### JONES CLASS AND THE CITY OF LOS ANGELES

**A.**     *Jack Landskroner/Landskroner, Greico, Merriman*

Based on evidence produced thus far, Class Counsel believes Jack Landskroner and his law

firm, Landskroner, Greico and Merriman (LGM) were selected by Paul Paradis to represent Mr.

Jones after the City's outside counsel raised concerns about dual representation.  However, it is

unknown whether Mr. Kiesel previously knew Landskroner or played any role in selecting him as

class counsel.  Class Counsel is aware of additional evidence pertaining to the relationship between

Paradis and Landskroner during the course of the *Jones* action that may be relevant to Mr.

Robbins' investigation; however, Class Counsel cannot divulge that evidence at this time because

Paradis has asserted work product objections that are currently pending before the Court of Appeal.

When Class Counsel was appointed in April 2019, it was ordered to prepare an Order re

Accounting for both Jack Landskroner individually and his law firm LGM. Class Counsel was also

instructed to pursue any motions necessary to obtain the documents Landskroner and LGM had

been ordered to produce. With respect to the Court's Orders re Accounting, Class Counsel provides

the following update:

1.  Almost immediately after being ordered to produce an accounting on April 10, 2019,
    Mr. Landskroner asserted the Fifth Amendment and refused to produce any
    documents in his individual capacity. LGM, on the other hand, produced

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

24

Exhibit 13
570

approximately 12 boxes of hard copy documents and over 3,000 pages of electronic documents including receipts and other documentation to support LGM's claimed case costs.

2. Class Counsel has reviewed LGM's document production and prepared indices. In addition, Mr. Landskroner recently produced two binders consisting of emails, internal notes and memoranda as well as an accounting that shows how LGM disbursed the fees it received from the *Jones* settlement. The accounting shows that LGM distributed the $19 million in fees to the attorneys in the related class actions pursuant to the settlement agreement and fee applications. The accounting also shows that LGM received a little over $10 million in fees, from which Mr. Landskroner and his partners received certain percentages as partner distributions. But that is where the money trail stops. At this point, Class Counsel does not know how Landskroner, Greico, or Merriman distributed their partner shares once the money hit their personal bank accounts.

3. Based on an initial review of LGM's accounting, emails and documents, Class Counsel is satisfied that Mr. Landskroner and LGM have complied with the order against LGM with the only reservation being that additional documents may come to light which Class Counsel is not aware. Class Counsel has cross referenced documents and emails and can find no emails or documents which refer to other documents or emails which have not yet been produced. Class Counsel has not retained an electronic discovery expert but reserves the right to retain one in the future to do a more thorough review of the document production.

4. The documents produced by Landskroner and LGM, except for a subset of documents for which Paradis is claiming work product protection (more on this issue below), have been provided to and copied by Special Master, Ed Robbins.

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

25

Exhibit 13
571

5.  While LGM appears to have complied with the order issued against it, Mr. Landskroner's compliance with the order issued against him personally is the subject of ongoing debate. Specifically, Class Counsel contends Mr. Landskroner has failed to comply with paragraph 3 of the written order signed by the Court on May 7, 2019. Paragraph 3 requires Mr. Landskroner to produce: "All documents reflecting disbursements made from any sums received *by Mr. Landskroner* and/or Landskroner Greico Merriman, LLC to anyone including all parties, individuals and/or entities in connection with *Jones v. City of Los Angeles, et al.* (BC577267) and all related matters." (Order, May 7, 2019, at ¶ 3, emphasis added). Thus, we cannot verify whether Mr. Landskroner used any of his personal funds received in this case to pay any illegal referral fees or kickbacks to any individual or entity.

6.  In June 2018, Class Counsel filed an ex parte application for an OSC re contempt against Mr. Landskroner, which was later turned into a motion for contempt.  The OSC was based on the grounds that while Mr. Landskroner may have asserted the Fifth Amendment to protect himself from turning over personal or individual documents, he was not immune from turning over any LGM documents in his possession/custody/control. At that time, Class Counsel did not raise the issue of Landskroner producing his personal bank records or personal accounting because he was asserting the Fifth Amendment as to those particular documents and records. Thus, Class Counsel focused instead on obtaining any LGM documents he had in his possession and/or control.

7.  On July 19, 2019, Class Counsel spoke to Ian Friedman, Mr. Landskroner's Cleveland attorney, who indicated Mr. Landskroner was willing to waive the Fifth Amendment as to *any and all documents*. Mr. Friedman also promised, on behalf of his client, that Mr. Landskroner would agree to produce *all documents in response to the Court's order*, including documents previously withheld when Mr. Landskroner

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

26

Exhibit 13
572

asserted the Fifth Amendment – which would include personal and individual documents.

8.  Based on Mr. Friedman's promises to cooperate fully, Class Counsel submitted several stipulations to the Court continuing the contempt hearing to allow Mr. Landskroner the opportunity to produce the documents. The stipulations, which were signed by Mr. Landskroner's attorneys, state that Mr. Landskroner desired to "comply with the Court's Orders." (See Stipulation to Continue Hearing re OSC, dated July 23, 2019; Stipulation to Continue Hearing re OSC, dated September 24, 2019.) Further, Class Counsel specifically told Mr. Landskroner and his attorneys during an in-person meeting at Class Counsel's office on September 23, 2019 that Class Counsel expected the accounting to include documents showing what Mr. Landskroner did with the funds he received as equity shareholder.  As noted above, that detailed accounting of Mr. Landskroner's personal funds was not forthcoming.

9.  On November 22, 2019, Class Counsel and counsel for Mr. Landskroner stipulated to vacating the November 26, 2019 contempt hearing. However, Class Counsel has reserved their right to continue litigating the issue of Mr. Landskroner's personal accounting/financial records and will seek another OSC re contempt if necessary.

10. While Class Counsel is not exonerating Mr. Landskroner from any conduct involved in the case itself (and that is not Class Counsel's job), Class Counsel can confirm that Mr. Landskroner and his attorneys have been cooperative until this final issue regarding Mr. Landskroner's personal funds.  Class Counsel held two in-person meetings with Mr. Landskroner where he answered questions about the settlement and its implementation.

11. Lastly, Mr. Landskroner has a motion to withdraw as class counsel on calendar for November 26, 2019. The parties have asked to continue this hearing to December 2, 2019. Class Counsel recommends the Court remove Mr. Landskroner as class counsel

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

27

Exhibit 13
573

but retain exclusive and continuing jurisdiction over him pursuant to Section III.N.9 until the settlement is deemed complete and the case is closed.

**B.   *Michael Libman***

The Court is aware that Mr. Libman was likely retained by Paul Kiesel to serve as local counsel for Mr. Landskroner who is a non-admitted lawyer (he is admitted to practice in Ohio). Mr. Libman is a California lawyer who, by all accounts, is a personal injury attorney operating effectively as a sole practitioner in Los Angeles. Class Counsel has been unable to make any determination about whether Mr. Libman had prior class experience. In Mr. Libman's deposition taken by lawyers for PwC, Mr. Libman claimed that he was aware of the overbilling LADWP issue as far back as 2013. If accurate, it is unclear why he did not file his own class action against the City.

