**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Dennis Bradshaw,

       Plaintiff,

     v.

City of Los Angeles et al,

       Defendants.

Case No. 2:19-cv-06661-VAP-JCx

**Order GRANTING IN PART and DENYING IN PART Defendants' Motions to Dismiss (Doc. Nos. 68, 71, 79, 81, 83, 85, 88) and DENYING Defendant Paul Kiesel and Kiesel Law LLP's Motion to Strike (Doc. No. 90)**

Before the Court are Defendants Jack Landskroner and The Landskroner Law Firm, Ltd.'s ("Landskroner Defendants") Motion to Dismiss ("Landskroner MTD," Doc. No. 68), Defendants Michael J. Libman and Law Offices of Michael J. Libman APC's ("Libman Defendants") Motion to Dismiss ("Libman MTD," Doc. No. 71), Defendant City of Los Angeles's Motion to Dismiss ("City MTD," Doc. No. 79), Defendant Thomas Peters's Motion to Dismiss ("Peters MTD," Doc. No. 81), Defendant James Clark's Motion to Dismiss ("Clark MTD," Doc. No. 83), Defendants Paul Paradis and Paradis Law Group PLLC's ("Paradis Defendants") Motion to Dismiss ("Paradis MTD," Doc. No. 85), and Defendant Paul Kiesel, and Kiesel Law LLP's ("Kiesel Defendants") Motion to Dismiss ("Kiesel MTD," Doc. No. 88) and Motion to Strike ("Kiesel MTS," Doc. No. 90.)

*United States District Court*
*Central District of California*

1

Plaintiff Dennis Bradshaw ("Plaintiff") filed oppositions to Defendants' motions ("Opp to Landskroner MTD," Doc. No. 98; "Opp to Libman MTD," Doc. No. 100; "Opp to City MTD," Doc. No. 105; "Opp to Peters MTD," Doc. No. 102; "Opp to Clark MTD," Doc. No. 104; "Opp to Paradis MTD," Doc. No. 99; "Opp to Kiesel MTD," Doc. No. 97; "Opp to Kiesel MTS," Doc. No. 103.)  Defendants replied ("Landskroner Reply," Doc. No. 112; "Libman Reply," Doc. No. 114; "City Reply," Doc. No. 110; "Peters Reply," Doc. No. 116; "Clark Reply," Doc. No. 111; "Paradis Reply," Doc. No. 119; "Kiesel Reply," Doc. No. 117; "Kiesel Reply ISO MTS," Doc. No. 118.)

After lifting the stay imposed on March 23, 2020 (Doc. No. 137), the Court on February 1, 2023 permitted the parties to file supplemental briefing (Doc. No. 196.)  The Landskroner Defendants, the Libman Defendants, the City, Peters, Clark, and the Kiesel Defendants filed their supplemental briefs on February 13 and 14, 2023.  ("Landskroner Suppl.," Doc. No. 198; "Libman Suppl.," Doc. No. 201-1; "City Suppl.," Doc. No. 200; "Peters Suppl.," Doc. No. 199; "Clark Suppl.," Doc. No. 197; "Kiesel Suppl.," Doc. No. 202.)  Plaintiff filed his supplemental brief on February 20, 2023. ("Plaintiff Suppl.," Doc. No. 203-3.)

After considering all the papers filed in support of, and in opposition to, the Motions, the Court GRANTS IN PART and DENIES IN PART Defendants' Motions to Dismiss and DENIES the Kiesel Defendants' Motion to Strike.

# I.   BACKGROUND

Plaintiff filed his operative First Amended Class Action Complaint ("FAC") on October 17, 2019.  (Doc. No. 48.)  The Court summarizes the relevant allegations in the FAC and the facts of which it has taken judicial notice below.

## A.   Allegations of Collusion

In September 2013, the Los Angeles Department of Water and Power ("LADWP") implemented a new billing system developed by PricewaterhouseCoopers, LLP ("PwC").  (FAC ¶ 25.)  The City of Los Angeles ("City") later discovered, however, that the new billing system was defective and had overbilled hundreds of thousands of LADWP customers.  (*Id.* ¶¶ 2, 26-66.)  By January 1, 2015, the City had retained the Paradis Defendants and the Kiesel Defendants to handle all disputes related to the defective billing system.  (*Id.* ¶ 67.)

In 2014, Antwon Jones ("Jones") submitted a complaint about his LADWP bill on a website created by Defendant Paul Paradis ("Paradis").  (*Id.* ¶ 68-69.)  On December 8, 2014, Jones retained Paradis as counsel to "conduct an investigation to determine whether [he] had any claims that could be brought against the LADWP and the City of Los Angeles to recover for the amounts that [he] had been overcharged by the LADWP for electricity."  (*Id.* ¶ 69.)  Unbeknownst to Jones, Paradis was overseeing remediation work on the LADWP billing system at the time, and by mid-December of 2014, Paradis was serving as "Special Counsel" to the City.  (*Id.* ¶¶ 70, 78.)

3

During the relevant timeframe, Defendant Thomas Peters ("Peters") was the chief of the Civil Litigation Branch at the Los Angeles City Attorney's Office. (*Id.* ¶ 8.) He reported directly to Defendant James Clark ("Clark"), who was the Chief Deputy City Attorney at the Los Angeles City Attorney's Office. (*Id.* ¶¶ 7-8.) After Jones had retained Paradis, Peters directed Paradis to prepare a complaint for Jones against PwC. (*Id.* ¶ 71.) Peters wanted to deflect any potential liability from the City to PwC, offering the following reasoning: "You can't get paid twice. You get it from one or the other. You don't get paid – you don't get it from both. And if it ain't coming from the City, then it's coming probably from [PwC]." (*Id.*) Paradis complied with Peters instruction, and on January 9, 2015, he provided Jones with a complaint against PwC. (*Id.*) On January 23, 2015, a draft complaint captioned "Jones v. PwC" and listing Paradis and Defendant Paul Kiesel ("Kiesel") as Jones's attorneys was circulated within the City Attorney's Office. (*Id.*) Peters, Clark, and a number of other City and LADWP employees reviewed the draft complaint. (*Id.*)

Ultimately, the City decided against having Jones file a class action against PwC, and instead decided that Jones should file a class action against the City to more expeditiously resolve any overbilling claims. (*Id.* ¶ 75.) Paradis thereafter dissuaded Jones from pursuing an action against PwC, and Jones agreed to file a lawsuit against the City. (*Id.* ¶ 77.) Paradis understood that as Special Counsel to the City, he could not appear on a complaint against the City and therefore told Jones that Defendant Jack Landskroner ("Landskroner") would be added to Jones's legal team without informing Jones that Paradis would no longer be attaching his own name to

any future complaints.  (*Id.* ¶ 78.)  Landskroner was then brought in to represent Jones at Paradis's recommendation to the City.  (*Id.* ¶ 81.)

Kiesel recruited Defendant Michael J. Libman ("Libman") to serve as Landskroner's local counsel, and on April 1, 2015, Landskroner and Libman filed the state court class action entitled *Jones v. City of Los Angeles*, Los Angeles County Superior Court Case No. BC577267 ("*Jones*").  (*Id.* ¶¶ 81, 99.)  The complaint in *Jones*, which was originally drafted by Paradis and Kiesel and reviewed by Libman, asserted sixteen claims related to the LADWP's defective billing system and the overbilling of LADWP customers.  (*Id.* ¶ 82; Doc. No. 69-1.)  Libman was aware at the time the complaint was filed, or became aware shortly thereafter, that Paradis and Kiesel worked for the City.  (*Id.* ¶ 82.)

**B.**  ***Jones* Settlement**

On December 30, 2016, Judge Elihu Berle, the presiding judge in *Jones*, granted preliminary approval of a class action settlement.  (Doc. No. 72-12.)  The Landskroner Defendants and the Libman Defendants prepared and filed a draft of the class notice, a final version of which was sent on April 4, 2017.  (FAC ¶¶ 192, 229; Doc. Nos. 69-2, 72-4.)  The class notice contained the following language proposed by the Landskroner Defendants and the Libman Defendants: "The Class Representatives and the attorneys that have been appointed by the Court to represent the Settlement Class believe that the Settlement is in the best interests of all Settlement Class Members."  (FAC ¶ 97; Doc. No. 72-4.)

United States District Court
Central District of California

On July 20, 2017, Judge Elihu Berle issued final approval of the class action settlement of *Jones* and related cases ("*Jones* Settlement Agreement").  (FAC ¶ 98.)  Pursuant to the settlement agreement, the City refunded or credited class members $69,000,000 and paid the Landskroner Defendants and the Libman Defendants $19,000,000 in attorneys' fees and $2,741,003.99 in costs and expenses.  (*Id.* ¶¶ 98, 105.)  Plaintiff, an LADWP customer who did not object to or opt out of the settlement, received a credit on his December 2017 bill.  (*Id.* ¶ 107.)