Presently, there are a number of open issues with Mr. Libman:

1. In response to a Court Order, Mr. Libman produced five boxes of documents. Class Counsel has reviewed the documents which are largely mundane. Class Counsel has not yet determined whether Mr. Libman's documents represent all of the documents in his possession, custody, or control, nor are we able to determine whether he is asserting work product with respect to any documents.

2. Mr. Libman was also ordered to produce an accounting. The accounting he produced is insufficient in that it merely states he received $1.6 million in attorney fees which were disbursed to his firm's account by LGM. Mr. Libman has not produced an accounting showing any sums that were disbursed from his personal account to any party, entity or individual involved in the case. Thus, we cannot verify whether Mr. Libman paid any illegal referral fees or kickbacks to any individual or entity involved in this case.

3. Mr. Libman has retained counsel. His lawyer is John Heller of Rogers, Joseph, O'Donnell located in San Francisco. Mr. Heller as of late October began communicating with Class Counsel on behalf of Mr. Libman.

---

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

28

Exhibit 13
574

4. At the October 18, 2019 hearing in this case, Mr. Libman reported that the third-party administrator, KCC, still listed him as Class Counsel or liaison counsel.  We have been working with Mr. Libman and his lawyer to make those changes; however, even this small issue has been a battle. Class Counsel initially told Mr. Libman it would simply ask KCC to change the contact information from his to Kabateck LLP. However, Mr. Libman rejected that simple solution and took the position that notice should be sent to all class members advising the class that Kabateck, LLP and Brian Kabateck have replaced Mr. Libman and Mr. Landskroner as Class Counsel.  It is Class Counsel's position that this would be a waste of resources and is unnecessary because notice is not required in order to comport with due process under the law.  Class notice is given to provide counsel a way to communicate with the class and comport with due process regarding opt-outs and objections. Class notice is not required when new class counsel is appointed. Class Counsel then proposed a stipulation signed by current and former class counsel and Mr. Libman, stating that the parties agree that KCC can update the contact information without sending class notice. Class Counsel is waiting for Mr. Libman's response. In the meantime, Class Counsel continues to receive calls from LADWP customers who have heard about Class Counsel's appointment through the news or friends and family or have been forwarded by prior class counsel.

5. As noted above, Mr. Libman has produced an accounting which simply indicates that his firm received $1.65 million in attorney's fees.  Class Counsel advised Mr. Libman's attorney that, at a minimum, the accounting would need to demonstrate what monies went to his firm and what monies went to either Mr. Libman personally or third parties. Furthermore, Class Counsel interprets the Court's Order re Accounting as requiring Mr. Libman to produce any documents showing payments from his personal funds to any party, individual, or entity involved in the *Jones* case.  The Court has made it clear he wants to trace the money.  To that end, Mr. Libman's attorney has offered to provide some verification that no monies went to Messrs. Kiesel, Landskroner, Paradis, or others

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
**Case No. BC577267**

29

Exhibit 13
575

involved in this case.  Mr. Libman's attorney also suggested that Class Counsel subpoena the institution that handles Mr. Libman's business finances, requesting any post-*Jones* evidence of payments or disbursements made to Paradis or Kiesel (or any other entity or party involved in the *Jones* case). While this is a good start to complying with the Court's Order, Class Counsel anticipates it will need to issue a subpoena and potentially seek an order from the Court requesting all of Mr. Libman's bank records.

6.  Another open issue is the purported Notice of Lien that Mr. Libman filed on September 24, 2019.  Mr. Libman for the first time asserted a lien for more than $9 million of the class settlement.  Mr. Libman claims that he is entitled to these fees as part of the 29% application process laid out in the settlement which would allow Class Counsel the ability to make an application up to 29% of any additional benefits brought to the class.  During that hearing the Court advised Mr. Libman that the opportunity to make a fee application does not equate to a creditor's right to place a lien on a case, and he advised that Mr. Libman make an application for fees as opposed to placing a lien. To date, Mr. Libman has not removed his lien nor filed an application for fees. At that same hearing, the Court suggested to Class Counsel that they file some kind of motion to strike the lien. Rather than striking the lien, Class Counsel advised Mr. Libman to simply withdraw it. Class Counsel also informed Mr. Libman, through his attorney, that they intend to move to strike his lien if he does not voluntarily withdraw it.

7.  Another unresolved issue is the status of Mr. Libman's deposition. Class Counsel originally scheduled a deposition at the courthouse on October 24, 2019.  However, At the October 18, 2019 hearing, Mr. Libman approached Class Counsel and indicated a willingness to sit down and explain the settlement, to deal with the outstanding issues, and to enlighten Class Counsel.  After that meeting, Mr. Libman retained counsel and then refused to meet.  Mr. Libman's attorney has suggested an informal meeting, which Class Counsel is amenable to doing (and what Mr. Libman previously promised) but

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

30

Exhibit 13
576

Class Counsel will likely have to depose Mr. Libman regardless of any informal meetings or discussions.

8.  Additionally, Class Counsel has advised Mr. Libman that Class Counsel needs to remove him as liaison counsel.  Class Counsel believes it is important the Court and the class retain some jurisdiction over Mr. Libman while issues are pending.  However, there is no reason for him to continue to serve as "liaison" counsel. His appointment as liaison counsel is puzzling because, according to the thousands of documents Class Counsel has reviewed, Mr. Libman's role in this case was limited to acting as local counsel for Mr. Landskroner, filing the complaint (which Mr. Kiesel paid for), filing Mr. Landskroner's pro hac vice, and speaking to a limited number of LADWP customers.  Perhaps the term "liaison counsel" was another way of indicating his role as local counsel.  Nevertheless, Class Counsel has advised Mr. Libman and his counsel that we would like him to resign as liaison counsel or Class Counsel will bring a motion to remove him.  There is nothing left for him to liaise.

## C.  *Paul Paradis*

Mr. Paradis is the original special outside counsel to the City along with Paul Kiesel. Mr. Paradis essentially catfished Antwon Jones with a plan to use Mr. Jones as a class representative in a ratepayer class action against PwC, while simultaneously serving as special counsel to the City who had brought its own action against PwC. Later, when the City's outside counsel raised concerns about dual representation, Mr. Paradis "repurposed" Mr. Jones as a class representative against his own client, the City.  These facts have been established through a mountain of evidence obtained by PwC over the last year.  Moreover, Mr. Paradis has been disruptive of both the orderly investigation of this class settlement as well as the processing of the case.  He retained experienced white-collar criminal defense lawyers whose objective seems to be directed at disrupting this litigation and deflecting attention away from Mr. Paradis' wrongful conduct.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

31

Exhibit 13
577

Unfortunately, Class Counsel has spent a significant amount of time over the last several months battling with Paradis' attorneys as opposed to fighting to protect the class. A summary follows:

1. As discussed above, Mr. Landskroner voluntarily produced his law firm's documents. Additionally, Antwon Jones is in possession of various emails, retainer agreements and other documents that he would like to distribute and publish (Mr. Jones waived the attorney-client privilege). Mr. Landskroner and Mr. Jones provided Class Counsel with a significant number of documents that would be interesting and helpful to Mr. Robbins investigation of the ethical issues in this case; however, Mr. Paradis has asserted a work product privilege over any documents which he authored, sent/received, or was copied on. Thus, Class Counsel has been unable to disseminate this subset of documents which has served only to delay Mr. Robbins' investigation.