**C.   Initial Investigation of Settlement and Continuation of *Jones***

In early 2019, Judge Berle was made aware of new information concerning the impropriety of the *Jones* Settlement.  (FAC ¶¶ 104-105.)  On May 7, 2019, Judge Berle appointed Brian Kabateck ("Kabateck") to replace the Landskroner Defendants and the Libman Defendants as class counsel in *Jones* and instructed him to, among other things, investigate the settlement and "seek appropriate relief on behalf of the class."  (*Id.* ¶ 105; Doc. No. 72-7.)

Kabateck's initial investigations revealed that some class members in *Jones* did not receive a full refund for the amount they were overbilled.  (FAC ¶ 105.)  In his "Preliminary Report Regarding Status of Class Action Settlement," Kabateck stated that he had identified several flaws in the settlement, which if remedied "could lead to the return to the class of more than $50 million in additional refunds beyond what has already been paid." (Doc. No. 77-2 at 22.)  He further stated that he "may request [that the] Court vacate final approval of the class action settlement and cause it to be

6

re-opened in whole or in part" or that he "may request modification of terms depending upon the City's willingness to cooperate."  (*Id.* at 34.)

### D.   Present Action

Shortly after Kabateck was appointed class counsel and had begun his investigations into the *Jones* Settlement, Plaintiff initiated this putative class action.  (*See* Doc. No. 1.)  Plaintiff purports to represent a class of persons comprised of the certified class members in *Jones* (FAC ¶ 108) and asserts nineteen claims against Defendants for: (1) violation of 42 U.S.C. § 1983; (2) unjust enrichment; (3) breach of fiduciary duty; (4) aiding and abetting breach of fiduciary duty; (5) professional malpractice; (6) aiding and abetting professional malpractice; (7) affirmative misrepresentation; (8) aiding and abetting affirmative misrepresentation; (9) conspiracy to commit affirmative misrepresentation; (10) negligent misrepresentation; (11) aiding and abetting negligent misrepresentation; (12) conspiracy to commit negligent misrepresentation; (13) fraudulent concealment; (14) aiding and abetting fraudulent concealment; (15) conspiracy to commit fraudulent concealment; (16) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (17) violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (18) declaratory judgment; and (19) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*  (*See generally* FAC.)

From December 2019 to January 2020, Defendants filed the motions to dismiss and motion to strike now before the Court.  (Doc. Nos. 68, 71, 79,

7

United States District Court
Central District of California

81, 83, 85, 88, 90.)  On March 23, 2020, the Court granted the Landskroner Defendants' motion to stay the case pending the resolution Kabateck's investigation and other proceedings in *Jones*.  (Doc. No. 137.)

### E.   Subsequent Proceedings in *Jones*

On March 24, 2021, Judge Berle granted Kabateck's "Motion for Disgorgement of Attorneys' Fees as to Michael Libman and/or the Law Offices of Michael J. Libman, APC."  (Doc. No. 201, Ex. 1.)  The order stated that both the *Jones* Class and the City were entitled to the disgorgement sum of $1,650,000.00, and that the exact distribution of the funds would be determined at a later date.  (*Id.*)

On May 28, 2021, Kabateck and the City agreed to a "Stipulation re Clarification of Settlement Agreement and Resolution of Open Issues" ("Stipulation," Doc. No. 200-2, Ex. A.)  Although the Stipulation did not modify the original terms and implementation of the *Jones* Settlement Agreement, it required the City to undertake various actions that were not originally spelled out in the agreement.  For example, the Stipulation required the City to: (1) issue additional refunds and credits to certain LADWP accounts; (2) agree not to retroactively bill certain accounts for services that had not been billed as of August 1, 2015; and (3) adhere to a set of revised service performance metrics.  (*Id.* at 5-14.)  On July 26, 2021, Kabateck and the City filed a joint motion asking the court to retain the *Jones* Settlement Agreement and approve the Stipulation.  (Doc. No. 200-3.)  The motion asserted that the Stipulation, "combined with the original terms and implementation of the *Jones* Settlement, constitute fair,

8

reasonable, and adequate relief for Plaintiff Antwon Jones and the *Jones*
Class and is in the best interests of the class members."  (*Id.* at 3.)  It also
explained that because the Stipulation did not modify the *Jones* Settlement
Agreement, the court could approve it without going through "the usual class
settlement approval process," which typically requires "a motion for
preliminary or final approval" and "notice . . . sent to unnamed class
members."  (*Id.* at 11-12.)  Judge Berle granted the motion and approved
the Stipulation in an order issued on September 30, 2021.  (Doc. No. 200-
2.)

On January 9, 2023, Kabateck filed a motion for disgorgement of
attorneys' fees against Paul Grieco and Tom Merriman, whom he claimed
received a portion of the attorneys' fees paid to the Landskroner Law Firm,
Ltd. dba Landskroner Grieco Merriman, LLC as part of the *Jones* Settlement
Agreement.  (Doc. No. 198-1, Ex. 1).  Kabateck also informed the *Jones*
court that he and the City have claims pending against Landskroner's estate
in Ohio.[1]  (*Id.* at 1 n.1.)

On February 1, 2023, the Court lifted the stay in this case after having
been informed that the work to implement the *Jones* Settlement Agreement
and Stipulation would soon conclude.  (Doc. No. 196.)

---

[1] The motion states that Landskroner is now deceased.

## II.    LEGAL STANDARD

### A.  Motion to Dismiss Pursuant to Rule 12(b)(1)

Dismissal under Rule 12(b)(1) is proper if the Court lacks subject matter jurisdiction to adjudicate claims asserted in a plaintiff's complaint. Fed. R. Civ. P. 12(b)(1).  To satisfy Article III's standing requirements, the party invoking federal jurisdiction must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

### B.  Motion to Dismiss Pursuant to Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief.  Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005); *ARC Ecology v. U.S. Dep't of*

United States District Court
Central District of California

*Air Force*, 411 F.3d 1092, 1096 (9th Cir. 2005); *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994).

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

Although the scope of review is generally limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990), and "take judicial notice of matters of public record outside the pleadings," *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).

## C.  Anti-SLAPP Motion to Strike

"A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so." *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 21 (2010).  California has enacted an anti-SLAPP statute authorizing "a 'special motion to strike' any 'cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection

United States District Court
Central District of California

1    with a public issue.'"  *Safari Club International v. Rudolph*, 862 F.3d 1113,

2    1119 (9th Cir. 2017) (citing Cal. Civ. Proc. Code § 425.16(b)(1)).  A party in

3    federal court may bring an anti-SLAPP motion to strike state law claims.

4    *See DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009, 1013 n.5 (9th Cir.

5    2013) ("We have held that [an anti-SLAPP] motion is available against state

6    law claims brought in federal court.").

7

8         The Court engages in a two-step inquiry to decide if a claim can be

9    stricken under the anti-SLAPP statute.  First, the Court must decide whether

10   the defendant has made a threshold showing that the challenged cause of

11   action is one arising from protected activity.  *Terry v. Davis Comty. Church*,

12   131 Cal. App. 4th 1534, 1544 (2005).  If the defendant makes such a

13   showing, the burden shifts to the plaintiff to establish a reasonable

14   probability that it will prevail on the claim.  *Lockheed Missiles & Space Co.*,

15   190 F.3d 963, 971 (9th Cir.1999).  "[W]hen an anti-SLAPP motion to strike

16   challenges only the legal sufficiency of a claim, a district court should apply

17   the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether

18   a claim is properly stated."  *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for*

19   *Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018).  If the plaintiff cannot

20   meet its burden, the Court will strike the claim.

21

22                      **III.    JUDICIAL NOTICE**

23        In connection with their motions and supplemental briefing, the parties

24   ask the Court to take judicial notice of various filings in the *Jones* case and

25   other state court cases.  (Doc. Nos. 69, 72, 77, 80, 82, 84, 86, 89, 198-1,

26   200-1, 201, 203.)  As these filings are a matter of public record, the Court

takes judicial notice of them.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (pursuant to Rule 201(b) "a court may take judicial notice of 'matters of public record'"); *Duckett v. Godinez*, 67 F.3d 734, 741 (9th Cir. 1995) ("We may take judicial notice of proceedings in other courts, whether in the federal or state systems.").  The Court does not, however, take judicial notice of the *truth* of the facts contained in the filings.  *See Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015).

## IV.   DISCUSSION

### A.   Justiciability

The Libman Defendants, the City, Peters, Clark, and the Kiesel Defendants assert that Plaintiff lacks Article III standing to bring his claims. (Libman MTD at 20-22; City MTD at 32-33; Peters MTD at 18-19; Clark MTD at 8-13; Kiesel MTD at 22-23.)  They primarily argue that Plaintiff has not alleged a concrete injury because the *Jones* settlement, even if inappropriately obtained, resulted in the reimbursement of the full amount Plaintiff was overbilled by the LADWP.  Plaintiff responds with several theories of standing, which the Court addresses below.