2. The subject of the work product protection has been hotly litigated in this case. Class Counsel has taken the position that although Antwon Jones believed Mr. Paradis was his lawyer, Mr. Paradis never intended to represent Jones in any capacity and was simply using Mr. Jones as a vehicle to get into the City Attorney's Office to represent the City as special outside counsel which occurred within days of his retention of Mr. Jones. Class Counsel has also argued that if an attorney-client relationship did in fact exist, Mr. Paradis waived any work product protection because of the obvious conflict of interest in representing both the City and Mr. Jones at the same time.

3. This issue was preliminarily ruled upon by the Court who agreed with Class Counsel. Mr. Paradis took an immediate writ. The Court of Appeal issued an alternative writ directing the Superior Court to review the documents *in camera* and allow Mr. Paradis to supplement his privilege log. The Court followed the Court of Appeal's directive to a "T" and ultimately issued an order explicitly rejecting the work product privilege on each of the documents held by Mr. Jones. Nevertheless, Paradis filed *another* writ petition.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

32

Exhibit 13
578

4. On November 22, 2019, the Court of Appeal issued an order denying Paradis' petition. Accordingly, Class Counsel intends to immediately produce the *Jones* documents. Class Counsel will also repeat its request to Mr. Paradis' counsel that the ruling of the Court of Appeal apply to documents produced by Mr. Landskroner, LGM, and any other future document productions.

5. In addition, Paradis through his lawyers has engaged in other disruptive action, refused to generally cooperate, refused to produce documents, and continues to refuse to answer our questions or make Mr. Paradis available for an interview. In addition, Mr. Paradis has asserted his rights under the Fifth Amendment of the United States Constitution.

**D.    Paul Kiesel**

Class Counsel has had little interaction with Mr. Kiesel. He has not asserted any work product protection, he cooperated in the depositions that were taken in the PwC action. There is no indication that Mr. Kiesel has any particular information that we need at this time. Furthermore, any investigation into his role in the *Jones* action and alleged collusion is the Special Master Robbins' purview. Class Counsel, however, reserves the right to depose Mr. Kiesel in the future.

**E.    Disgorgement of Fees and Payments to Prior Counsel**

The 90-Day Report noted "[i]f Mr. Robbins determines that ethical violations did occur," Class Counsel intends to clawback fees paid to any lawyer, either indirectly or directly, and return them to the ratepayers. (90-Day Report at 7:10-15.) Mr. Robbins has not completed his investigation, however, in September 2019 the City informed Class Counsel that it intended to seek an OSC re Issuance of a Preliminary Injunction Requiring Disgorgement of Attorney Fees against Class Liaison Michael Libman who received approximately $1.6 million and Jack Landskroner and partners of his former law firm which received approximately $10 million. Although Mr. Robbins' investigation is ongoing, Class Counsel had to join the City's motion in order to ensure that any captured fees are returned to the ratepayers and/or used to establish an independent office to oversee the LADWP's billing practices. The hearing on the OSC is set for December 2, 2019.

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

33

Exhibit 13
579

To date, no such motion has been filed against Paul Paradis for payments he received though Paradis Law Group or Aventador/Ardent to serve as project manager of the implementation of the settlement. However, Class Counsel is prepared to seek appropriate relief on behalf of the class of ratepayers in the event the Special Master, or any other official or governmental entity, finds that fees were paid to Paradis under the auspices of fraud. As with any fees disgorged from Landskroner or Libman, Class Counsel intends to return Paradis' fees to the ratepayers or to fund an independent office for the customers' benefit.

## VII.

## **THE PANSKY REPORT**

The City retained ethicist, Ellen Pansky, to prepare a report outlining certain ethical issues.[9] The report predominantly focuses on the conduct of Paradis and Kiesel.  Ordinarily, Class Counsel would not comment on this report but for the fact that the City's retained ethicist made certain comments regarding Class Counsel's work and the settlement which deserves rebuttal:

1. The report misunderstands Class Counsel's use of the term "appearance of impropriety." Class Counsel's 90-Day Report uses this term in the context of there being an appearance of impropriety in the conduct of Kiesel, Paradis, Landskroner, Libman and possibly others inside the City that warrant an evaluation of whether the settlement was fair and reasonable. The report, however, conflated "appearance of impropriety" in the class action settlement with an ethical standard, which is not what Class Counsel intended when it used the term.

2. The report assumes Landskroner did nothing wrong despite evidence that he was hand-picked by Paradis, copied the allegations of the related class actions nearly verbatim, was fed insider information by someone within the City in order to prepare the *Jones* complaint and demand letter, leveraged his knowledge of back-billing issues in order to

---

[9] Ms. Pansky has provided ethical advice to the Kabateck firm for at least two decades. Ms. Pansky and Class Counsel did not discuss this report before it was published.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

34

Exhibit 13
580

negotiate a larger attorney fee award (see discussion below of the August 1, 2015 email from City's counsel) and ultimately did not disclose any of this to the Court at any time.

3.  The report assumed Libman did nothing wrong despite the fact Libman received $1.6 million dollars in fees yet did not participate in drafting any motions/briefs, did not conduct any oral arguments before the court. Further, there is evidence that Paradis and Kiesel actively worked with Landskroner and Libman to draft and file the *Jones* complaint and Libman asked Kiesel who would pay for filing fees (while knowing Kiesel was special counsel for the City). Further, Libman recently admitted to the Court that he never met Mr. Jones, never communicated with Mr. Jones, never retained Mr. Jones, and never had Mr. Jones sign a fee sharing disclosure as required by California Rules of Professional Conduct.

4.  The report assumed the settlement was at all times arm's length and did not warrant a closer look despite the fact the case was settled in 71 days - a feat unheard of in class actions of this size and complexity and without any formal discovery.

5.  The report assumed that the failure to disclose to the Court that the City suing itself was not, in and of itself, a warning sign about the fairness of the settlement to the class.

6.  The report assumed, without independent investigation that Class Counsel is aware of, that staff lawyers at the City were unaware of certain facts and circumstances pertaining to Paradis and Kiesel's actions.

7.  The report assumed the City Attorney's Office was completely oblivious to Paradis and Kiesel's actions.

8.  The report assumed that David Wright, the manager of the LADWP (who took the Fifth Amendment), and other City employees in the LADWP did nothing wrong.

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

35

Exhibit 13
581

9.  The report assumed the no-bid contracts, totaling over $40 million, awarded to Paradis Law Group and Aventador were negotiated at arms-length even though Paradis has no discernible experience in project management and/or cybersecurity.

10. The report assumed that the Rule 17 accounting before new Class Counsel was appointed was accurate when in fact it went from approximately $900,000 in refunds/credits to approximately $38 million around the time new Class Counsel came into the picture.