### 1.   Overbilling

Plaintiff first contends that even if he received a full reimbursement of the amount he was overbilled, other class members did not.  (*See, e.g.*, Opp to City MTD at 17.)  The Court, however, may entertain a class action only if "at least one named class representative has Article III standing." *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015) (citation omitted). As Plaintiff is the only putative class representative, it is not enough for him

to allege that other putative class members suffered a concrete injury—he must allege that he himself suffered a concrete injury.  Plaintiff has not done so, and therefore has not established standing based on his claims of overbilling.

### 2.   Inadequate Settlement

Plaintiff next argues that Defendants, by colluding to obtain the settlement in *Jones*, deprived him of a more favorable recovery of not only a full reimbursement of the amount he was overbilled, but also of prejudgment interest on that amount.  (Opp to City MTD at 17.)  As it is plausible that, absent any collusion, other counsel would have been able to obtain a more favorable settlement to account for Plaintiff's temporary loss of use of the money for which he was overbilled, Plaintiff states a concrete injury satisfying the first requirement of Article III standing.  *See Lujan*, 504 U.S. at 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (internal quotation marks, citation, and alterations omitted)).

Clark asserts that even if Plaintiff has sufficiently pleaded an injury, such an injury is not fairly traceable to his actions.  (Clark MTD at 10-11.)  Clark first points out that Plaintiff "does not even allege that he would have opted out of or objected to the settlement" had he known about the "allegedly collusive nature of the settlement."  (*Id.* at 10.)  This argument is a red herring.  What matters, and what Plaintiff alleges, is that had Defendants

not colluded to obtain the *Jones* settlement, a different set of disinterested attorneys would have negotiated a more favorable settlement for Plaintiff.  In any case, Plaintiff has alleged that "[b]ecause of Defendants' actions, Plaintiff and the Class did not object or otherwise opt out of the settlement." (FAC ¶ 336.)

Clark next argues that Plaintiff has failed to plead sufficient facts to show that he participated in the collusion that caused Plaintiff's injury. (Clark MTD at 11.)  Here, the Court agrees.  Although the FAC details the conduct of Peters, the Landskroner Defendants, the Libman Defendants, the Paradis Defendants, and the Kiesel Defendants in bringing about the *Jones* action, the FAC's allegations with respect to Clark are much more sparse.  (*See* FAC ¶¶ 67-103.)  The FAC generally alleges that Clark "supervised, ratified, and directed the conduct of [the Paradis Defendants and the Kiesel Defendants], including the decision to file and settle *Jones* as a collusive class action."  (FAC ¶ 67.)  In support of this allegation, however, the FAC states only that Clark directly supervised Peters and that Clark reviewed the "Jones v. PwC" complaint that was circulating within the Los Angeles City Attorney's Office.  (FAC ¶¶ 7-8, 71.)  These facts are insufficient to establish Clark's participation in the collusive class action. That Clark may have supervised a participant in the scheme and may have been copied on an email related to the scheme does not by itself give rise to a reasonable inference that he took part in it.  The Court therefore GRANTS Clark's motion to dismiss for lack of Article III standing.

As to the other defendants, the FAC sufficiently alleges that they caused Plaintiff's injury.  Moreover, Plaintiff's injury of an inadequate settlement recovery can be redressed through the money damages he seeks.  As Plaintiff has adequately alleged the second and third requirements of Article III standing with respect to the collusive settlement in *Jones*, Plaintiff has standing to assert his claims against the other defendants to the extent that they permit recovery for damages stemming from the settlement.

In their supplemental briefing, Defendants point out that following the approval of the *Jones* Settlement Agreement, the *Jones* court appointed Kabateck as new class counsel and approved the Stipulation.  They suggest that these new intervening circumstances have rendered the case moot. (*See, e.g.*, Kiesel Suppl. at 2.)  The Court disagrees.  Even if the *Jones* Settlement Agreement, in conjunction with the Stipulation, is "fair, reasonable, and adequate under all the circumstances," (Stipulation at 2), the agreement and Stipulation do not address Plaintiff's claim that he may nevertheless have obtained a more favorable settlement were it not for the Defendants' alleged collusion.  The Stipulation, like the *Jones* Settlement Agreement, does not require the City to compensate Plaintiff for the temporary loss of use of his money.

Moreover, while Kabateck's independent acceptance of the *Jones* Settlement Agreement and Stipulation may remove some of the settlement agreement's original taint, it does not sever the causal connection between Defendants' alleged collusion and the final resolution of *Jones*.  Kabateck

suggests that he did not seek to invalidate the *Jones* Settlement Agreement and negotiate a new settlement with the City in part because he wanted to avoid "the usual class settlement approval process," involving "a motion for preliminary or final approval" and "notice . . . sent to unnamed class members." (Doc. No. 200-3 at 11-12.) Kabateck had an incentive to keep the *Jones* Settlement Agreement in place, and did so. Had Kabateck represented the *Jones* class at the outset of the litigation, he may have been in a better position to negotiate a more favorable settlement agreement. Accordingly, any inadequacy in the *Jones* Settlement Agreement remains fairly traceable to Defendants,[2] with the exception of Clark, and redressable through a payment of monetary damages.

### 3.   Violation of a Legal Right

Plaintiff contends that even if he did not suffer any economic damages, he nevertheless would have standing to pursue his § 1983 claim for a violation of his procedural due process rights. (*See, e.g.*, Opp to City MTD at 17-18.) The Court agrees. The Supreme Court has held that the deprivation of certain "absolute" rights, including the right to procedural due process, constitutes an injury that can be redressed with nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978).

---

[2] At the hearing, Defendants argued that Plaintiff could have objected to the settlement agreement after Kabateck began his investigation or after the *Jones* court had approved the Stipulation. The original class notice, however, set a June 5, 2017 deadline for objections, well before any allegations of collusion had been made public, (Doc. No. 72-4 at 1), and Defendants have not provided any judicially noticeable documents showing that Plaintiff was given a subsequent opportunity to object.

United States District Court
Central District of California

United States District Court
Central District of California

1    Plaintiff makes the same argument with respect to his RICO claim,

2   stating that he is entitled to nominal damages under RICO whether or not he

3   can establish a concrete and particularized injury.  (Opp to City MTD at 18.)

4   Here, Plaintiff is incorrect.  Although a plea for nominal damages satisfies

5   the redressability element of standing, Plaintiff must still plead an injury in

6   fact.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ("This is

7   not to say that a request for nominal damages guarantees entry to court.

8   Our holding concerns only redressability.  It remains for the plaintiff to

9   establish the other elements of standing (such as a particularized injury).").

10   Unlike Plaintiff's assertion that Defendants violated his constitutional right to

11   due process, his assertion that Defendants' violated RICO does not by itself

12   allege a concrete and particularized injury.

13

14    As discussed above, however, the FAC alleges an economic injury

15   sufficient to confer standing for Plaintiff's RICO claim.  If it turns out that

16   Plaintiff can prove the existence of an injury, but not a specific amount of

17   damages, Plaintiff may nevertheless be entitled to nominal damages.  *See*

18   *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 266

19   (4th Cir. 2001) (holding that if the plaintiff could show "*some* amount of

20   damage likely is present, even if [the plaintiff] cannot prove the amount,

21   [then] a nominal amount of damage is adequate to support liability.").

22

23   4.   Threat of Future Injury

24    In addition to damages, Plaintiff seeks "[a]n injunction prohibiting [t]he

25   City from directly or indirectly selecting the counsel that would bring lawsuits

26   against it."  (FAC, Prayer for Relief.)  Unlike the monetary damages he asks

for, Plaintiff's requested injunction would not redress his claimed injury.  An injunction against future collusion does nothing to address past collusion. Nor would such an injunction redress a plausible threat of future injury. Plaintiff does not claim that the City frequently selects the counsel that bring lawsuits against it, or that the City has a policy of doing so.  As Plaintiff does not allege that he is "likely to suffer future injury" from the conduct he seeks to enjoin, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), he lacks standing to pursue injunctive relief against the City.

### B.   Abstention

The Libman Defendants and the Paradis Defendants argue that even if the Court has jurisdiction to hear this case, it should nevertheless abstain from exercising that jurisdiction under the *Younger* and *Colorado River* abstention doctrines.  (Libman MTD at 5-9; Paradis MTD at 12-18.)  The *Younger* abstention doctrine prohibits federal courts from enjoining pending state criminal proceedings or pending state civil proceedings that: "(1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014).  The *Colorado River* abstention doctrine permits federal courts to relinquish jurisdiction in favor of a pending state court action in "exceptional circumstances."  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  "In this Circuit, the narrow *Colorado River* doctrine requires that the pending state court proceeding resolve all issues in the federal suit."  *Holder v. Holder*, 305 F.3d 854, 859

United States District Court
Central District of California

(9th Cir. 2002).  Even when the state court proceedings will resolve all issues in the federal suit, courts in this circuit also consider "(1) whether the state court first assumed jurisdiction over property; (2) inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings are inadequate to protect the federal litigant's rights; (7) whether exercising jurisdiction would promote forum shopping."  *Id.* at 870.