11. The report assumed the carve-out for back-billing that occurred between September 3, 2013 and September 11, 2015 was appropriate despite evidence that Landskroner leveraged his knowledge of back-billing issues to negotiate a larger fee award and despite the fact that the class period itself started in 2013, not 2015.

12. The report commented on the August 1, 2015 email from the City's outside counsel (Ex. 83 to the Deposition of Eskiel Solomon) which accuses Landskroner of essentially "blackmailing" the City by leveraging his knowledge of the back-billing issues to secure a larger attorney fee; however, the report did not sufficiently attribute any wrongdoing to Landskroner who clearly used his inside information to obtain a larger pay day for himself – a payday he did not earn by providing sufficient services to the class which is clearly outlined in the August 1, 2015 email.

13. The report did not consider whether claims omitted from the settlement were properly excluded.

Class Counsel believes that nothing in the report should slow down or stop our review of the settlement, nor have we received any request or recommendation from the City to discontinue our evaluation of the settlement. Nevertheless, it is important for Class Counsel to highlight the areas of the report that cause concern or are inaccurate. It is also important to note that the report was prepared at the behest of the City and thus should be viewed in that context.

///

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

36

Exhibit 13
582

# VIII.

## ANTICIPATED NEXT STEPS/ACTION ITEMS FOR THE NEXT 90-120 DAYS

It is no surprise to anyone following this case that Class Counsel has a significant amount of work to do in order to reach any final conclusions about the fairness of the settlement. Below are the action items Class Counsel will take in the next 90-120 days to (hopefully) bring this case to a final resolution:

**A.** *Confirmatory Discovery and Depositions*

To date, Class Counsel has learned a significant amount of information about the *Jones* settlement through informal interviews and a review of documents produced either voluntarily or by court order. However, Class Counsel believes it is imperative, particularly in light of the allegations of collusion, that formal discovery take place.

The settlement specifically provides for "confirmatory discovery" as follows:

> The Settlement is subject to Plaintiff Jones completing reasonable confirmatory discovery including, but not limited to, any of the following: (1) requesting that LADWP respond to and produce documents responsive to a request by Plaintiff Jones for the information below and (2) requesting that LADWP provide evidence from designated LADWP representatives in the subject areas of requested inquiry:
>
> ▪ Criteria used for identification of membership in each identified sub-class;
> ▪ The internal methodology, criteria, queries used and data relied upon for the evaluation of all class members' accounts to determine credit or refund eligibility and amount of credit or refund and validation protocols;
> ▪ Reports and all data documenting the total payment of credits and/or refunds issued to customers and from ongoing remediation efforts;
> ▪ Remediation implementation protocols, progress reports, updates, and the metrics generated from reporting; and
> ▪ Such other items as are mutually agreed upon to confirm the fairness, reasonableness and adequacy of the Settlement. (RCAS 48:7-19.)

Now that Class Counsel has retained outside experts to assist in developing appropriate discovery requests and analyzing any responses/data/documents, Class Counsel intends to move forward as soon as possible with the confirmatory discovery process. However, Class Counsel believes formal discovery cannot commence until they have obtained all documents, resolved all

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

37

Exhibit 13
583

issues concerning the Paradis work product objections, and received preliminary reports from Concentric. Nevertheless, Class Counsel is working on a discovery plan that will span all forms of discovery necessary to evaluate the fairness of the settlement and the proper implementation of the existing refunds/credits.

Furthermore, while the settlement does not specifically call for depositions, Class Counsel intends on noticing the depositions of any and all individuals and PMKs of any entities who had any role in formulating, drafting, or negotiating any aspect of the settlement – even if those persons/entities were previously deposed as part of the *City of LA v. PwC* action. If necessary, Class Counsel will seek an order from the Court reopening the discovery process to allow for such depositions and/or written discovery requests.

**B.     Stipulation to Toll the Five-Year Rule – Code of Civil Procedure Section 583.330 (a).**

Class Counsel and counsel for the City have agreed to stipulate that the five-year rule in which to bring a litigation to trial under Code of Civil Procedure, section 583.330 (a), which could theoretically run as early as April 1, 2020, will be stayed. Class Counsel is preparing a stipulation and order for the Court to be filed in early December 2019.

**C.     Continued Work with the Special Masters and Outside Consultants**

To date, Class Counsel has worked cooperatively and successfully with Special Master Robbins, Special Master Barkovich, Court Monitor Paul Bender and Siva Thoppe, and Auditors KPMG. Class Counsel will continue to meet with these individuals and entities on a regular basis to review their work, identify problems or issues concerning class member claims, and obtain final numbers and determinations. Additionally, Class Counsel anticipates spending a large percentage of its time in the ensuing months working closely with Concentric, and possibly a statistician, to verify the veracity of the LADWP's work in identifying refunds/credits as well as Bender/Thoppe's work in monitoring the settlement.

**D.     Evaluation of Settlement Subclasses and Remedial Relief**

In the first six months of its appointment, Class Counsel focused largely on learning the facts, history, and nuances of this complicated case, addressing Rule 17 issues, vetting and hiring independent experts and developing an action plan for evaluating the fairness of the settlement.

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

38

Exhibit 13
584

Moving forward, however, Class Counsel intends to increase its focus on evaluating other aspects

of the settlement, including but not limited to verifying that each of the seven non-Rule 17

subclasses were accurately refunded/credited, determining (to the extent possible) the ramifications

of the broad release of claims, and evaluating the outcome of the LADWP's remedial measures to

stabilize the performance and functioning of the CC&B System. Additionally, Class Counsel will

work with the City to determine whether any of the performance metrics set forth in the settlement

set unrealistic goals the LADWP will not be able to meet.

**E.**      ***Potential Amendments to Settlement and Implementation***

In the event Class Counsel is able to resolve any outstanding claims with the City, including

but not limited to the Rule 17 issues discussed herein, Class Counsel will seek approval from the

Court and, if approved, oversee implementation, with the assistance of outside experts and/or

possibly Siva Thoppe, of any additional refunds/credits owed to the class.

**F.**      ***Class Members Contesting Determinations by Special Master Barkovich***

The settlement provides that any class member who wishes to contest Special Master

Barkovich's determination of that class member's claim "shall submit . . . a letter to the Court

requesting a review by the Court, stating the grounds for disputing the determination and

submitting any supportive documentation." (RCAS at 53-27-28, 54:1-3.)  Class Counsel recently

requested information from the City and Claims Administrator KCC regarding whether

determination letters have been mailed to customers with instructions for contesting the

determination and whether any class members have indicated a desire to contest Barkovich's

determinations. To date, Class Counsel has not received answers to these questions, however, Class

Counsel will continue to work on this important issue. In the event there are customers who want to

contest Barkovich's ruling, Class Counsel will work with the City to bring those appeals to the

Court's attention in the most efficient and expeditious manner.

**G.**      ***LADWP Customer Complaint Log***

Class Counsel continues to receive calls from LADWP customers complaining about their

bills, albeit the calls have slowed down in recent weeks. As of November 5, 2019, Class Counsel

had received 58 calls from customers with complaints. Class Counsel works with each customer

NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION
OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)
Case No. BC577267

39

Exhibit 13
585

and forwards their issues to the appropriate persons at the LADWP. Class Counsel will continue to work with customers who have ongoing issues with the LADWP and will report to the Court if there are trends or red flags that should be addressed.