As the relevant state court proceedings that the Libman Defendants and Paradis Defendants point to in support of their request for abstention have concluded and are therefore not "ongoing" or "pending," (*see* Libman MTD at 6-9; Paradis MTD at 4-5), the Court declines to relinquish jurisdiction pursuant to *Younger* or *Colorado*.

## C.  Exclusive Jurisdiction

The Paradis Defendants additionally contend that this case must be dismissed because the parties to the *Jones* Settlement Agreement, including Plaintiff, agreed that the *Jones* court would retain "exclusive and continuing jurisdiction over the Actions, the Parties, Settlement Class Members, and the Claims Administrator in order to interpret and enforce the terms, conditions and obligations under the [*Jones* Settlement Agreement]." (Paradis MTD at 5-12.)  Plaintiff, however, does not seek to interpret or enforce the *Jones* Settlement Agreement.  The language that the Paradis

1  Defendants reference therefore does not deprive the Court of jurisdiction

2  over the present action.

3

4      The Paradis Defendants additionally point to language in the *Jones*

5  court's Final Approval Order stating: "the Court hereby retains continuing

6  jurisdiction over: (a) the implementation of this Settlement and any award or

7  distribution to the Settlement Class members; (b) hearing and determining

8  an application for attorneys' fees and costs and (c) all parties for the

9  purpose of enforcing and administering the Settlement Agreement pursuant

10  to California Code of Civil Procedure § 664.6 *or otherwise*."  (Paradis MTD

11  at 7 (emphasis added).)  They argue that "by including the catchall phrase,

12  'or otherwise' in the Final Approval Order, the *Jones* Court made clear that

13  its 'continuing' and 'exclusive' jurisdiction was not limited to the enforcement

14  or administration of the Jones Settlement."  (*Id.* at 9.)  The Court disagrees.

15  The phrase "or otherwise" simply clarifies that the *Jones* court may enforce

16  or administer the agreement pursuant to California Code of Civil Procedure

17  § 664.6 or some other applicable law.  The *Jones* Court never purported to

18  retain the "extremely broad" jurisdiction the Paradis Defendants suggest it

19  did.  (*Id.* at 7.)

20

21      Finally, the Paradis Defendants assert that independent of the

22  language in the *Jones* Settlement Agreement or Final Approval Order, the

23  *Jones* court has been exercising jurisdiction over "the very same issues that

24  are at the heart of [this] Action."  (*Id.* at 11-12.)  Even if true, a state court's

25  exercise of jurisdiction over certain issues does not automatically deprive a

26  federal court of jurisdiction over the same issues.  *See Holder*, 305 F.3d at

United States District Court
Central District of California

870 (listing the *Colorado River* factors).  The Court has already addressed the Paradis Defendants' arguments for abstention above, and declines to dismiss this case on the theory that the *Jones* court has retained exclusive jurisdiction over the matters now before the Court.

### D.  *Rooker-Feldman*

The *Rooker-Feldman* doctrine, named for *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923) and *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983), "instructs that federal courts are without jurisdiction to hear direct appeals from the judgments of state courts."  *Cooper v. Ramos*, 704 F.3d 772, 777 (9th Cir. 2012).  "The doctrine bars a district court from exercising jurisdiction not only over an action explicitly styled as a direct appeal, but also over the 'de facto equivalent' of such an appeal."  *Id.* (citation omitted). An action brought before a district court is a de facto appeal under *Rooker-Feldman* when the plaintiff "complains of a legal wrong allegedly committed by the state court, and seeks relief from the judgment of that court."  *Noel v. Hall*, 341 F.3d 1148, 1163 (9th Cir. 2003).

The City, Peters, and the Kiesel Defendants argue that the Court lacks subject matter jurisdiction over this action because it is a de facto appeal of the settlement in *Jones*.  (City MTD at 30-31; Peters MTD at 13-16; Kiesel MTD at 17-18.)  For example, Peters asserts that Plaintiff's FAC "raises the same overbilling claims that were resolved by the *Jones* judgment" and that "[t]he *Jones* judgment released all claims relating to LADWP overbilling."  (Peters MTD at 15.)

United States District Court
Central District of California

Peters and the other defendants misconstrue Plaintiff's FAC.  While the FAC alleges that LADWP overbilled Plaintiff and other putative class members in order to provide background information, the FAC does not "raise[] the same overbilling claims."  The judgment in *Jones* covers the City's conduct in overbilling LADWP customers.  Plaintiff's current claims, on the other hand, relate to the collusive actions Defendants undertook after the overbilling had already occurred.  In sum, "this suit does not concern state-court judgments, but rather independent torts committed to obtain them," *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 315 (3d Cir. 2014), and as such, does not run afoul of *Rooker-Feldman*.

Peters nevertheless claims that the relief Plaintiff seeks "would invalidate the releases ordered in the *Jones* judgment."  (Peters MTD at 15).  Again, the Court disagrees.  Plaintiff is not asking the Court to overturn the *Jones* settlement.  In fact, Plaintiff's claims are predicated on the validity and enforceability of the settlement.  It is precisely because the *Jones* settlement is valid and enforceable that Plaintiff can now assert that he was harmed when Defendants colluded to deprive him of sufficient compensation for the release of his LADWP overbilling claims.  The *Rooker-Feldman* doctrine therefore does not bar the Court from exercising jurisdiction over this case.

### E.  Res Judicata

The Libman Defendants, the City, and Peters argue that the final settlement agreement in *Jones* precludes Plaintiff's claims against them. (Libman MTD at 11-14; City MTD at 27-30; Peters MTD at 8-13.)  Plaintiff, on the other hand, asserts that the *Jones* settlement has no preclusive

effect because it resolved different claims than the ones currently before the Court.  (*See* Opp to City MTD at 3-8; Opp to Peters MTD at 3-8.)

When determining the preclusive effect of a final state court judgment, courts in this circuit "must follow [the state's] preclusion rules."  *San Diego Police Officers' Ass'n v. San Diego City Employees' Ret. Sys.*, 568 F.3d 725, 734 (9th Cir. 2009).  In California, "a valid, final judgment on the merits precludes parties or their privies from relitigating the same 'cause of action' in a subsequent suit."  *Id.* (citation omitted).  California follows the primary right theory, under which "a 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty."  *Crowley v. Katleman*, 8 Cal. 4th 666, 681 (1994).  Therefore, two "causes of action" are the "same," and a final judgment with respect to the first precludes the second, if they both involve a violation of the same "primary right."  *See id.* at 668 ("[T]he violation of a single primary right gives rise to but a single cause of action.").

The "causes of action" in the present case differ from those covered by the *Jones* settlement because they involve violations of different primary rights.  In *Jones*, the class members claimed that the City violated their right not to be overbilled for electricity, water, and sewage services.  (*See generally* Doc. No. 89-1.)  Here, Plaintiff claims that the Libman Defendants, Peters, and the City violated his right to "obtain a fair settlement" in *Jones* (FAC ¶ 2), or more generally, his right to be free from the adverse consequences of their illegal behavior in bringing about the *Jones*

24

United States District Court
Central District of California

1  settlement.  (*See generally* FAC.)  Although the harms in both cases were

2  related, they were caused by different conduct affecting different rights.  The

3  final approval of the *Jones* Settlement Agreement therefore does not

4  preclude Plaintiff's present claims.

5

6  **F.   *Noerr-Pennington***

7  The *Noerr-Pennington* doctrine, named for *E. R. R. Presidents Conf.*

8  *v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers*

9  *of Am. v. Pennington*, 381 U.S. 657 (1965), originated in the antitrust context

10  and immunizes individuals and entities from antitrust liability for "attempt[ing]

11  to persuade the legislature or the executive to take a particular action . . .

12  that would produce a restraint or monopoly."  *Noerr*, 365 U.S. at 136.  The

13  Supreme Court has since expanded the doctrine, based on the First

14  Amendment's Petition Clause, outside the antitrust field and has clarified

15  that it not only protects the petitioning of the legislative or executive

16  branches, but also protects access to judicial processes as well.  *See Sosa*

17  *v. DIRECTV, Inc.*, 437 F.3d 923, 930-31 (9th Cir. 2006) (summarizing

18  cases).  Thus, "[u]nder the *Noerr-Pennington* doctrine, those who petition

19  any department of the government for redress are generally immune from

20  statutory liability for their petitioning conduct."  *Id.* at 929.