**H.** ***Class Counsel Application for Costs and Fees***

Class Counsel believes it is premature to make an application for fees and costs and would prefer any fee application take into account the total benefits (both monetary and non-monetary) achieved plus the time and effort spent on this case. As noted above, Class Counsel's law firm has spent over 2,000 hours working on this matter since April 2019 and there is considerable more work to do before evaluation of the settlement is complete.

## IX.

## CONCLUSION

Class Counsel intends to submit another report by March 30, 2020, to apprise the Court of ongoing efforts to evaluate the operative settlement and determine what would be in the best interests of the Class. Thereafter, Class Counsel proposes reporting to the Court on a quarterly basis.

Dated: November 22, 2019

**KABATECK LLP**

BRIAN S. KABATECK
ANASTASIA K. MAZZELLA
SERENA VARTAZARIAN
*Attorneys for the Jones Class*

---

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

40

Exhibit 13
586

**DECLARATION**

1

2

3

4

5

6

7

8 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 **COUNTY OF LOS ANGELES**

10

| | |
|---|---|
| ANTWON JONES, on behalf of himself, and all others similarly situated,<br><br>        Plaintiff,<br><br>     v.<br><br>CITY OF LOS ANGELES, by and through the Los Angeles Department of Water and Power; and DOES 1 through 50, inclusive,<br><br>        Defendants. | Lead Case No.: BC577267 [Related to Case Nos. BC536272, BC565618, BC568722, BC571664, BC594049, BC574690]<br><br><br><br>**DECLARATION OF GREGG THERRIEN** |
| AND RELATED CASES | |

///

///

///

**1**

## DECLARATION OF GREGG THERRIEN

I, Gregg Therrien, declare as follows:

1.  I am over the age of 18 and I have personal knowledge of the facts set forth herein. If called as a witness, I could and would competently testify to the matters stated herein.

2.  I am the Assistant Vice President of Concentric Energy Advisors, a consulting company with expertise in energy billing and project management.

3.  I am a former utility Director who has held leadership positions at Connecticut Natural Gas Corporation and affiliated companies for more than 19 years. I also have experience with forensic billing investigations that required developing extensive databases and analysis to determine the affected population of customers and the amount of over-or-under billing charges. I received my Bachelor of Science in Finance from Bryant University, a Masters in Business Administration from the University of Connecticut, and I am also a certified Project Management Professional (PMP). A true and correct copy of my curriculum vitae is attached hereto as Exhibit 1.

4.  In the summer of 2019, Concentric was contacted by Kabateck LLP to review and analyze available data pre and post September 3, 2013, as well as to verify the methodologies for identifying class members, calculating refunds/credits and the project management performed by the Court Monitor Paul Bender and his colleague Siva Thoppe.

5.  On November 4, 2019, Kabateck LLP formally retained me, and two of my colleagues, Benjamin Davis and Marisa Ihara, as expert consultants in this project. Mr. Davis has extensive experience with utility regulation and is uniquely qualified to assist in solar panel matters. Ms. Ihara has extensive and deep understanding of customer systems and database tools. One of Ms. Ihara's past engagements required the consolidation of several rate divisions into a consolidated rate class. This required multiple rate and bill impact iterations, overall revenue analysis, and comprehensive regulatory compliance filings.  A true and correct copy of Mr. Davis', Ms. Ihara's, and Mr. Reed's curriculum vitaes are attached hereto as Exhibit 2.

///

///

6.   Additionally, Concentric's Chairman and Chief Executive Officer, John Reed, will serve as Senior Advisor and provide oversight and guidance on the project. Mr. Reed is a financial and economic consultant with more than 42 years of experience in the energy industry. He has provided advisory services in the areas including, but not limited to energy market analysis, rate and regulatory matter, and energy contract negotiations to clients across North and Central America. A true and correct copy of Mr. Reed's curriculum vitae is attached hereto as Exhibit 3.

7.   Other than the connection my colleagues and I now have performing work as consultants in the *Jones v. City of Los Angeles* case, neither my colleagues nor I have, nor have ever had, any other professional or personal relationships with any of the parties, individuals, entities, or attorneys involved in this action, including but not limited to the City of Los Angeles, Aventador, Ardent, and the attorneys in the Los Angeles City Attorney Office- including Los Angeles City Attorney Mike Feuer, Paul Paradis, Paul Kiesel, Jack Landskroner, Paul Greico, Thomas Merriman, Michael Libman, Paul Bender, Siva Thoppe, or Barbara Barkovich. This statement is based on my thorough review of Concentrics' records and extensive interviews with other members of my team working on this project.

Executed this 21st day of November, 2019, at Marlborough, Massachusetts.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Gregg Therrien

2

**DECLARATION OF GREGG THERRIEN**
Exhibit 13
590

**EXHIBIT 1**



**GREGG H. THERRIEN**
Assistant Vice President

Gregg Therrien is a former utility Director who has held leadership positions at Connecticut Natural Gas Corporation and affiliated companies for more than 19 years. Most recently, he served as the Director, Gas Construction at Connecticut Natural Gas and The Southern Connecticut Gas Company and Director, Regulatory & Tariffs at UIL Holdings, Inc. Mr. Therrien's experience includes natural gas distribution system operations and construction practices, regulatory strategies, natural gas growth, infrastructure replacement programs, integrated resource planning and technical rate case issues such as utility cost of service, rate design, tariff writing and administration, as well as pricing, gas cost accounting, gross margin, and load forecasting for regulated utilities. Mr. Therrien has an M.B.A. from the University of Connecticut and a B.S. in Finance from Bryant University, and is also a certified Project Management Professional (PMP).

## REPRESENTATIVE PROJECT EXPERIENCE

Representative responsibilities performed for Connecticut gas utilities include:

Regulatory Affairs

- Led the preparation, filing, discovery and implementation of several rate cases
- Designed rates and prepared testimony, and served as the primary rate design witness
- Prepared, testified, and implemented revenue requirement rate mechanisms for new customer growth and pipeline replacement programs
- Prepared gas Integrated Resource Plans
- Prepared assessment of forecast methodology and forecast accuracy of gas demands
- Prepared validation of sales forecast and analysis of declining use per customer
- Proposed, testified, and implemented Connecticut's first gas decoupling mechanism
- Key contributor in settlement negotiations for rate cases and other litigated regulatory matters, including the LDC gas expansion plan
- Prepared testimony and exhibits for bi-annual Purchased Gas Adjustment proceedings
- Prepared testimony and new program tariffs in support of gas unbundling

Business Strategy and Operations

- Led a newly-created gas construction organization, leveraging project management practices to plan and execute a $100M annual capital budget
- Responsible for RFP development and bid selection of five-year contracts of local, regional and national gas construction and restoration contractors representing approximately 70 work crews
- Developed and implemented a tablet-based QA/QC inspection program
- Developed annual sales and revenue operating budgets
- Developed rate of return new customer acquisition model



- Led several process improvement teams
- Successfully negotiated contracts with large cogeneration users avoiding system bypass and obtaining regulatory approval