21

22  The City, Peters, and the Kiesel Defendants argue that the *Noerr-*

23  *Pennington* doctrine immunizes them from Plaintiff's § 1983 and RICO

24  claims because the claims are based on protected petitioning activity.  (City

25  MTD at 31-32; Peters MTD at 16-18; Kiesel MTD at 15-17.)  Plaintiff

26  concedes that his RICO claim against the Landskroner Defendants and the

Libman Defendants may be based in part on petitioning activity, since they were the parties that ultimately initiated the *Jones* action and made misrepresentations to the *Jones* court.  (*See, e.g.* Opp to City MTD at 14-15.)  He contends, however, that his § 1983 and RICO claims against the City, Peters, and the Kiesel Defendants are not based on petitioning activity because they rely only on allegations of collusion.  (*Id.*)

The Ninth Circuit has previously suggested that only a communication to the court could be considered a "petition."  *See Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005).  It has since clarified, however, that "conduct incidental to the prosecution of the suit is protected by the *Noerr-Pennington* doctrine."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006) (citation and internal quotation marks omitted).  Accordingly, the Ninth Circuit has held that *Noerr-Pennington* protects the sending of pre-suit demand letters to private parties.  *See id.* at 936.  More relevant here, the Ninth Circuit in another case concluded that *Noerr-Pennington* immunity extended to a person who funded litigation that he himself was not a party to.  *Liberty Lake Invs., Inc. v. Magnuson*, 12 F.3d 155, 156-59 (9th Cir. 1993); *see also Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401 (4th Cir. 2001) ("Funding of litigation by a non-party can be petitioning to the same extent that filing a lawsuit itself is petitioning.").

Although Peters and the Kiesel Defendants were not parties to the *Jones* litigation, their and the City's alleged actions in advocating for and ultimately bringing about that litigation closely resemble the actions of non-parties who fund a lawsuit.  And like the non-party funders in *Liberty Lake*

and *Baltimore Scrap*, the City, Peters, and the Kiesel Defendants engaged in conduct that was more than "incidental to the prosecution of the suit." The Court therefore concludes that such conduct would in normal circumstances fall under the protection of the *Noerr-Pennington* doctrine.

Not all petitioning conduct, however, is immunized under *Noerr-Pennington*.  The Ninth Circuit has identified three circumstances in which the "sham litigation" exception to *Noerr-Pennington* applies: "first, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose; and third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy."  *Sosa*, 437 F.3d at 938.  The conduct in this case falls squarely within the third circumstance.  The FAC alleges, for example, that Defendants colluded in the filing of *Jones* to settle quickly any claims that LADWP customers may have had against the City, and that the papers they submitted intentionally misrepresented to the *Jones* court that class counsel were disinterested and acting in the class members' best interests.  (*Id.* ¶ 335.)  These alleged misrepresentations suffice to render Defendants' prosecution of *Jones* a "sham."

The Kiesel Defendants argue that the "sham litigation" exception does not apply to them because the FAC does not allege that they made any

misrepresentations to the *Jones* court.  (Kiesel Reply at 4.)  The FAC, however, also does not allege that the Kiesel Defendants directly petitioned the *Jones* court.  But just as *Noerr-Pennington* applies because the Kiesel Defendants' conduct was incidental to the prosecution of the suit, the "sham litigation" exception also applies if the Kiesel Defendants' conduct was incidental to the prosecution of a "sham" suit.  *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006) ("[W]e have observed that private discovery conduct, not itself a petition, may fall within the sham exception where either the conduct itself, or the underlying petition, meets [the] sham litigation test." (citations omitted)).

The City relies on *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056 to argue that the "sham litigation" exception "only applies if the allegations of fraud satisfy the 'heightened pleading standard' required to overcome *Noerr-Pennington*."  (City Reply at.)  *Kottle*, however, enunciated a common-law-developed heightened pleading standard specific to the *Noerr-Pennington* doctrine, and the Ninth Circuit has since interpreted intervening Supreme Court decisions as "dictat[ing] that a heightened pleading standard should only be applied when the Federal Rules of Civil Procedure so require." *Empress LLC v. City & Cnty. of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005) (referring to *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)). The Court therefore limits its application of a heightened pleading standard to the one spelled out in Rule 9(b), and applies the standard when analyzing the sufficiency of Plaintiff's fraud-based allegations below.  To the extent that Plaintiff's claims have satisfied the appropriate pleading standard set by the

1   Federal Rules of Civil Procedure, the *Noerr-Pennington* doctrine does not

2   bar them.[3]

3

4   **G.   California's Litigation Privilege**

5         California's litigation privilege immunizes "any communication (1)

6   made in judicial or quasi-judicial proceedings; (2) by litigants or other

7   participants authorized by law; (3) to achieve the objects of the litigation;

8   and (4) that have some connection or logical relation to the action."  *Silberg*

9   *v. Anderson*, 50 Cal. 3d 205, 212 (1990).  The Kiesel Defendants argue that

10  Plaintiff's state law claims against them are based on communications

11  protected by the litigation privilege and must therefore be dismissed.

12  (Kiesel MTD at 22-24.)

13

14        Plaintiff responds that the Kiesel Defendants' communications are not

15  protected because at the time they were made, the Kiesel Defendants were

16  not "litigants or other participants authorized by law" in the *Jones* action, or

17  any other litigation mentioned in the FAC.  (Opp to Kiesel MTD at 24.)

18  Although the litigation privilege "is not limited to statements made during a

19  trial or other proceedings, [and] may extend to steps taken prior thereto, or

20  afterwards," *Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal.

21  4th 1232, 1241 (2007), the Kiesel Defendants do not explain how their

22  communications preceded or followed any litigation in which they were

23        [3] The Kiesel Defendants additionally argue that the *Noerr-Pennington* doc-
24  trine bars Plaintiff's state law claims.  (Kiesel MTD at 25-26.)  None of Plain-
     tiff's state law claims, however, are based on petitioning activity not already
25  discussed above.  Therefore, the *Noerr-Pennington* doctrine does not bar
     Plaintiff's state law claims for the same reason that it does not bar Plaintiff's
26  § 1983 and RICO claims.

United States District Court
Central District of California

United States District Court
Central District of California

"litigants or other participants authorized by law."  (*See* Reply at 9-10.)  The Court therefore declines to dismiss Plaintiff's state law claims against the Kiesel Defendants on the basis that California's litigation privilege protects their communications.

### H.   Sufficiency of the Allegations

Defendants argue that Plaintiff has not adequately pleaded several of his claims.  The Court considers these arguments below.

### 1.   First Claim: Violation of 42 U.S.C. § 1983

Plaintiff's first claim is based on the actions taken by Defendants to have conflicted attorneys represent the class members in *Jones*.  Plaintiff claims that these actions interfered with his and other class members' right to adequate representation by their counsel in violation of their right to procedural due process.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015) (recognizing "that settlements in class actions 'present unique due process concerns for absent class members,' including the risk that class counsel 'may collude with the defendants.'" (citation omitted)); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009) ("An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class.").

The Kiesel Defendants argue that Plaintiff's allegations are too speculative and lack the factual details needed to show that they knowingly and actively participated in Defendants' scheme.  (Kiesel MTD at 23-24.)

For example, although the FAC states that "it was Kiesel who recruited Libman to participate in the scheme with Defendants to serve as Landskroner's local counsel," it does so "on information and belief."  (FAC ¶ 99.)  The Kiesel Defendants complain of the phrase "on information and belief," stating that the qualifier renders the assertion too speculative. (Kiesel MTD at 23-24.)  This argument lacks merit.  Rule 8(a) permits pleading "on information and belief."  *See United States ex rel. Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 664 (9th Cir. 2018).  Even Rule 9(b) permits pleading "on information and belief" so long as the facts are "peculiarly within the opposing party's knowledge" and "the allegations are accompanied by a statement of facts upon which the belief is founded." *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 494 (9th Cir. 2019) (citation omitted).

Here, Kiesel is in a better position to know his own role in the collusion.  Moreover, the allegation that Kiesel recruited Libman is based in part on an email Kiesel sent to Libman dated March 3, 2015, stating: "We are preparing the [*Jones*] complaint for your review.  Can you send me your State Bar number for inclusion in the draft complaint?  I am including Paul Paradis, my cocounsel, who is drafting this complaint."  (*Id.* ¶ 82.)  Even if Kiesel did not recruit Libman, the email Plaintiff cites sufficiently implicates Kiesel in Defendants' improper scheme to drive the *Jones* litigation.  Plaintiff has therefore sufficiently alleged the Kiesel Defendants' involvement in a plan to deprive the *Jones* class members of non-conflicted representation.

1      Peters and the Kiesel Defendants assert that even if Plaintiff has

2   adequately alleged a § 1983 claim against them, they are nevertheless

3   protected by qualified immunity.  (Peters MTD at 19-20; Kiesel MTD at 24.)

4   "In determining whether a government official is entitled to qualified

5   immunity, we consider two different questions: (1) whether, taken in the light

6   most favorable to the party asserting the injury, the facts alleged show the

7   officer's conduct violated a constitutional right; and (2) if so, whether the

8   right was clearly established."  *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir.