Consultancy

- Regulatory risk assessments
- Gas infrastructure replacement program technical and financial analysis and testimony
- Market analysis for international clients
- M&A due diligence (regulatory)
- Electric distribution alternative rate plan analysis
- Economic Development tariff development
- Decoupling testimony assistance for a Western Gas LDC
- Decoupling and Rate Design expert witness testimony for a New England Gas LDC
- Revenue Requirements witness for an electric distribution company
- Regulatory rate strategies for a vertically-integrated electric utility
- Testified on behalf of a New England gas LDC on the subjects of decoupling, capital trackers and rate design
- Developed an Alternative Rate Plan for a New England gas LDC
- Rate comparison study for the Government of Alberta, Canada
- Developed a cost of service-based pricing model for a 10MW fuel cell developer
- Power procurement consultancy for a New England investor-owned water utility

## PROFESSIONAL HISTORY

**Concentric Energy Advisors, Inc. (2016 – Present)**
Assistant Vice President

**AVANGRID and affiliated companies (2016)**
**Connecticut Natural Gas and The Southern Connecticut Gas Company (2014 – 2016)**
Director, Gas Construction

**UIL Holdings, Inc. (2010 – 2014)**
Director, Regulatory & Tariffs

**Iberdrola S.A. / Energy East Corporation / Connecticut Natural Gas and The Southern Connecticut Gas Company (2001 – 2010)**
Director, Regulatory & Pricing / Director, Pricing & Analysis

**Connecticut Natural Gas Corporation (1997 – 2001)**
Manager, Pricing

**United Technologies, Inc. – Pratt & Whitney Turbo Power & Marine Systems (1996 – 1997)**
Manager, Financial Planning & Analysis



**Pratt & Whitney Aircraft**
Business Unit Cell Leader, Overhaul & Repair / Manufacturing – turbine airfoils (1994 – 1996)
Financial Analyst, Commercial Engine Business (1987 – 1994)

## EDUCATION

**University of Connecticut**
M.B.A., Concentration in Finance, 1993

**Bryant University (College)**
B.S., Finance, 1987

## PROFESSIONAL AFFILIATIONS

American Gas Association
*State Affairs Committee, 2001 – Present*

Northeast Gas Association

Project Management Institute

## CERTIFICATIONS

Certified Project Management Professional (PMP)

## LEADERSHIP

**Connecticut Economic Resource Center (CERC)**
Member, Board of Directors 2008 – 2011
Treasurer, 2011 – 2016

**Connecticut Power and Energy Society (CPES)**
Executive Secretary and Director, 2018 – Present
Member, Board of Directors 2017 – 2018

**AGA Executive Leadership Development Program – 2012**

**Guild of Gas Managers, 2018  - present**

Exhibit 13
594

**EXHIBIT 2**



## BENJAMIN O. DAVIS
Senior Project Manager

Mr. Davis has worked on a variety of engagements at Concentric, including related to renewable energy, innovative regulatory models, nuclear regulatory issues, and expert testimony preparation. Prior to joining Concentric, Mr. Davis worked for over 7 years on a wide range of electric power and regulatory issues at the Massachusetts Department of Public Utilities. Mr. Davis' experience at the Department includes matters pertaining to clean energy policies, grid modernization, dynamic pricing, competitive electric markets, utility provision of retail electric supply, electric system reliability, service quality, and utility mergers. Mr. Davis's experience in sustainable electricity policies and regulation includes utility administered energy efficiency programs, electric rate decoupling, long-term contracts for renewable generation, electric vehicles, and net metering. Mr. Davis has a Master's degree in Public Policy from the Kennedy School of Government at Harvard University, a B.A. cum laude from Harvard University, and a Master of Divinity from Andover Newton Theological School.

### REPRESENTATIVE PROJECT EXPERIENCE

Representative experience at Concentric Energy Advisors:

- Support of a group of northeast utilities in a proceeding aimed at reforming the regulatory construct, including project management support, analysis of key issues, and drafting of joint comments
- Conducting and summarizing analysis related to North American utility mergers
- Preparation of expert testimony on an innovation incentive proposal by a northeast utility
- Providing support to Midwest utility regarding "utility of the future" issues
- Preparation of expert testimony to support a southwestern utility's renewable energy plan, with a focus on utility sponsored solar programs
- Review of generation and demand-side offers filed with the ISO New England for its Forward Capacity Market.
- Conducting research and drafting report materials related to nuclear power issues.

Representative experience from the Massachusetts Department of Public Utilities includes:

- Supervise staff of 15 in regulating electric sector in Massachusetts, with focus on clean energy policies, competitive electric market, and electric system reliability
- Execute management functions including conducting and overseeing performance evaluation reviews for staff; interviewing, evaluating, and hiring staff; assigning and training staff; and case management
- Communicate and coordinate with Commission, other division directors, other state agencies, utility regulatory staff, and non-government organizations
- Interact with utility personnel and industry stakeholders in formal and informal settings, ranging from hearings and technical sessions to conferences and site visits

Exhibit 13
596



- Supervise staff analysis, investigation, and execution of cases, including cross examination, writing of discovery, orders, and memoranda, and making presentations on sustainable electricity policies and proposals such as energy efficiency, grid modernization, long term contracts for renewable generation, electric vehicles, net metering, utility mergers, dynamic pricing, service quality, and retail electric market issues
- Serve on several interagency efforts, including compliance with Global Warming Solutions Act (an aggressive greenhouse gas emissions mitigation law), energy storage, and a clean energy standard
- Served as DPU Steering Committee representative for DPU's intensive Grid Modernization Working Group process, comprised of utilities and other stakeholders, to investigate and develop framework for grid modernization efforts
- Make presentations at industry meetings and conferences on topics including grid modernization, energy efficiency, and utility ratemaking
- Completed training and received certificate in Massachusetts' Commonwealth Management Certificate Program

## PROFESSIONAL HISTORY

**Concentric Energy Advisors, Inc. (2015 – Present)**
Senior Project Manager

**Massachusetts Department of Public Utilities (2008 – 2015)**
Electric Power Division – Director, Assistant Director, Economist

**City of Boston Mayor's Office (2007 – 2008)**
Policy Analysis Intern

**United Way of Massachusetts Bay and Merrimack Valley (Summer 2007)**
Community Impact Intern

**Wellesley Congregational Church (2002 – 2006)**
Associate Pastor

**Massachusetts Institute of Technology (1996 – 1998)**
Administrative Assistant

## EDUCATION

**Harvard University, Kennedy School of Government**
M.P.P., 2008

**Andover Newton Theological School**
M.Div., 2002

**Harvard University**
B.A., *cum laude*, 1994



**SELECTED PUBLICATIONS/PRESENTATIONS**

- "A Stakeholder Approach to Grid Modernization Policy."  Ben Davis, Justin Brant, Jonathan Raab.  IEEE Smart Grid Newsletter.  April 2014.