9   2018) (alterations, citation, and internal quotation marks omitted).

10

11      Accepting Plaintiff's allegations as true, Peters and the Kiesel

12  Defendants recruited the Landskroner Defendants and the Libman

13  Defendants and assisted them in filing the *Jones* lawsuit as part of a

14  scheme to settle the *Jones* class members' claims for less than they were

15  worth.  (FAC ¶¶ 67-103.)  In doing so, they deprived Plaintiff and the other

16  class members of their right to adequate representation, and due process,

17  in the *Jones* litigation.

18

19      Moreover, "[i]t is clear that government interference with a defendant's

20  relationship with his attorney [m]ay render counsel's assistance so

21  ineffective as to violate his . . . right to due process of law."  *United States v.*

22  *Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980).  In the class action context, the

23  Ninth Circuit has indicated that collusion between class counsel and the

24  defendants implicates absent class members' due process rights.  *See In re*

25  *Online DVD-Rental Antitrust Litig.*, 779 F.3d at 944; *In re Bluetooth Headset*

26  *Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).  Although Plaintiff does

not cite a case directly on point, the contours of the *Jones* class members' right to adequate and unconflicted representation is sufficiently clear that a reasonable official would understand that colluding to have biased counsel represent the class members violates that right. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court therefore determines that the doctrine of qualified immunity does not protect the egregious behavior alleged in this case.

Although Plaintiff's § 1983 claim against Peters and the Kiesel Defendants may proceed, his claim against the City may not. A local governing body "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Instead, a local governing body can be held directly liable for an action only if that action "executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. A claim based on such a policy must allege that: (1) an employee "committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom"; (2) the person who "committed the constitutional tort was an official with 'final policy-making authority'"; or (3) an official with "final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). Plaintiff alleges none of these. He states that Clark and Peters "were at the very highest level in the City Attorney's Office, making them policymakers" (Opp to City MTD at 24), but he does not adequately allege that they or anyone else who ratified their actions had "final policy-making authority." The Court therefore

GRANTS the City's motion to dismiss Plaintiff's § 1983 claim and DENIES Peters' and the Kiesel Defendants' motion to dismiss the same claim.

2.   Second and Eighteenth Claims: Unjust Enrichment and Declaratory Judgment

"The elements of an unjust enrichment claim are the receipt of a benefit and the unjust retention of the benefit at the expense of another." *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008).  Plaintiff alleges that the Landskroner Defendants and the Libman Defendants received a benefit in the form of attorneys' fees paid by the City pursuant to the *Jones* Settlement Agreement.  (FAC ¶ 131.)  He further alleges that it would be unjust for the Landskroner Defendants and the Libman Defendants to retain the attorneys' fees.  (FAC ¶ 135-136.)  Plaintiff, however, does not adequately explain how the Landskroner Defendants' and the Libman Defendants' retention of the attorneys' fees comes at his expense.

Plaintiff cites several cases where courts have required the disgorgement of attorneys' fees from counsel who have breached their fiduciary duties to their clients.  (*See* Opp to Libman MTD at 5-8.)  None of these cases, however, involve independent claims for unjust enrichment. While Plaintiff makes a case for the disgorgement of attorneys' fees as the proper remedy for the Landskroner Defendants' and the Libman Defendants' breach of fiduciary duty, he does not state an independent claim for unjust

enrichment.  The Court accordingly GRANTS the Libman Defendants'

motion to dismiss Plaintiff's second claim.[4]


3.  <u>Third and Fifth Claims: Professional Malpractice and Breach of</u>
    <u>Fiduciary Duty</u>

The Libman Defendants assert that they did not establish an attorney-

client relationship with Plaintiff or any other unnamed class member in

*Jones* until July 20, 2017, when Judge Berle certified the settlement class

and approved the settlement agreement.  (Libman MTD at 15 (citing

*Sherman v. CLP Res., Inc.*, No. CV 12-8080-GW-PLAx, 2015 WL 13542762,

at *5 (C.D. Cal. Feb. 4, 2015) ("putative class members are not clients

before class certification")).)  They therefore argue that because Plaintiff's

allegations of collusion and misrepresentation occurred prior to July 20,

2017, before any attorney-client relationship had formed, such misconduct

cannot serve as the basis for a claim for professional malpractice or breach

of fiduciary duty.  (Libman MTD at 14-16.)


Attorneys, however, do not only owe duties to their clients.  They also

owe duties to prospective clients as well.  *See, e.g.*, Cal. R. Prof. Conduct

---

[4] Plaintiff's eighteenth claim seeks a declaratory judgment stating that the
Landskroner Defendants and the Libman Defendants "must forfeit the attor-
neys' fees and costs they have collected in *Jones*, resulting in the creation
of a constructive trust for the benefit of Plaintiff and the Class."  (FAC ¶ 325.)
In a footnote, the Libman Defendants argue that the Court should dismiss
Plaintiff's eighteenth claim because Plaintiff has not stated a claim for unjust
enrichment.  (Libman MTD at 11 n.3.)  The Court declines to do so.  As
explained above, just because Plaintiff has not stated a standalone claim
for unjust enrichment does not mean that he and the other putative class
members are not entitled to the disgorgement of the Landskroner Defend-
ants' and the Libman Defendants' attorneys' fees.

United States District Court
Central District of California

United States District Court
Central District of California

1.18.  In the class action context, California courts have held that "[w]hen a plaintiff sues on behalf of a class, he assumes a fiduciary obligation to the members of the class."  *Larner v. Los Angeles Drs. Hosp. Assocs., LP*, 168 Cal. App. 4th 1291 (2008) (citation omitted).  *See also Pirjada v. Superior Ct.*, 201 Cal. App. 4th 1074, 1087 (2011) (recognizing that prior to the certification of the class, "[plaintiff], as well as his counsel, assumed a fiduciary duty to the members of the class when he sued on their behalf"); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.").  Therefore, even if the Libman Defendants did not represent the *Jones* class members prior to class certification, they nevertheless assumed fiduciary duties to them as early as April 1, 2015, when they first initiated the *Jones* action.

Moreover, the Libman Defendants do not dispute that after Judge Berle had certified the class and approved the *Jones* Settlement Agreement, they owed Plaintiff fiduciary duties as his attorneys.  As it is plausible that this relationship would have required the Libman Defendants to disclose their conflict of interest to Plaintiff, notify the *Jones* court of the impropriety of the settlement and seek its invalidation, or undertake other actions in Plaintiff's interest, the Libman Defendants' failure to undertake these actions serves as an alternative basis for Plaintiff's professional malpractice and breach of fiduciary duty claims.  The Court accordingly DENIES the Libman Defendants' motion to dismiss Plaintiff's third and fifth claims.

4. <u>Seventh, Tenth, and Thirteenth Claims: Affirmative Misrepresentation, Negligent Misrepresentation and Fraudulent Concealment</u>

The elements of fraud are "(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Agosta v. Astor*, 120 Cal. App. 4th 596, 603 (2004). The elements for negligent misrepresentation are the same, except that it "does not require scienter or intent to defraud." *Id.*

The Landskroner Defendants and the Libman Defendants first argue that Plaintiff has failed to allege fraud with the particularity required by Rule 9(b). (Landskroner MTD at 8-9; Libman MTD at 17-18.) "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (alterations, citations, and internal quotation marks omitted). Thus, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* (citation omitted).

Plaintiff has met Rule 9(b)'s heightened pleading standard. He alleges that the Landskroner Defendants and the Libman Defendants filed a draft of the class notice, which formed the basis of the final class notice sent out to the *Jones* class members on April 4, 2017. (FAC ¶¶ 192, 229; Doc. Nos. 69-2, 72-4.) Plaintiff further alleges that the Landskroner Defendants

and the Libman Defendants decided to include the following language in their draft of the class notice, which ultimately made it into the final version: "The Class Representatives and the attorneys that have been appointed by the Court to represent the Settlement Class believe that the Settlement is in the best interests of all Settlement Class Members."  (FAC ¶ 97; Doc. Nos. 69-2, 72-4.)  These allegations state the circumstances constituting the fraud with sufficient particularity.  They answer the "who, what, when, where, and how" of the misconduct charged, and are sufficient to give the Landskroner Defendants and the Libman Defendants notice of the misconduct.

The Landskroner Defendants argue that the statement in the class notice is not a "representation" by Landskroner because (1) the class notice was a negotiated document ultimately approved by the Court; (2) nothing on the face of the class notice indicated that Landskroner was making the representation; and (3) LADWP, not Landskroner, sent the class notice to the class members.  (Landskroner MTD at 9-10.)  The Court does not find these arguments persuasive.  First, although Landskroner may not be liable for statements in a negotiated document not made by him, Plaintiff asserts that the Landskroner Defendants and the Libman Defendants drafted the relevant sentence at issue.  (FAC ¶¶ 97, 192, 229.)  Second, an action for fraud does not require that the recipient of a misrepresentation know its author.  Finally, the Landskroner Defendants cite no authority for their claim that a third party's delivery of a document somehow insulates its author from the misrepresentations it contains, and the Court finds none.