**SELECTED SPEAKING ENGAGEMENTS**

- "Grid Modernization in Massachusetts - Changing the Relationship Between Customer and Utility." National Governor's Association, Learning Lab for New Utility Business Models & the Electricity Market Structure of the Future. Boston, MA. July 27, 2015.
- "Energy Efficiency and New Utility Models: Massachusetts Grid Modernization." Northeast Energy Efficiency Council and the Association of Energy Services Professionals Fall Conference.  Westborough, MA. Nov. 13, 2014.
- "DPU Proceedings on Grid Modernization and Electric Vehicles."  Presentation to Massachusetts Electric Vehicle Initiative (MEVI) Taskforce. Boston, MA. Sept. 29, 2014.
- "Massachusetts Grid Modernization." Presentation to Electrical Engineering Department, Suffolk University. Oct. 10, 2014.
- "Massachusetts Grid Modernization."  Keynote Speech, Annual Banquet of Power and Energy Society, Boston Chapter, Institute of Electrical and Electronics Engineers. May 20, 2014.
- "Cracking the Code on Net Savings."  Northeast Energy Efficiency Partnerships EMV Forum Annual Public Meeting.  Portsmouth, NH.  Dec. 12, 2013
- "Grid Modernization in Massachusetts: Energy Efficiency."  ACEEE National Conference on Energy Efficiency as a Resource.  Nashville, TE. Sept. 22, 2013.
- "Smart Grid and Renewables."  Environmental Business Council of New England, Boston MA. June 21, 2013.
- "Ratemaking and Regulatory Policies for Massachusetts Electric Utilities."  Presentation to Massachusetts Grid Modernization Steering Committee.  Boston, MA. Feb. 5, 2013.

Exhibit 13
598



**MARISA IHARA**
Senior Project Manager

Ms. Ihara has over 15 years of experience consulting in the energy industry with technical expertise in econometric analysis, financial modeling, and database management. Ms. Ihara has assisted clients with rate design, integrated resource planning, utility prudency reviews, contractual disputes, acquisition/divestiture due diligence, market power studies and energy market assessments. She is proficient in VBA, MATLAB, SQL and SPSS.

## REPRESENTATIVE PROJECT EXPERIENCE

### Demand Forecasting & Supply Planning

- Developed natural gas demand forecasts and assisted in the development of long-term Integrated Resource Plans on behalf of several utilities located in the Northeast, Midwest, and Pacific Northwest.
- Reviewed the demand forecasting methodology for a multi-state gas utility and recommended certain process changes to improve the methodology and accuracy of the forecast.
- Reviewed the demand forecasting methodology for a Canadian electric utility. Analyzed and evaluated the statistical and quantitative projection methods used, including end-use and econometric forecasting techniques.

### Regulatory Affairs

- Developed a marginal cost study for a Northeast utility utilizing regression analysis.
- On behalf of several gas utilities, evaluated rate design restructuring and its impacts on customer bills.
- Investigated a Northeast utility's declining natural gas use per customer by efficiently and effectively performing regression analysis of billing data for each individual customer and successfully synthesizing the trends.
- Designed a model to calculate needed contributions in aid of construction (CIAC) for a Northeast gas utility.
- Performed market research to estimate cost of new entry for electric generating capacity in New England for the ISO-NE LICAP proceeding with FERC.
- Analyzed a generation facility's cost of service for FERC filing of a Reliability Must Run contract with ISO-NE.



Market Assessments

Performed extensive market research to evaluate demand for planned expansions and new market entry by various pipelines, Local Distribution Companies (LDCs), LNG import terminals, and natural gas and LNG storage facilities.

- Analyzed Florida's current and projected natural gas market including demand from growing electric generation and traditional LDC markets.  Filed an independent report at FERC.
- Conducted buy-side due diligence regarding an investment in an existing natural gas storage project in the eastern United States.
- Developed models to optimize withdrawal/injection scheduling for natural gas and LNG storage facilities utilizing real options theory, Monte Carlo simulation, and linear programming.

Electric Distribution Reliability Studies

- Analyzed effect of utility deregulation on existing and future reliability of New York State's electric distribution system for the New York State Energy Research and Development Authority (NYSERDA).  Developed statistical models to analyze major causes of power interruption and presented recommendations for improvement to the New York State Energy Planning Board.
- Developed an hour by hour thermal model to investigate the effects of ambient temperature and load on transformer insulation life.

Transaction Support and Valuation

Provided sell-side transaction support for favorable sale of over 2,300 MW of fossil and nuclear capacity, including the sale of Atlantic City Electric's minority interests in Keystone and Conemaugh Generating Stations, IPL's 70% interest in Duane Arnold Nuclear Plant, CMS Energy's sale of Palisades Nuclear Plant, and Wisconsin Energy's sale of Point Beach Nuclear Plant.

- Collaborated with technical staff and developed financial information memorandums and continued cost of operation financial models
- Expeditiously evaluated bids and Power Purchase Agreements in a well-documented and defensible manner utilizing comparable sales analyses and DCF analyses with Monte Carlo simulation to evaluate risks such as commodity pricing and outage risks.
- Drafted expert testimony and responses to help achieve regulatory approvals from state agencies.

Exhibit 13
600



Litigation Support

Performed research and analyses to support litigation strategies in various energy related arbitrations including fuel supply contracting, damages, and LDC prudence issues.  Prepared expert testimony, discover and briefing materials.

- Developed analyses to support expert witness testimony in a North American gas supply contract arbitration case.
- Estimated financial damages for purposes of energy contract disputes involving civil litigation
- Provided litigation support to a mid-west utility regarding proposed gas purchase disallowances for storage utilization, hedging activity, and pipeline capacity decisions.

**PROFESSIONAL HISTORY**

**Concentric Energy Advisors, Inc. (2004 – Present)**
Senior Project Manager
Project Manager
Senior Consultant
Consultant
Assistant Consultant
Analyst

**General Electric Power Systems Energy Consulting (2000 – 2001)**
Application Developer (2001)
Intern Engineer (2000)

**EDUCATION**

**Brown University**
B.S., Applied Mathematics, *magna cum laude*, 2003

Exhibit 13
601

**EXHIBIT 3**
Exhibit 13

602



**ATTACHMENT C:**
**PROJECT TEAM RESUMES**

## JOHN J. REED
Chairman and Chief Executive Officer

Mr. Reed is a financial and economic consultant with more than 42 years of experience in the energy industry. Mr. Reed has also been the CEO of an NASD member securities firm, and Co-CEO of the nation's largest publicly traded management consulting firm (NYSE: NCI). He has provided advisory services in the areas of mergers and acquisitions, asset divestitures and purchases, strategic planning, project finance, corporate valuation, energy market analysis, rate and regulatory matters and energy contract negotiations to clients across North and Central America. Mr. Reed's comprehensive experience includes the development and implementation of nuclear, fossil, and hydroelectric generation divestiture programs with an aggregate valuation in excess of $20 billion. Mr. Reed has also provided expert testimony on financial and economic matters on more than 400 occasions before the FERC, Canadian regulatory agencies, state utility regulatory agencies, various state and federal courts, and before arbitration panels in the United States and Canada. After graduation from the Wharton School of the University of Pennsylvania, Mr. Reed joined Southern California Gas Company, where he worked in the regulatory and financial groups, leaving the firm as Chief Economist in 1981. He served as executive and consultant with Stone & Webster Management Consulting and R.J. Rudden Associates prior to forming REED Consulting Group (RCG) in 1988. RCG was acquired by Navigant Consulting in 1997, where Mr. Reed served as an executive until leaving Navigant to join Concentric as Chairman and Chief Executive Officer.