The Landskroner Defendants additionally contend that the statement Plaintiff complains of is not actionable because it expressed an opinion. (Landskroner MTD at 9-10.)  Although statements of opinion are not generally actionable as fraud, "when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact."  *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 408, 834 P.2d 745, 768 (1992).  As a jury could conclude that the statement "[Class Counsel] believe that the Settlement is in the best interests of all Settlement Class Members" implies Class Counsel's superior knowledge or possession of special information, and as the *Jones* class members could reasonably be expected to rely on such supposed superior knowledge or special information, the Court treats it as a statement of material fact at this stage in the litigation.  *See Willson v. Mun. Bond Co.*, 7 Cal. 2d 144, 151 (1936) ("[W]here there is a reasonable doubt as to whether a particular statement is an expression of opinion or the affirmation of a fact, the determination rests with the trier of the facts.").

Finally, the Landskroner Defendants argue that even if they made an affirmative misrepresentation, they cannot be held liable for fraudulent concealment.  (Landskroner MTD at 12-13.)  Plaintiff's fraudulent concealment claim is based on the Landskroner Defendants' failure to disclose their relationship with the City and the City's attorneys.  (FAC ¶¶ 265-275.)  The Landskroner Defendants contend that their fiduciary duty to the absent class members in *Jones* did not require them "to disclose [the]

communications that led to the settlement."  (Landskroner MTD at 13.) They assert that such a duty is impractical because of the difficulty of communicating with absent class members.  (*Id.* at 12.)

These contentions ignore the fact that the Landskroner Defendants did communicate with absent class members using the class notice. Moreover, assuming for the sake of argument that class counsel owe a lesser fiduciary duty to absent class members than they do to named class members, such a fiduciary duty would nevertheless require the disclosure of a clear conflict of interest.  *See Estakhrian v. Obenstine*, No. CV 11-3480 FMO (CWx), 2019 WL 3035119, at *15 (C.D. Cal. Mar. 26, 2019) (finding that class counsel in a prior class action breached his fiduciary duty to an unnamed class member "by failing to disclose, and affirmatively concealing . . . a conflict of interest").

For the reasons stated above, the Court DENIES the Landskroner Defendants' and the Libman Defendants' motions to dismiss Plaintiff's seventh and tenth claims, and DENIES the Landskroner Defendants' motion to dismiss Plaintiff's thirteenth claim.

5.   Sixth, Eleventh, and Twelfth Claims: Aiding and Abetting Professional Malpractice, Aiding and Abetting Negligent Misrepresentation, and Conspiracy to Commit Negligent Misrepresentation

The Kiesel Defendants assert that California does not recognize claims for aiding and abetting, or conspiracy to commit, negligence.  (Kiesel

United States District Court
Central District of California

MTD at 27-28.)  They cite several district court cases finding no California caselaw recognizing such claims.  *See Garber v. United States*, No. 2:15-CV-05867-CAS-JPRx, 2016 WL 552656, at *3 n.2 (C.D. Cal. Feb. 9, 2016) ("[T]he Court has found no caselaw recognizing a claim for aiding and abetting negligence under California law.  And, in every case the Court has found addressing claims for 'aiding and abetting' the court has discussed the claim solely in the context of intentional torts."); *Koehler v. Pulvers*, 606 F. Supp. 164, 173 n.10 (S.D. Cal. 1985) ("This court is unaware of California decisional law imposing liability for conspiring to commit negligence.").

The authorities the Kiesel Defendants cite, however, are not dispositive.  Indeed, Plaintiff points to at least one California court that has explicitly affirmed the existence of a cause of action for conspiracy to commit a negligent act.  (Opp to Kiesel MTD at 25.)  In *Navarrete v. Meyer*, 237 Cal. App. 4th 1276 (2015), the court noted that "civil conspiracy requires an express or tacit agreement only to commit a civil wrong or tort," and that the civil wrong or tort need not be intentional so long as the participants had "knowledge of the agreement's unlawful purpose." *Id.* at 1293-94.  It therefore held that persons who expressly or tacitly agreed that one of them would drive in excess of the speed limit, a negligent act, could be held liable for civil conspiracy. *Id.*

California courts have also cited Restatement 2d of Torts § 876 with approval.  *See Saunders v. Superior Ct.*, 27 Cal. App. 4th 832, 846 (1994). Section 876 states that liability may exist for aiding and abetting negligent acts.  *See* Restatement (Second) of Torts § 876 (1979), Comment d and

United States District Court
Central District of California

Illustration 6.  With respect to negligent misrepresentation, an "aider and abettor could knowingly further a misrepresentation that was negligently made by another party."  *In re ZZZZ Best Sec. Litig.*, No. CV 87-3574 RSWL, 1990 WL 132715, at *13 (C.D. Cal. July 23, 1990).

Here, Plaintiff alleges that even if the Landskroner Defendants' and the Libman Defendants' professional malpractice and misrepresentations were negligent, rather than intentional, the Kiesel Defendants knew about it and nevertheless assisted or encouraged their actions.  (FAC ¶¶ 184-185, 245-246.)  Plaintiff additionally alleges that the Landskroner Defendants, the Libman Defendants, and the Kiesel Defendants agreed that they would make certain statements that turned out to be negligent misrepresentations. (FAC ¶¶ 258-259.)  These allegations are sufficient to support Plaintiff's claims for aiding and abetting professional malpractice, aiding and abetting negligent misrepresentation, and conspiracy to commit negligent misrepresentation.  The Court therefore DENIES the Kiesel Defendants' Motion to Dismiss Plaintiff's Sixth, Eleventh, and Twelfth claims.

    6.    Sixteenth Claim: Violation of the Consumer Legal Remedies Act

The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices . . . intended to result in or that results in the sale or lease of goods or services to any consumer."  Cal. Civ. Code § 1770(a). The CLRA defines a "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes."  *Id.* § 1761(d).  It defines "goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes," and

United States District Court
Central District of California

"services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods."  *Id.* §§ 1761(a), (b).

The Landskroner Defendants and the Libman Defendants correctly point out that Plaintiff does not fit the CLRA's definition of a "consumer." (Landskroner MTD at 13-14; Libman MTD at 18-19.)  Plaintiff argues that he is a consumer because he "purchased" legal services from the Landskroner Defendants and Libman Defendants by giving them a right to future attorneys' fees.  But "the more generalized notion that the phrase 'purchase' or 'lease' contemplates any less than tangible form of payment . . . finds no support under the specific statutory language of the CLRA."  *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 864 (N.D. Cal. 2011) (holding that the plaintiff did not "purchase" a service by exchanging his personally identifiable information for the use of otherwise free online services).  As Plaintiff did not pay, or agree to pay, the Landskroner Defendants or the Libman Defendants any money in return for their supposed services, Plaintiff did not "purchase" anything.  Plaintiff offers no legal authority supporting his strained interpretation of the word "purchase" in the context of the CLRA, and the Court declines to adopt it.

Accordingly, the Court GRANTS the Landskroner Defendants' and the Libman Defendants' motions to dismiss Plaintiff's sixteenth claim.

7.    <u>Seventeenth Claim: Violation of the Unfair Competition Law</u>

The UCL prohibits "unfair competition," including "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200. The UCL, however, "is not an all-purpose substitute for a tort or contract action."  *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 452 (2005) (citation omitted).  It limits the remedies available to restitution and injunctive relief.  *Id.*  A "plaintiff [that] fail[s] to present a viable claim for restitution or injunctive relief (the only remedies available) . . . fail[s] to state a viable UCL claim."  *Id.* at 467.

Restitution under the UCL is a narrower remedy than disgorgement. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1145 (2003). It is focused on the plaintiff's loss, rather than the defendant's gain, and is typified in situations where "the disgorged money or property [came] from the prospective plaintiff in the first instance."  *Id.* at 1152.  Thus, under the UCL, a plaintiff cannot recover disgorgement of profits unfairly earned by a defendant unless the money sought was taken from the plaintiff or the plaintiff had an ownership interest in it.  *Id.* at 1144-45.

Plaintiff's UCL claim asserts that Plaintiff is entitled to "damages," which the Court interprets as "restitution."  (*See* FAC ¶ 322.)  Plaintiff, however, does not state facts showing that he is entitled to restitution.  He does not allege that Defendants obtained from him money or anything else in which he had an ownership interest.