## REPRESENTATIVE PROJECT EXPERIENCE

Executive Management

- As an executive-level consultant, worked with CEOs, CFOs, other senior officers, and Boards of Directors of many of North America's top electric and gas utilities, as well as with senior political leaders of the U.S. and Canada on numerous engagements over the past 25 years. Directed merger, acquisition, divestiture, and project development engagements for utilities, pipelines and electric generation companies, repositioned several electric and gas utilities as pure distributors through a series of regulatory, financial, and legislative initiatives, and helped to develop and execute several "roll-up" or market aggregation strategies for companies seeking to achieve substantial scale in energy distribution, generation, transmission, and marketing.

Financial and Economic Advisory Services

- Retained by many of the nation's leading energy companies and financial institutions for services relating to the purchase, sale or development of new enterprises. These projects included major new gas pipeline projects, gas storage projects, several non-utility generation

Exhibit 13
603



projects, the purchase and sale of project development and gas marketing firms, and utility acquisitions. Specific services provided include the development of corporate expansion plans, review of acquisition candidates, establishment of divestiture standards, due diligence on acquisitions or financing, market entry or expansion studies, competitive assessments, project financing studies, and negotiations relating to these transactions.

Litigation Support and Expert Testimony

- Provided expert testimony on more than 400 occasions in administrative and civil proceedings on a wide range of energy and economic issues. Clients in these matters have included gas distribution utilities, gas pipelines, gas producers, oil producers, electric utilities, large energy consumers, governmental and regulatory agencies, trade associations, independent energy project developers, engineering firms, and gas and power marketers. Testimony has focused on issues ranging from broad regulatory and economic policy to virtually all elements of the utility ratemaking process. Also frequently testified regarding energy contract interpretation, accepted energy industry practices, horizontal and vertical market power, quantification of damages, and management prudence. Has been active in regulatory contract and litigation matters on virtually all interstate pipeline systems serving the U.S. Northeast, Mid-Atlantic, Midwest, and Pacific regions.

- Also served on FERC Commissioner Terzic's Task Force on Competition, which conducted an industry-wide investigation into the levels of and means of encouraging competition in U.S. natural gas markets and served on a "Blue Ribbon" panel established by the Province of New Brunswick regarding the future of natural gas distribution service in that province.

Resource Procurement, Contracting and Analysis

- On behalf of gas distributors, gas pipelines, gas producers, electric utilities, and independent energy project developers, personally managed or participated in the negotiation, drafting, and regulatory support of hundreds of energy contracts, including the largest gas contracts in North America, electric contracts representing billions of dollars, pipeline and storage contracts, and facility leases.

- These efforts have resulted in bringing large new energy projects to market across North America, the creation of hundreds of millions of dollars in savings through contract renegotiation, and the regulatory approval of a number of highly contested energy contracts.

Strategic Planning and Utility Restructuring

- Acted as a leading participant in the restructuring of the natural gas and electric utility industries over the past fifteen years, as an adviser to local distribution companies, pipelines, electric utilities, and independent energy project developers. In the recent past, provided services to most of the top 50 utilities and energy marketers across North America. Managed projects that frequently included the redevelopment of strategic plans, corporate reorganizations, the development of multi-year regulatory and legislative agendas, merger, acquisition and divestiture strategies, and the development of market entry strategies.



Developed and supported merchant function exit strategies, marketing affiliate strategies, and detailed plans for the functional business units of many of North America's leading utilities.

## PROFESSIONAL HISTORY

**Concentric Energy Advisors, Inc. (2002 – Present)**
Chairman and Chief Executive Officer

**CE Capital Advisors (2004 – Present)**
Chairman, President, and Chief Executive Officer

**Navigant Consulting, Inc. (1997 – 2002)**
President, Navigant Energy Capital (2000 – 2002)
Executive Director (2000 – 2002)
Co-Chief Executive Officer, Vice Chairman (1999 – 2000)
Executive Managing Director (1998 – 1999)
President, REED Consulting Group, Inc. (1997 – 1998)

**REED Consulting Group (1988 – 1997)**
Chairman, President and Chief Executive Officer

**R.J. Rudden Associates, Inc. (1983 – 1988)**
Vice President

**Stone & Webster Management Consultants, Inc. (1981 – 1983)**
Senior Consultant
Consultant

**Southern California Gas Company (1976 – 1981)**
Corporate Economist
Financial Analyst
Treasury Analyst

## EDUCATION

**Wharton School, University of Pennsylvania**
B.S., Economics and Finance, 1976
Licensed Securities Professional: NASD Series 7, 63, 24, 79 and 99 Licenses

## BOARDS OF DIRECTORS (PAST AND PRESENT)

Concentric Energy Advisors, Inc.
Navigant Consulting, Inc.
Navigant Energy Capital
Nukem, Inc.
New England Gas Association

Exhibit 13
605



R. J. Rudden Associates
REED Consulting Group

**AFFILIATIONS**

American Gas Association
Energy Bar Association
Guild of Gas Managers
International Association of Energy Economists
Northeast Gas Association
Society of Gas Lighters
Society of Utility and Regulatory Financial Analysts

**ARTICLES AND PUBLICATIONS**

"Maximizing U.S. federal loan guarantees for new nuclear energy," Bulletin of the Atomic Scientists (with John C. Slocum), July 29, 2009
"Smart Decoupling – Dealing with unfunded mandates in performance-based ratemaking," Public Utilities Fortnightly, May 2012

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles. I am over the age of eighteen years and not a party to the within entitled action; my business address is 633 West Fifth Street, Suite 3200, Los Angeles, CA 90071.

On November 22, 2019, I served a copy of the following document(s) described as **NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT).**on the interested party(ies) in this action as follows:

[ ]     **BY MAIL:**    By placing a true copy thereof enclosed in a sealed envelope(s) addressed as above, and placing each for collection and mailing on that date following ordinary business practices. I am "readily familiar" with this business practice for collecting and processing correspondence for mailing.  On the same day that correspondence IS placed for collection and mailing, it is deposited in the ordinary course of business with the U.S. Postal Service in Los Angeles, California, in a sealed envelope with postage fully prepaid.

[ ]     **BY OVERNIGHT DELIVERY:**    I enclosed the document(s) in an envelope or package provided by an overnight delivery carrier and addressed as above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

[X]     **VIA FILE AND SERVE:**    I caused such documents described herein to be uploaded electronically onto the website www.fileandservexpress.com per a mutual agreement between the parties.  I uploaded the above entitled document(s) with the understanding that all parties will have access and be able to download said documents

[X]     **STATE:**    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed November 22, 2019, at Los Angeles, California.

*Irma DeLeon*
Irma Deleon

**NEW CLASS COUNSEL'S REPORT REGARDING THE STATUS OF ITS EVALUATION OF THE CLASS ACTION SETTLEMENT (210 DAYS POST-APPOINTMENT)**
Case No. BC577267

41

Exhibit 13
607