United States District Court
Central District of California

Plaintiff argues that he possesses an ownership interest in the attorneys' fees that the City paid to the Landskroner Defendants and the Libman Defendants.  (*See, e.g.*, Opp to Libman MTD at 12-13.)  But even assuming that Plaintiff acquired an interest in the attorneys' fees, Plaintiff's ownership interest would have arisen as a result of Defendants' wrongful acts—Defendants' wrongful acts did not deprive him of the fees or his ownership interest in it.  The UCL therefore does not permit recovery of those fees.  As Plaintiff has not presented a viable claim for restitution or injunctive relief, the Court GRANTS the Landskroner Defendants' and the Libman Defendants' motions to dismiss Plaintiff's seventeenth claim.

8.   Nineteenth Claim: Violation of the Racketeer Influenced and Corrupt Organizations Act

Plaintiff alleges that Defendants violated 18 U.S.C. §§ 1962(c) and (d).  (FAC ¶¶ 30.)  As relevant here, § 1962(d) makes it unlawful to conspire to violate § 1962(c).  18 U.S.C. § 1962(d).  A violation of § 1962(c), in turn, requires "1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

A "pattern of racketeering activity" requires at least two racketeering predicates committed within a 10-year period.  18 U.S.C. § 1961(5).  In addition, to establish such a pattern, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

United States District Court
Central District of California

1    Plaintiff details the contents of four emails sent between Kiesel,

2  Paradis, and Libman on March 3, 2015, March 24, 2015, March 25, 2015,

3  and April 1, 2015 discussing the drafting and filing of the *Jones* complaint.

4  (FAC ¶ 82.)  He further asserts that these emails were sent to facilitate

5  Defendants' scheme of filing and quickly settling the *Jones* action in order to

6  deprive the *Jones* class members the full value of their overbilling claims.

7  (*See* FAC ¶ 335.)  As Plaintiff plausibly alleges four instances of wire fraud,

8  *see* 18 U.S.C. § 1343, committed within a 10-year period, and which

9  constitute racketeering activity, *see* 18 U.S.C. § 1961(1), he has satisfied

10  the "minimum necessary condition" for alleging the existence of a "pattern of

11  racketeering activity."  *H.J.*, 492 U.S. at 237.

12

13    Plaintiff, however, must still show that the racketeering predicates are

14  related and continuous.  *Id.*  Defendants do not dispute that the alleged

15  instances of wire fraud are related.  Plaintiff, for his part, concedes that there

16  is little threat of continued racketeering activity.  (*See, e.g.*, Opp to Clark

17  MTD at 23.)  The parties' only remaining dispute is whether the predicates

18  that have already occurred "demonstrate continuity over a closed period" of

19  time.  *H.J.*, 492 U.S. at 242.  As "Congress was concerned in RICO with

20  long-term criminal conduct," a party alleging a RICO violation over a closed

21  period must generally do so "by proving a series of related predicates

22  extending over a substantial period of time."  *Id*.  "Predicate acts extending

23  over a few weeks or months and threatening no future criminal conduct do

24  not satisfy this requirement."  *Id.*

25

26

United States District Court
Central District of California

1    Here, Plaintiff's allegations of four instances of wire fraud spanning a

2  period of one month do not demonstrate a continuity sufficient to establish a

3  "pattern of racketeering activity."  Plaintiff hints at other instances of mail

4  fraud and wire fraud.  (*See* FAC ¶ 340 ("Thus, to the extent that Defendants

5  mailed documents to each other to further their scheme, they committed

6  mail fraud.  To the extent they emailed each other to further their scheme,

7  they committed wire fraud.  To the extent that they mailed or electronically

8  filed documents for the Jones action, they also committed mail or wire

9  fraud.").)  He does not, however, describe the circumstances of such fraud

10 with the particularity required by Rule 9(b), and his generalized allegations

11 are insufficient to support his RICO claim.

12

13    Plaintiff suggests that the Landskroner Defendants and the Libman

14 Defendants may have committed mail fraud or wire fraud when they filed

15 their complaint in *Jones* on April 1, 2015, when they filed their February

16 2017 response to settlement objections, and when they filed a motion for

17 final approval of class settlement on July 14, 2017.  (Opp to Landskroner

18 MTD at 15; *see also* Doc. No. 72-6.)  To be sure, Plaintiff does not actually

19 allege mail fraud or wire fraud since he does not allege that the documents

20 filed in *Jones* were sent by mail or wire.  But even if Plaintiff were to

21 successfully allege that the filings constitute mail fraud or wire fraud, the

22 additional three predicates would not save his RICO claim.  Plaintiff cites

23 several cases where courts have found racketeering activity spanning

24 thirteen months to two years sufficient to establish continuity.  (Landskroner

25 MTD at 19-20.)  Unlike the predicates in the cases Plaintiff cites, however,

26 Plaintiff's seven predicates constitute racketeering activity spanning two

United States District Court
Central District of California

years only in a technical sense.  They are better described as isolated instances of racketeering activity separated by close to two years of inactivity.  As such, they do not rise to the level of a "pattern of racketeering activity."  *See Turner v. Cook*, 362 F.3d 1219, 1231 (9th Cir. 2004) ("Because almost all of the alleged fraudulent communications occurred during [a] two month period . . . and the additional three categories of communication occurred only sporadically in the preceding year . . . appellants have failed to allege a 'series of related predicates extending over a substantial period of time.'").

As Plaintiff has failed to adequately allege a "pattern of racketeering activity," the Court GRANTS Defendants' motion to dismiss Plaintiff's nineteenth claim.[5]

### I.    Anti-SLAPP

The Kiesel Defendants move to strike Plaintiff's fourth, sixth, eighth, ninth, eleventh, twelfth, fourteenth, and fifteenth claims against them. (Kiesel MTS at 5.)  They assert first, that these state law claims arise from protected activity, and second, that Plaintiff cannot establish a probability of prevailing on them.  (*Id.* at 5-10.)  The Court need not, and does not, decide whether Plaintiff's state law claims against the Kiesel Defendants arise from protected activity because the Court has already determined, for the reasons stated above, that Plaintiff has adequately pleaded his state law claims against the Kiesel Defendants.  *See Planned Parenthood Fed'n of*

---

[5] The Court previously granted the City's motion to dismiss Plaintiff's nine-teenth claim on other grounds.  (Doc. No. 154.)

United States District Court
Central District of California

*Am., Inc.*, 890 F.3d at 834 ("[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated.").  The Court accordingly DENIES the Kiesel Defendants' Motion to Strike.

### J.    Leave to Amend

At the hearing, Plaintiff requested that the Court grant him leave to amend his first claim against Clark and the City if the Court decided to dismiss his claims against them.  Federal Rule of Civil Procedure 15 encourages courts to "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  District courts, however, have "wide discretion in granting or refusing leave to amend after the first amendment."  *Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016) (citation omitted).  Although courts consider several factors in determining whether to grant leave to amend, "[f]utility of amendment can, by itself, justify the denial of a motion for leave to amend."  *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

Since Plaintiff's filing of the FAC, new information has come to light involving Clark's alleged involvement in the collusive settlement in *Jones*.  (*See* Plaintiff Suppl. at 3-4.)  The Court finds that in the interests of justice, Plaintiff should be permitted to amend his complaint to incorporate this new information.  The Court therefore GRANTS Plaintiff leave to amend his first claim against Clark.

United States District Court
Central District of California

Plaintiff also seeks leave to amend his first claim as to the City so that he can allege that Clark, Peters, or someone else in the Los Angeles City Attorney's Office who ratified their actions had final policy-making authority. Any such amendment, however, would be futile.  "[T]he identification of policymaking officials is a question of state law. . . . it is not a question of fact."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988).  In Los Angeles, no one in the City Attorney's Office, including the City Attorney, has final policy-making authority with respect to the initiation and settling of litigation.  *See* Los Angeles, Cal., City Charter § 272 ("In the course of litigation, [the City's] decisions, including a decision to initiate litigation, shall be made by the Mayor, the Council, or boards of commissioners . . . ."); *Id.* § 273 (detailing the circumstances in which the Mayor, the Council, or boards of commissioners may approve a settlement).  The Court therefore DENIES Plaintiff leave to amend his first claim against the City.

Plaintiff did not seek leave to amend any of his other claims at the hearing, and the Court determines that amendment of his second, sixteenth, seventeenth, or nineteenth claim would in any case be futile.  The Court therefore dismisses those claims without leave to amend.

### V.    CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss.  The Court DISMISSES Plaintiff's claims to the extent they seek injunctive relief.  The Court DISMISSES Plaintiff's first claim against Clark and the City for a violation of 42 U.S.C. § 1983, with leave to amend as to Clark only.  The Court

DISMISSES, without leave to amend, Plaintiff's second claim for unjust enrichment; Plaintiff's sixteenth claim for a violation of the CLRA; Plaintiff's seventeenth claim for a violation of the UCL; and Plaintiff's nineteenth claim for a violation of RICO.  The Court DENIES the Kiesel Defendants' motion to strike.

**IT IS SO ORDERED.**

Dated:     3/10/23

_____
Virginia A. Phillips
Senior United States District Judge