Filippo Marchino, Esq. (SBN 256011)
FM@XLAWX.COM
Carlos X. Colorado, Esq. (SBN 231031)
CC@XLAWX.COM
Thomas E. Gray, Esq. (SBN 299898)
TG@XLAWX.COM
**THE X-LAW GROUP, P.C.**
625 Fair Oaks Ave, Suite 390
South Pasadena, CA 91030
Tel: (213) 599-3380
Fax: (213) 599-3370

Attorneys for Plaintiff Dennis Bradshaw,
Individually and On Behalf of All Others
Similarly Situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS BRADSHAW, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:19-cv-06661-VAP (JCX) |
| Plaintiff, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CITY OF LOS ANGELES, a municipal entity; JAMES CLARK, in his individual and official capacity; THOMAS PETERS, in his individual and official capacity; THE LANDSKRONER LAW FIRM, LTD. dba LANDSKRONER GRIECO MERRIMAN, LLC, a limited liability company; JACK LANDSKRONER, an individual; LAW OFFICES OF MICHAEL J LIBMAN APC, a California Professional Corporation; MICHAEL J. LIBMAN, an individual; KIESEL LAW LLP, a California limited liability partnership; PAUL KIESEL, an individual; PARADIS | Judge: Virginia A. Phillips<br>Courtroom: 8A<br><br>Trial Date: None Set |

LAW GROUP PLLC, a New York Professional Service Limited Liability Company; PAUL PARADIS, an individual

Defendants.

## INTRODUCTION

1.     Plaintiff Dennis Bradshaw ("Plaintiff" or "Bradshaw") brings this suit against James Clark ("Clark"), Thomas Peters ("Peters"), The Landskroner Law Firm, LTD. ("The Landskroner Firm"), Jack Landskroner, deceased, ("Landskroner"), Law Offices Of Michael J Libman APC, Michael J. Libman ("Libman"), Kiesel Law LLP, Paul Kiesel ("Kiesel"), Paradis Law Group PLLC, and Paul Paradis ("Paradis")   (collectively, "Defendants") to recover damages owed to him and others similarly situated.

2.     This lawsuit arises out of professional misconduct at an almost unfathomable level by Defendants, most of whom are attorneys, or law corporations involved in the practice of law.  When the Los Angeles Department of Water and Power ("LADWP") switched to a new billing system, it began billing hundreds of thousands of ratepayers incorrect amounts.  However, rather than simply refund consumers and resolve the problem, attorneys at the Los Angeles City Attorney's Office, along with outside counsel, instead decided to eliminate ratepayers' claims through a class action.  In essence, they chose to prophylactically sanitize the problem and prevent any true legal exposure. Although Los Angeles' outside counsel initially planned to represent a ratepayer in a class action against the company that developed the billing system, PricewaterhouseCoopers, LLP ("PwC"), they instead passed the ratepayer off to an attorney so that he could file a class action against *The City of Los Angeles*.  The attorneys who were given this ratepayer almost immediately filed the class action captioned as *Antwon Jones v. City of Los Angeles* (the "*Jones* Action"), and almost as quickly settled it with the City of Los Angeles ("the City").  However, at no time

**SECOND AMENDED CLASS ACTION COMPLAINT**

during the settlement approval process or the notice period for ratepayers to object or opt out did the attorneys disclose their conflict of interest or that they were plotting with the defendant in that case, The City, for a quick settlement.  As a result, the ratepayers lost their ability to obtain a fair settlement from The City and the attorneys went on to obtain tens of millions of dollars in fees and benefits.  The truth only came to light by happenstance, when the company that developed the billing system, which is involved in litigation with The City, learned that The City had originally intended that the plaintiff in the class action was originally supposed to sue PwC, rather than The City.  Significantly, and unlike in most other lawsuits, Plaintiff's allegations are based in large part upon deposition testimony taken by PwC and documents it obtained through the course of discovery.

3.     As a result of Defendants' conduct, Plaintiff and other LADWP ratepayers who were *Jones* class members have suffered significant damages.

4.     Pursuant to the Court's March 10, 2023 *Order Granting In Part and Denying In Part Defendants' Motions to Dismiss*, this Second Amended Class Action Complaint pleads facts demonstrating that Los Angeles Chief Deputy City Attorney James P. Clark ("Clark") was the architect of the collusive scheme in the *Jones* Action that caused Plaintiff's injury and that Clark not only authorized this collusive scheme, but also actively participated in this scheme to ensure its success.  This Second Amended Class Action Complaint also pleads facts demonstrating that Clark then actively participated in the cover-up that ensued in an effort to prevent Los Angeles Court Superior Court Judge Elihu Berle, the FBI and the Office of Chief Trial Counsel of the State Bar of California from learning the truth concerning the collusive litigation scheme and numerous other illegal and unethical acts undertaken by City Attorney personnel, City officials and private attorneys in connection with the *Jones* Action.

**SECOND AMENDED CLASS ACTION COMPLAINT**

**PARTIES**

5.     Plaintiff Dennis Bradshaw is the renter of a house in the City of Los Angeles and an LADWP customer.  He is a citizen of the State of Nevada.

6.     Defendant James Clark was at all times relevant to this action the Chief Deputy City Attorney of the Los Angeles City Attorney's Office and reported directly to then City Attorney Michael Feuer.  The general counsel of LADWP directly reported to him.  In addition, Clark had overall supervisory authority for the City's defense of the *Jones* Action from 2015 to 2017.  Clark is a citizen of the State of California, and a resident of Los Angeles County, California. He is sued in both his individual and official capacity.

7.     Defendant Thomas Peters was at all times relevant in this action the chief of the Civil Litigation Branch of the Los Angeles City Attorney's Office and reported directly to Clark.  Before working for the City, Peters was a partner at Kiesel Boucher & Larson, a law firm that eventually became Kiesel Law LLP. Peters is a citizen of the State of California, and a resident of Los Angeles County, California.  He is sued in both his individual and official capacity.

8.     Clark and Peters are collectively referred to in this Complaint as "LA Defendants."

9.     Defendant The Landskroner Law Firm, Ltd dba Landskroner Grieco Merriman, LLC is an Ohio limited liability company with its principal place of business in Ohio.

10.     Defendant Jack Landskroner, deceased, was an attorney with The Landskroner Firm and a citizen of Ohio.

11.     Defendant Law Offices of Michael J Libman APC is a California professional corporation with its principal place of business in Los Angeles County, California.

**SECOND AMENDED CLASS ACTION COMPLAINT**

12.     Defendant Michael J. Libman is an attorney with Law Offices of Michael J. Libman APC, a citizen of the State of California, and a resident of Los Angeles County, California.

13.     The Landskroner Firm, Jack Landskroner, Law Offices of Michael J. Libman, and Michael J. Libman are collectively referred to in this Complaint as "Class Counsel Defendants."

14.     Defendant Kiesel Law LLP is a limited liability partnership with its principal place of business in Los Angeles County, California.

15.     Defendant Paul Kiesel is an attorney with Kiesel Law LLP, a citizen of the State of California, and a resident of Los Angeles County, California.

16.     Defendant Paradis Law Group PLLC is a New York Professional Service Limited Liability Company with its principal place of business in New York.

17.     Defendant Paul Paradis is an attorney with Paradis Law Group PLLC and a citizen of New York.

18.     Defendants Kiesel Law LLP, Paul Kiesel, Paradis Law Group PLLC, and Paul Paradis are collectively referred to in this Complaint as "Special Counsel Defendants."

19.     LA Defendants, Class Counsel Defendants, and Special Counsel Defendants are collectively referred to in this Complaint as "Defendants."

20.     Plaintiff is informed and believes, and upon such basis alleges, that at all times herein mentioned, each of the Defendants herein was an agent, servant, employee, co-conspirator, partner, joint venturer, wholly owned and controlled subsidiary and/or alter ego of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, conspiracy, partnership and/or joint venture.

**SECOND AMENDED CLASS ACTION COMPLAINT**

21.     Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein.  In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of their primary wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332 because there are over 100 members of the proposed class, at least one member of the proposed class has a different citizenship from a defendant and the total matter in controversy exceeds $5,000,000.  This Court also has subject matter jurisdiction over Plaintiffs' federal claims for relief under 42 U.S.C. § 1983 pursuant to 28 § 1331 and over Plaintiffs' state law claims, because they are so related to their federal law claims as to form part of the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

23.     Venue is proper pursuant to 28 U.S.C. § 1391(b) & (c) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because Defendants are subject to the Court's personal jurisdiction in this judicial district.

//

//

5

**SECOND AMENDED CLASS ACTION COMPLAINT**

**FACTUAL ALLEGATIONS**

**I.      LADWP Overcharges Customers.**

    **A.      New Allegations in the Second Amended Complaint**

        **1.      LADWP's Implementation of the New CC&B Billing System
Is A Disaster**

24.      The City provides water and electric service to certain residents of the
City and the County of Los Angeles through the City's Department of Water &
Power ("LADWP").  The LADWP is the largest municipal utility in the United
States, with an annual operating budget of $5.5 billion.  LADWP provides water
and electric service to approximately 4 million residents and has 1.4 million
customers ("ratepayers").

25.      In September 2013, the LADWP launched a new customer
information and billing system (CIS) to assist in managing some of its core
business operations, including billing for power and water usage. As part of the
new CIS, the LADWP replaced its forty-year-old billing system with a new
"Customer Care & Billing System" ("CC&B System") that was configured and
implemented by PricewaterhouseCoopers, LLP ("PwC").

26.      The launch of the LADWP's CC&B System was a disaster.  By the
end of 2014, the City had lost hundreds of millions of dollars in unclaimed revenue
due to billing problems with the CC&B System and had suffered from scathing
and relentless attacks in the media about the billing debacle. In addition, due to
DWP's failure to resolve ratepayer complaints and ongoing issues with the new
CC&B System, four putative billing class action lawsuits were filed against the
City in 2014 and early 2015:

    • *Kimhi v. The City of Los Angeles*, Los Angeles County Superior Court
("LACSC") Case No. BC536272, filed February 13, 2014 (the "Kimhi
Class Action");

• *Bransford v. City of Los Angeles*, LACSC, Case No. BC565618, filed December 4, 2014 (the "Bransford Class Action");

• *Morski v. City of Los Angeles*, LASC, Case No. BC568722, filed January 7, 2015 (the "Morski Class Action"); and

• *Fontaine v. City of Los Angeles*, LACSC, Case No. BC571664, filed February 5, 2015 (the "Fontaine Class Action") (collectively, the "Related Class Actions").

27.     These class actions generally alleged that, since the September 2013 "go live" of the CC&B System, the LADWP had improperly overcharged its customers, sent delayed bills, improperly estimated bills, failed to investigate problems, and failed to provide customers with appropriate refunds or credits.

28.     By the end of 2014, the LADWP was enmeshed in a public relations firestorm resulting from the LADWP's ongoing failure to provide reliable billing services to its over 1.4 million ratepayers.

## 2.     Attorneys Blood and Himmelfarb Execute Tolling Agreements and Agree To Dismiss the *Casler* and *Morski* Class Actions Against The City of Los Angeles

29.     On or about January 26 and 29, 2015, respectively, attorneys Timothy Blood and Alan Himmelfarb agreed to dismiss the *Casler* and *Morski* consumer class actions that each of them had previously filed against the City of Los Angeles, which alleged claims arising out of plaintiffs Casler and Morski having been incorrectly charged by the Los Angeles Department of Water and Power ("LADWP").

30.     On or about those same dates, attorneys Blood and Himmelfarb also executed Tolling Agreements with the City, pursuant to which the City agreed to toll any applicable statute of limitations in exchange for the dismissal of the *Casler* and *Morski* class actions.

**SECOND AMENDED CLASS ACTION COMPLAINT**

31.　　The dismissal of the *Casler* and *Morski* consumer class actions was conditioned on attorneys Blood and Himmelfarb joining Kiesel and Paradis as co-counsel in a soon to be filed consumer class action on behalf of plaintiff Antwon Jones, which was captioned *Antwon Jones v. PwC.*

32.　　On February 1, 2015, without explanation, attorney Himmelfarb withdrew from the Tolling Agreement in the *Morski* action and re-filed the complaint in the *Morski* consumer class action.

33.　　On February 4, 2015, attorney Blood withdrew from the Tolling Agreement in the *Casler* action and re-filed the complaint in the *Casler* consumer class action on behalf of Plaintiff Bransford.  Thereafter, this action became known and was referred to as the "*Bransford* Action."

34.　　As Clark testified on April 29, 2019, Clark was asked to – and did – personally approve the Tolling Agreements in both the *Casler* and *Morski* Actions and directed Peters to execute both Tolling Agreements on behalf of the City, which Peters subsequently did.  Accordingly, Clark had actual knowledge that the Tolling Agreements had been executed *and* that both plaintiffs soon thereafter withdrew from their respective Tolling Agreements, which touched off a series of events that quickly led Clark to authorize and direct that the collusive *Jones v. City* Action be filed against the City.   *See* Clark April 29, 2019 Deposition Tr. 88:24 - 89:11.

> **3.　The Negative Press Concerning the City's Failure To Resolve the LADWP Billing Debacle Continues To Mount and Plaintiffs Casler and Morski Exacerbate The Situation By Withdrawing From The Tolling Agreements**

35.　　On January 29, 2015, Peters sent Clark an email with a link to news story that appeared in the January 28, 2015 edition of the *Daily News*.  In his email to Clark, Peters stated, "***The narrative of DWP screwed up (see e.g., the link below) can and should change, and we can begin to make that change now.***"

*See* Clark April 29, 2019 Deposition Tr. 111:12 - 112:6. (Emphasis added).

36.     When Clark was asked whether Clark shared Peter's sentiment as of January 29, 2015, Clark testified, "***Certainly the part of the narrative being DWP screwed up was something the entire team wanted to change.  So yes***." *Id*. at 112:2 - 112:6. (Emphasis added).

37.     On February 3, 2015, Peters, and Deputy City Attorney personnel Richard Brown, Richard Tom, Eskel Solomon and Deborah Dorny participated in a conference call and discussed the withdrawal from the tolling agreement by plaintiff *Morski* and how that would impact the City's ability to control the litigation filed against the City and the public narrative surrounding the LADWP billing system debacle.

38.     On or about February 4, 2015, after learning that plaintiffs *Morski* and *Bransford* had withdrawn from the tolling agreements they had previously entered into and had decided to proceed with litigating both the *Morski* and *Bransford* consumer class actions against the City, Peters repeatedly openly and expressed the fact that he was "extraordinarily disappointed."

39.     During that same time period, Defendant Clark became apoplectic and began to demand that the City take the necessary actions to ensure that the City would control any LADWP related consumer class action litigation against the City, as well as the public narrative, concerning the City's handling of the LADWP customer billing system debacle.

40.     On February 6, 2015, a third consumer class action involving the LADWP billing system debacle was filed against the City by Plaintiff Fontaine.

41.     On February 10, 2015, the LADWP was the subject of additional negative and very critical news reporting relating to the ongoing LADWP customer billing system debacle.

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

42. On February 11, 2015, Paradis and Kiesel met with Agrusa, Annaguey, Tom and Dorny to discuss coordinating discovery efforts in the various cases involving the LADWP customer billing system debacle. During this in-person meeting at the LADWP, Kiesel informed Agrusa and Annaguey that Kiesel and Paradis would soon be filing the *City v. PwC* Action on behalf of the City, as well as the *Antwon Jones v. PwC* class action as well.

43. On February 12, 2015, Paradis met with Clark, Brown, Tom and Solomon to discuss status of draft pleadings, the negative publicity that LADWP continued to receive concerning the LADWP billing system debacle, and the impact of plaintiffs *Morski* and *Bransford* having withdrawn from the tolling agreements and made the decision to proceed with litigating both the *Bransford* and *Morski* class actions on the City's overall effort to gain control over the ever-growing amount of LADWP billing system debacle related litigation that was being filed against the City.

## B.     Allegations from the First Amended Complaint

44. On or about September 3, 2013 LADWP implemented a Customer Care and Billing software platform (the "CC&B System"), which had been developed and implemented by PricewaterhouseCoopers, LLP ("PwC"), to bill customers for water, electricity, and other utility services as well as to administer solar-power accounts. The CC&B System was inherently and fundamentally flawed, causing over-billing and other billing problems for LADWP's customers. As was alleged in the Amended Class Action Complaint that was filed in *Jones*, the CC&B System billed incorrectly in at least the following ways:

### 1.     Tiered Billing Issue.

45. Pursuant to Incremental Electric Rate Ordinance No. 182273, the LADWP was permitted to charge its customers for electricity and water usage according to tiers. This Ordinance provided for three tiers of pricing: Tier 1, Tier

10

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    2, and Tier 3.

2    46.    The Tier at which a customer is charged was dependent upon the

3    amount of electricity or water a customer used in a given billing period. The more

4    electricity and/or water that a customer used, the higher the Tier at which the

5    customer would be charged.  Accordingly, Tier 1 customers would be charged

6    lower rates than Tier 2 customers and Tier 3 customers would be charged higher

7    rates than Tier 1 or Tier 2 customers. One of the laudable purposes behind this

8    tiered structure was to allow a customer to adjust their usage downward so as to

9    prevent billing at a higher Tier, and to simultaneously conserve resources.

10    47.    Due to programming defects in the CC&B System, LADWP

11    improperly assigned customers to Tiers higher than those to which the customer

12    should have been assigned based on usage. This, in turn, resulted in customers

13    being billed at an erroneously higher rate than otherwise legal and valid.

14

15                    **2.    Trend Estimate Issue.**

16    48.    Pursuant to the Rules Governing Water and Electric Service (the

17    "Rules"), under certain circumstances LADWP was permitted to charge its

18    customers using "estimated" rather than "actual" usage.

19    49.    Estimated billing, however, was permitted under the Rules in only a

20    limited number of circumstances including: (i) where a customer paid on a "flat

21    rate" schedule (regardless of usage); (ii) for deposits; (iii) for improper

22    consumption of services; (iv) to recoup monies due to theft of services; and (v)

23    where a meter is maintained in a locked compartment or otherwise fails to register

24    correctly.

25    50.    Unbeknownst to its customers, and despite the very limited

26    circumstances in which LADWP is permitted to use estimated billing, LADWP

27    intentionally violated the Rules by sending out millions of estimated bills since

28    2013. The vast majority of these bills did not satisfy the criteria under the Rules

                                           11
                    **SECOND AMENDED CLASS ACTION COMPLAINT**

1  which would have allowed for "estimated" billing.

2       51.    The CC&B System's Trend Estimation Algorithm was defective.

3       52.    To perform "Trend Estimation" properly, a utility billing system

4  utilized a series of algorithms that analyzed such things as geographic area, type of

5  customer, etc. in order to estimate a customer's usage.

6       53.    These criteria were examined and utilized in calculating a "Trend

7  Estimate" to ensure that the "Trend Estimate" used to bill customers is as close to

8  actual usage data as possible, and that the "estimated" bill is therefore as close to

9  what a bill based on actual usage data would be.

10      54.    When configured properly, the algorithms that calculated the "Trend

11  Estimate" would use a "neighborhood" attribute to ensure that the usage patterns

12  employed to calculate a "Trend Estimate" for a customer were based on the usage

13  patterns of other customers who also lived in the immediate geographic area, rather

14  than on the usage patterns of customers who lived in, for example, disparate

15  geographic locations, i.e., similar customers. Stated another way, in order to

16  calculate a reliable and valid – and therefore, reasonable - "Trend Estimate," it was

17  critical that the billing system used to calculate the Trend Estimate be programmed

18  in such a way that the billing system compared apples with apples, as opposed to

19  apples and oranges, and generated the Trend Estimate based on the billing system

20  having done so.

21      55.    Rather than configuring the Trend Estimate based on "similar"

22  customers, PwC configured the Trend Estimate algorithm to estimate a customer's

23  usage based on a straight average of all customer types.

24      56.    Because the Trend Estimate was mis-configured, estimates generated

25  by the CC&B system were inaccurate.

26      57.    Accordingly, as a result of this programming, customers were

27  damaged. In particular, customers were either overbilled based on inflated

28  estimates or were underbilled, but forced into a higher Tier (along with higher

**SECOND AMENDED CLASS ACTION COMPLAINT**

taxes and surcharges) as a result of being billed in one-lump sum at the time when their bills were reconciled with their actual usage:

58. First, LADWP billed its customers for greater quantities of electricity, water and sewage than they had actually used because the estimates themselves were higher than any customer's actual usage.

59. Second, because the estimates themselves were randomly generated, the estimates have no correlation to actual usage, which could negatively impact a customer by forcing him into a Tier higher than that which he would be assigned had his usage not been estimated.

60. Third, although LADWP could ultimately reconcile the estimate with a customer's actual usage, if, in the interim, a rate increase was implemented, or if a customer's actual usage was shifted into a higher cost season, all of the shifted usage would be improperly billed at a higher rate.

61. Fourth, because estimated bills do not reflect actual consumption, consumers were deprived of the knowledge of whether their actual consumption required a downward modification so as to prevent them from being billed at a higher Tier, which, in turn, violates the spirit of tiered pricing.

### 3. Closed Account with Credit Balance Issue.

62. When an LADWP customer closes his or her account, and the account has a positive balance or credit, those funds must be refunded to the customer.

63. Due to programming defects in the CC&B System, customers with closed accounts with positive balances did not receive refunds.

### 4. Premise Condition/Estimated Bill Issue.

64. Unbeknownst to some customers, there were conditions on their premises which caused excessive consumption of water or power or sewage, increasing their usage from ordinary levels.

13

65.     LADWP's use of estimated bills for such customers for multiple billing periods resulted in these customers failing to appreciate that their consumption had increased from ordinary levels as a result of an unknown premise condition.

66.     Ultimately, upon reconciliation, these customers were charged for far greater usage than they otherwise would have been had the increased consumption appeared on an initial actual bill, such that the customer could remediate it instead of being hidden in multiple improperly estimated bills.

### 5.     Solar Customer Issues.

67.     Defects in the CC&B System have caused several problems with respect to utility bills issued to those customers of the LADWP that installed their own solar power systems.

68.     First, defects in the CC&B System caused the CC&B System to fail to recognize when LADWP customers switched from traditional electric power to solar power. As a result, the CC&B System continued to charge these customers for electric power without consideration of the solar power generated by their systems. Moreover, the delay in recognizing that a customer was producing excess energy resulted in a failure to credit that customer's account for power generated, and/or a failure to pay for excess energy under the applicable rate schedule, City Ordinance 182273.

69.     Second, where the CC&B System did recognize that a household had converted to solar power, defects in the CC&B System caused the CC&B System to miscalculate rates and credits due to these solar power customers.

70.     As a result of these defects in the CC&B System, LADWP customers that used solar power were overcharged for electricity and were not credited appropriately for electricity that they had produced and generated into the grid.

**SECOND AMENDED CLASS ACTION COMPLAINT**

6.        **Automatic Bill Payment/Bank Overdraft Charge Issues.**

71.      Many LADWP customers were enrolled in an automatic bill-payment plan. Due to the over-billing errors resulting from the flaws in the CC&B System, the automatic withdrawals were for greater amounts than customers reasonably expected to pay (or should have been required to pay) and resulted in overdrafts of the customers' bank accounts—and fees and penalties associated with such overdrafts.

7.        **Late Payment Charge Issue.**

72.      Due to defects in the CC&B System, certain customers were improperly assessed an inaccurate Late Payment Charge.

8.        **Estimated Electric Bills with "Minimum Charge" Issue.**

73.      Due to the defects in the CC&B System, certain customers received estimated bills for zero consumption, when, in fact, they had actual usage.

74.      These customers were assessed a "Minimum Charge" fee when they should have received a bill for actual usage without such a fee.

9.        **Other Billing and Customer Service Issues.**

75.      Defects in the CC&B System caused LADWP to delay the issuance of its customers' bills for electricity, water, sewage, and sanitation services for multiple billing cycles.

76.      The failure to timely issue bills was a result of an error in the CC&B System related to the integration of a particular interface, the responsibility of which was to upload meter read data into the CC&B System. This interface was known as the "Meter Read Upload Interface" or "MRU Interface," which was created and programmed by PwC.

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

77.     The Meter Read Upload Interface was designed to take meter read data, which is collected by meter readers in the field, and to then transmit or "upload" that data to the CC&B System for the generation of bills.

78.     Because PwC created and programmed the MRU Interface in a defective manner, the MRU Interface did not function properly and LADWP could not issue bills to many of its customers for long periods of time.

79.     After failing to issue bills for many months, LADWP then billed its customers for four, six, or even eight months of water and electricity in one "lump sum."

80.     The impact of LADWP's "lump sum" billing was that it resulted in inappropriately high bills, as it caused customers to be bumped up from lower pricing Tiers to higher pricing Tiers. As a direct result of being billed at higher Tiers, these LADWP customers have also improperly incurred higher utility taxes and energy surcharges. Moreover, such customers were not necessarily in a financial position to pay large lump-sum bills.

81.     Additional defects in the CC&B System caused the LADWP to: (i) continue to bill customers who requested that their services be terminated; (ii) fail to issue refunds for the overpayment of services; and (iii) inaccurately calculate bills that involved multiple billing periods.

82.     The CC&B System was intended to be programmed to automatically close out "off orders" that were not completed in the field upon the occurrence of a subsequent "on order" at the same location, thereby ensuring that billing was stopped and started properly. This programming component or "enhancement" of the CC&B System was known as "Auto-Close of Off Orders."

83.     By way of example, assume an LADWP customer is moving out of an apartment and places an "Off Order" so that service to the apartment is terminated. Then assume that a new resident moves into that same apartment days later. The "Auto-Close on Off Orders" enhancement was intended to ensure that billing to the

16

customer who is moving out of the apartment is completely stopped when the "On Order" is placed, so that the new resident – rather than the resident who is moving out – is billed for service once the "On Order" is placed.

84.     The "Auto-Close on Off Orders" enhancement was not programmed properly. As a result, the LADWP continued to bill customers *after* they had placed "Off Orders."

85.     Additionally, defects in the CC&B System have caused the LADWP to inaccurately calculate bills that involve multiple billing periods.

## II.     Defendants Collude To Settle The Claims.

### A.     New Allegations in the Second Amended Complaint

#### 1.     Annaguey and Agrusa Author and Deliver the "Liner Memo" to Clark and Numerous Other City Attorney Personnel

86.     On February 17, 2015, Annaguey circulated to the City Attorney's office (but not Kiesel or Paradis) the "*Liner Memo*," which Annaguey and Agrusa had drafted and in which Annaguey and Agrusa discussed what they perceived as potential conflicts Annaguey and Agrusa purportedly believed would likely arise if the City allowed Kiesel and Paradis to file both the *City v. PwC* action and the *Antwon Jones v. PwC* consumer class action, and to simultaneously serve as plaintiffs' counsel in both of those cases.

87.     Prior to Annaguey and Agrusa having circulated the "*Liner Memo*," the City had consented, in writing, to allow Kiesel and Paradis to file both the *Antwon Jones v. PwC* class action and the *City v. PwC* action and to simultaneously serve as plaintiffs' counsel in both of those cases.

88.     Evidence that the City had consented to do so is found in multiple drafts of Section III L. entitled "Conflicts of Interest" of the "*Engagement and Contingency Fee Agreement*" (the "Special Counsel Contract") with Kiesel Law

LLP ("Kiesel Law") and Paradis Law Group, PLLC ("PLG"), pursuant to which Kiesel Law and PLG were retained to serve as Special Counsel to the City of Los Angeles.

> ### 2. After Receiving the Liner Memo, Clark Becomes a "Shot Caller" and "Authorized and Directed" the City's "Collusive Litigation Scheme" in *Jones v. City*

89. After having been provided with and considered the *Liner Memo*, Clark determined to withdraw the City's express written consent to allow Kiesel and Paradis to file both the *Antwon Jones v. PwC* class action and the *City v. PwC* action and to simultaneously serve as plaintiffs' counsel in both of those cases. Clark then instructed Peters to inform Kiesel of Clark's decision. Promptly thereafter, Peters informed Kiesel as Clark had instructed him to do.

90. On or about February 23, 2015, Clark, Peters, Kiesel and Paradis met in City Attorney Feuer's executive conference room on the 8th floor of City Hall East. During this meeting, Clark complained about the increasingly negative news cycle and ever-increasing number of hostile news stories concerning the failed implementation of the LADWP's new customer billing system and how LADWP and City officials were being targeted for blame. *See* Kiesel May 28, 2019 Tr. at 104:25 – 105:7. *See also* Kiesel May 29, 2019 Tr. at 14:6 – 15:7.

91. During this meeting, Clark discussed a rapidly growing sentiment among LADWP and City officials and stated many City officials felt that something drastic needed to be done to change the increasingly negative and hostile public narrative concerning who bore responsibility for the LADWP's newly implemented failed billing system. Clark stated that City officials, including Feuer himself, felt strongly that the City needed to hold whoever was responsible for delivering the failed billing system to the LADWP financially accountable to the City and believed that doing so would greatly aid the effort to

**SECOND AMENDED CLASS ACTION COMPLAINT**

1
2

change the narrative.  *See* Kiesel May 28, 2019 Tr. at 121:16 – 123:16; 136:20 –
137:1; 145:9 – 146:18.

3
4
5
6
7
8
9

92.    In addition to changing the public narrative and re-directing public
criticism away from City officials and toward the people responsible for delivering
the failed billing system to the LADWP, Clark also stated that the City Attorney's
office very much wanted to gain control over the ever-burgeoning number of
consumer class actions that were being filed against the City so that the City could
resolve these cases on terms dictated by the City.  *See* Kiesel May 28, 2019 Tr. at
121:16 – 123:16.  *See also* Kiesel May 30, 2019 Tr. at 649:3 – 657:8.

10
11
12
13
14
15
16
17
18
19
20

93.    ***After an extended discussion, Chief Deputy Clark then personally
authorized and directed Kiesel and Paradis to find counsel who would be
friendly to the City to supposedly represent plaintiff Antwon Jones in a class-
action lawsuit against the City. Clark, Peters, Kiesel and Paradis further agreed
that, pursuant to this strategy, the forthcoming Jones v. City of Los
Angeles lawsuit would be used as a vehicle to settle all existing LADWP-billing-
related claims against the City on the City's desired terms, including those
claims asserted in four other consumer class actions***.  *See* Kiesel May 28, 2019
Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10 – 200:23.  *See also* Kiesel
May 29, 2019 Tr. at 37:24 – 38:21.  *See also* Kiesel May 30, 2019 Tr. at 658:2 –
659:21; 661:10 – 661:19; 663:1 – 664:9; 665:7 – 665:19.

21
22
23
24
25
26

94.    ***Acting at Clark's authorization and direction, Paradis and Kiesel
then created the "white knight" suit by hand-picking friendly plaintiff's lawyers
(Jack Landskroner of Cleveland and Michael Libman of Los Angeles)
(hereinafter "Landskroner" and "Libman") to file a Paradis-drafted complaint
against the City and email a Paradis-drafted settlement offer to the City***.  *See*
Clark February 26, 2019 Tr. at 105:7-9.

27
28

*//*

**SECOND AMENDED CLASS ACTION COMPLAINT**

95.     At the direction of Clark and Peters, Paradis drafted the *Jones v. City* class action complaint that accused the City of having engaged in a host of bad actions against Mr. Jones and the Class members, including fraud and deceit, unjust enrichment, negligent misrepresentation, violation of city ordinances, and incorporated the theme from their earlier *Jones v. PwC* draft complaint.  *See* Kiesel May 28, 2019 Tr. at 25:25 – 30:4.  *See* also Kiesel May 30, 2019 Tr. at 690:19 – 691:9.

96.     Clark's own testimony confirmed Kiesel's testimony.  At pp. 95-96 of Clark's February 26, 2019 deposition transcript, Clark testified in relevant part:

Q:     *Is it your understanding that the Complaint that was filed by Mr. Jones on his behalf on April 1, 2015 against the City of Los Angeles was originally drafted by Mr. Paradis*?

A:     *I think he had -- he had -- well, I'm not sure. think he may have had some role in that*.

Q:     Did you inquire about that?

A:     Yes.

Q:     And what did Mr. Paradis tell you about his role in preparing the draft Complaint that was filed six days after the case was handed off to Mr. Landskroner?

A:     *I think he had prepared the earlier Complaint, and I think he gave it to Mr. Landskroner*.

*See* Clark February 26, 2019 Tr. at 95:15 – 96:4. (Emphasis added)

97.     Testimony provided by Clark on February 26, 2019 evidences Clark's knowledge of and active participation in the City's collusive litigation scheme.  At pp. 110-112 of Clark's February 26, 2019 deposition transcript, Clark testified in relevant part:

20

**SECOND AMENDED CLASS ACTION COMPLAINT**

| | |
|---|---|
| 1 | Q:  *Prior to April 1, 2015, did anyone in the City Attorney's office or special counsel for the City in the LADWP versus PwC action know or expect that Mr. Jones would be filing the Jones v City of Los Angeles, No. BC 577267 (Los Angeles Superior Court filed April 1, 2015) Complaint*? |
| 2 | |
| 3 | |
| 4 | |
| 5 | A:  *I'm sure we knew before April 1, yes.* |
| 6 | Q:  And *did you understand at that time, immediately before April 1, 2015, that the Jones v LADWP Complaint was going to be filed and that there would then be an immediate request to individuals in the City Attorney's office to settle the case?* |
| 7 | |
| 8 | |
| 9 | |
| 10 | A:  I think we were trying to settle the case, so I mean, I -- I don't know about immediate request, but we were not -- we were trying to settle the case on the basis I explained. |
| 11 | |
| 12 | |
| 13 | Q:  *Did you understand that Mr. Landskroner, after he took over in the last week of March 2015, was going to file a lawsuit and then immediately reach out to try to settle the case?* |
| 14 | |
| 15 | |
| 16 | A:  *I think I did.* |
| 17 | *     *     * |
| 18 | Q:  And *the City, in late March 2015, thought that it could most readily obtain such a settlement from negotiations with Mr. Landskroner; correct*? |
| 19 | |
| 20 | |
| 21 | A:  *I'm sure we reached that conclusion, yes . . . .* |

*See* Clark February 26, 2019 Tr. at 110:18 – 111:17; 112:3-6.  (Emphasis added).  *See also*, Clark February 26, 2019 Tr. at 105:10 – 105:15 (***Clark personally understood in late February 2015 that "the reason Landskroner was coming in [to represent Antwon Jones] was to sue the City of Los Angeles*.**")  (Emphasis added).

*//*

**SECOND AMENDED CLASS ACTION COMPLAINT**

98. Similarly, additional sworn testimony provided by Clark later during the same deposition further evidences Clark's personal knowledge of and active participation in the City's collusive litigation scheme in mid-March 2015. At p. 137 of Clark's February 26, 2019 deposition transcript, Clark testified as follows:

Q: And, again, do you -- ***does this refresh your recollection that you understood at the time of filing that this document [Landskroner/Libman April 2, 2015 Settlement Demand] would be forthcoming the next day or soon thereafter***?

A: ***I knew that we anticipated settling with Mr. Jones***. I --I can't recall if I -- if I knew this document was coming. I don't further recall thinking it was coming April 2nd.

Q: ***How much earlier than April 1 did you know that the settlement demand would be forthcoming at some point and that you would be settling with Mr. Jones?***

A: ***Sometime during the latter half of -- the end of March.***

*See* Clark February 26, 2019 Tr. at 137:4-18. (Emphasis added).

99. Eliminating any doubt as to who at the City Attorney's Office made the decision to execute the collusive litigation scheme with Mr. Landskroner, Ms. Agrusa testified:

Q: Did – ***do you know who made the decision at the City ultimately to select Mr. Landskroner***?

A: ***I believe it was Jim Clark.***

*See* Agrusa June 28, 2019 Tr. at 150:5-7. (Emphasis added).

100. Remarkably, Clark, himself, admitted that he was in fact the "shot caller" for the corrupt *Jones v. City* litigation when he testified as follows:

Q: Am I correct that during the time period of 2015 through 2017, ***you had overall supervisory authority for the City's defense of the Antwon Jones v. City of Los Angeles case?***

A:     *I – I think overall, yeah.  I think that's correct.*

*See* Clark April 29, 2019 Deposition Tr. 170:14 - 170:22.  (Emphasis added).

101.    Significantly, the United States Attorney's Office and the FBI have confirmed the foregoing after having conducted a criminal investigation involving the City's collusive litigation scheme.  *See* Paradis Plea Agreement at Factual Basis, ¶ 5.

102.    In addition, after also conducting an extensive investigation, Special Master Robbins found that the February 23, 2015 meeting "***was the inception of the collusive Jones v. City lawsuit,***" which also became known and was referred to as the "white knight" lawsuit.  *See* Special Master Robbins Report at p. 22. (Emphasis added).  Special Master Robbins also correctly identified ***Mr. Clark and Mr. Peters as the "shot callers for the Jones v. City sham.***"  *Id.* at 109. (Emphasis added).

### 3.    The Jones v. City Action Was A "Sham" Lawsuit That Was Intended To – and Did – Defraud Judge Elihu Berle and Class Members

103.    What started out as a plan to help City Attorney Mike Feuer and Chief Deputy City Attorney James Clark solve a burgeoning political crisis of confidence in the City's political leadership stemming from a failure to successfully manage the billing and business affairs of the Los Angeles Department of Water and Power, soon spiraled into a complex web of deceit, corruption, and fraud without rival.

104.    That web of lies and deceit began with the "collusive litigation scheme" that Chief Deputy Clark authorized and directed Kiesel, Paradis and numerous other attorneys to corruptly implement to achieve a collusive settlement in the *Jones v. City* class action on terms and a schedule that had secretly been

**SECOND AMENDED CLASS ACTION COMPLAINT**

1  dictated by the City Attorney's office.

2  105.  By quickly settling LADWP consumer claims on terms, conditions

3  and a schedule that they exclusively secretly controlled, City officials quelled the

4  political backlash that they feared would be harmful to their future political

5  aspirations.

6  106.  Special Master Robbins found that "***Jones v. City was a [collusive]***

7  ***sham in substance; it was promoted as a real lawsuit, but in substance the City***

8  ***sued itself thus failing to qualify as a civil action under the law.  Jones v. City***

9  ***claimed to be a legitimate lawsuit. It was not . . . .  Here, a group of lawyers***

10  ***created a sham lawsuit, lied about it to a Court to obtain a favorable judgment***

11  ***including millions in fees, then obstructed the efforts to expose the sham***

12  ***lawsuit.***" *Id*. at 116.  (Emphasis added).

13  107.  Collusion, in the context of litigation, refers to a dishonest and

14  deceitful practice in which two or more parties conspire to manipulate the legal

15  process for their own advantage, thereby undermining the integrity of the judicial

16  system.

17  108.  In a collusive litigation scheme, such as the one authorized and

18  directed by Chief Deputy City Attorney Clark in the *Jones v. City* Action, one

19  party covertly cooperates with another party to facilitate a sham lawsuit, allowing

20  one of the parties to effectively sue itself in order to dictate the terms and

21  conditions of a settlement that is favorable to its own interests.

22  109.  A collusive litigation scheme requires the knowing participation of at

23  least two parties, as it is impossible for one party to conspire and collude with itself

24  without engaging in some form of collaboration or coordination with another party.

25  The requirement of two or more participants in a collusive scheme, such as the

26  corrupt scheme perpetrated by the City in the *Jones v. City* Action, ensures that the

27  dishonesty and fraud involved in such practices are not just individual acts of

28  deception, but rather a concerted effort to manipulate the legal process and exploit

24

1    the court's trust and the trust of Class members for the benefit of those engaged in

2    the collusion.

3        110.    The collusive litigation scheme authorized and directed by Clark in

4    the *Jones v. City* Action involved a concerted effort to manipulate the legal process

5    and exploit the Los Angeles County Superior Court's trust, and in particular, Judge

6    Elihu Berle's trust, as well as the trust of Class members, for the benefit of the City

7    and then Los Angeles City Attorney Feuer's political future, and enabled the City

8    to resolve numerous LADWP rate payer class actions involving the LADWP's

9    defective billing system on terms and a schedule dictated solely by the City in the

10   *Jones v. City* Action.

11       111.    While many attorneys played various roles in perpetrating the City's

12   corrupt collusive litigation scheme in the *Jones* Action at Clark's direction, the

13   three defense counsel of record to the City of Los Angeles who were responsible

14   for – and did – conduct the day-to-day activities on behalf of the City and who

15   thereby each knowingly and actively perpetrated the corrupt collusive litigation

16   scheme for the City included: (i) Liner LLP Partner Angela Agrusa; (ii) Liner LLP

17   Partner Maribeth Annaguey; and (iii) Liner LLP Associate attorney Kathryn

18   McCann ("McCann").

19       112.    Counsel of record to Plaintiff Jones in the *Jones v. City* Action who

20   colluded with Agrusa, Annaguey and McCann from the plaintiff's side of the

21   *Jones v. City* Action included Jack Landskroner ("Landskroner") (now deceased)

22   and Michael Libman ("Libman").

23       113.    Without the willful, knowing, and ongoing day-to-day participation of

24   Agrusa, Annaguey and McCann on behalf of the City of Los Angeles, the City's

25   corrupt collusive litigation scheme could not have been accomplished because

26   these three attorneys actively facilitated the City's corrupt plan on a daily basis as

27   detailed herein.

28   //

**SECOND AMENDED CLASS ACTION COMPLAINT**

114.   By engaging in the wrongful activities detailed herein and by personally authorizing and directing the activities undertaken by all of the participants in the City's corrupt scheme in the *Jones v. City* Action, Clark and his team of attorneys successfully deceived Judge Berle and Class members into believing that the *Jones* Action involved a *bona fide* dispute between thousands of LADWP ratepayers and the LADWP/City.

### 4.   Clark Personally Oversees And Directs Preparation of The Jones Settlement Demand Letter That The City Provided To Landskroner To Corruptly Settle The Jones v. City Action

115.   Critical to the City's ability to successfully file the collusive *Jones v. City* class action and then work with Landskroner and Libman to immediately settle the Jones Action and ***all*** of the related class actions on terms and conditions dictated solely by the City was the City's ability to ensure that the terms demanded by Landskroner and Libman during the staged mediations sessions were terms and conditions that had previously been determined and then dictated by the City.

116.   Clark recognized that the only real way to ensure that this occurred was for the City, itself, to create those very terms and conditions and to then secretly provide those terms and conditions to Landskroner and Libman so that they could, in turn, create a formal settlement demand letter that incorporated these terms and then send it to the City as a formal written settlement demand.

117.   To ensure the success of the City's corrupt plan, Clark directed Paradis to create a data-mining team comprised of attorneys and LADWP IT personnel that was charged with conducting a data-mining operation to determine class and sub-class membership and the damages that had been incurred by each of the Class and sub-class members.

118.   In late February / early March 2015, acting on Clark's instructions, Paradis assembled and led a team of attorneys (Agrusa, Annaguey, Farkas, Dorney and Tom) and LADWP IT personnel (including Mark Townsend, Flora Chang and

26

Kathy Wright) who conducted an unprecedented data mining operation for the purpose of defining the class and sub-classes that would be used to effectuate the collusive settlement in the *Jones v. City* Action.

119.    During this period, Clark required Paradis to meet with Clark periodically to keep Clark updated concerning the prospective size of the class (number of LADWP customers who had been damaged and were entitled to refunds) and the dollar amount of damages incurred by each sub-class, as well as the aggregate amount of damages incurred by all sub-classes that comprised the class.

120.    Acting on Clark's instructions, Paradis personally met with Clark in the 8th floor Executive Conference Room in the City Attorney's Office at least 2-3 times during this time period to apprise Clark of the progress on the data-mining project.  During these meetings, Paradis informed Clark of the most current sub-class size and damage estimates by sub-class and Clark repeatedly instructed Paradis that Clark did not want any delays in learning any new information and this was the reason Clark stated he wanted regular periodic updates concerning the work effort Paradis was overseeing relating to the determination of the class size, membership, and damages in connection with the collusive *Jones* settlement.

121.    On March 26, 2015, Paradis participated in a 1 hour and 53-minute conference call with Dorny and Townsend to review all of the sub-classes, including how each of them were precisely defined and the search algorithms that were being used to identify LADWP customers who would qualify for inclusion in each such sub-class.

122.    At the time of this conversation, Dorny and Paradis had repeatedly discussed the fact that these sub-classes would be utilized in connection with the collusive settlement of the *Antwon Jones v. City* class action.  One of the documents that was created as a result of this data mining process and these numerous daily discussions (that spanned weeks) with Townsend, Dorny, Tom,

27

Agrusa, Annaguey and Farkas, was known as the "*Class Member Identification Report*," and was provided to Mediator Tevrizian and used during the mediation sessions.

123.   On March 26, 2015, Dorny emailed Paradis and Tom a memo prepared by Annaguey detailing all of the various "types" of customer complaints that the LADWP had received so that Paradis could include these various complaint types in the "white knight" complaint that Tom and Dorny each personally reviewed and edited with Paradis via a Smart Board meeting conducted by Paradis from his NYC office.

124.   Subsequent to March 26, 2015 and after preparing the draft of the *Jones* Settlement Demand Letter as Clark had instructed him to do, Paradis met with Clark so that Clark could review and discuss the draft of the *Jones* Settlement Demand Letter with Paradis and, if the draft was satisfactory to Clark, obtain Clark's approval to send the *Jones* Settlement Demand Letter to Landskroner so that Landskroner could, in turn, send it back to the City (to LADWP Assistant General Counsel Tom and Deputy City Attorney Solomon).

125.   After Clark had reviewed the draft of the *Jones* Settlement Demand Letter during his meeting with Paradis, Clark approved it and instructed Paradis to send it to Landskroner in furtherance of the collusive litigation scheme and Paradis did so based on Clark's instructions.

126.   At or about that same time, Paradis emailed a copy of the *Jones* Settlement Demand Letter that he had drafted to Kiesel for Kiesel's review and comments before sending it to Landskroner and Libman.  After reviewing the *Jones* Settlement Demand Letter Paradis had provided to him, Kiesel replied by email and simply stated, "***fucking brilliant***."

127.   Thereafter, Paradis emailed the *Jones* Settlement Demand Letter that he had drafted and that Clark and Kiesel had approved, to Landskroner as Clark had instructed Paradis to do.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

128.   On April 2, 2015, Landskroner and Libman caused the *Jones* Settlement Demand letter that Paradis had provided to Landskroner to be emailed to LADWP Assistant General Counsel Richard Tom and Deputy City Attorney Eskel Solomon by Landskroner and Libman in furtherance of the collusive litigation scheme.

129.   During her deposition, Annaguey confirmed that Landskroner's office emailed that Settlement Demand to Tom and Solomon at 9:27 am on April 2, 2015. Annaguey also confirmed that, within hours of having received the Settlement Demand from Landskroner, Tom then forwarded the Settlement Demand to Annaguey, Agrusa and Dorny and requested that the four of them participate in a call at either 1 pm or 4:30 pm later that same afternoon.  *See* Annaguey June 5, 2019 Tr. at 198:10 - 201:16.

130.   Had Annaguey not been a knowing and active participant in the City's corrupt collusive litigation scheme, her receipt of the *Jones* Settlement Demand would have immediately set off alarm bells and caused her great concern because even a cursory review of this Settlement Demand quickly revealed that this document contained the exact same sub-class names and definitions that Annaguey and the attorney team who had been working with LADWP IT personnel throughout March 2015 had identified, created and agreed upon during their data-mining project.

131.   Because Annaguey was, however, a knowing and willing participant in the City's corrupt collusive litigation scheme, Annaguey never questioned how or why the *Jones* Settlement Demand contained the exact same sub-class names and definitions that Annaguey and her colleagues had identified, created and agreed upon because Annaguey knew this information had been created by Annaguey and her colleagues for use by the City in effectuating the collusive scheme and was intentionally provided to Landskroner and Libman in furtherance of the City's corrupt scheme.

29

**SECOND AMENDED CLASS ACTION COMPLAINT**

132.    On April 8, 2015, Annaguey, Agrusa, Tom, Solomon and Dorny met in-person with Landskroner to discuss the Settlement Demand that Landskroner had emailed to Tom and Solomon on April 2, 2015.  During that meeting, Agrusa discussed using a mediator for "optics" in order to create the artificial appearance that the collusive settlement in the *Jones v. City* Action was the result of arm's-length negotiations.  During this same initial meeting with Landskroner, Agrusa also informed Landskroner that she thought she had the settlement terms ***"largely done."***

133.    On April 13, 2015, Richard Tom emailed Annaguey, Agrusa, Kiesel and Paradis and informed them that Clark was requesting a 90-minute meeting on Wednesday April 15th to discuss "the PwC/Customer Billing Class action cases."

134.    On April 15, 2015, Clark received an email from Solomon that was also sent to Annaguey, Agrusa, Farkas, Hallock, Peters, Brown, Tom, Dorny, Kiesel and Paradis.  The subject line of that email was "**ANTWON JONES VS. LADWP**, BC577267 (Class Action, Billing Practices)".  Attached to Solomon's email as PDF files were the Complaint in the *Jones* Action and Jones' *Initial Confidential Settlement Proposal*, "***together w/ the April 2, 2015 Confidential Settlement Proposal letter received from Landskroner Grieco Merriman, LLC, both of which have been previously distributed.***" (Emphasis added).

135.    In his April 15 email, Solomon admitted to having received both the complaint and settlement proposal from Landskroner days **BEFORE** the City was ever officially served with the Jones complaint.  *Id*.  Absent the City's corrupt collusive litigation scheme, this would not have occurred, and Clark had knowledge of this fact on April 15, 2015 because of Clark's ongoing participation in the collusive litigation scheme as detailed herein.

136.    Tellingly, neither Clark, nor anyone in the City Attorney's Office ever questioned how Solomon could have obtained a copy of the non-public *Jones* Complaint that had not yet been served on the LADWP or City.   No one

30

questioned it because they all had actual knowledge that Landskroner had emailed the *Jones* Complaint directly to Tom as Tom had instructed in furtherance of the City's corrupt collusive litigation scheme immediately after the *Jones* Action had been filed.

137.    During March and continuing into April 2015 after Landskroner had sent the Jones Settlement Demand Letter to the City, Paradis continued to worked with Annaguey on the massive data mining project that involved identifying LADWP customers who had been damaged as a result of having been improperly billed by the LADWP and who should therefore be included as Class and sub-class members in the collusive settlement that had been authorized and directed by Chief Deputy Clark.

138.    On May 1, 2015, LADWP Assistant IT Director, Mark Townsend ("Townsend"), emailed Farkas, Deputy City Attorney Dorny, Paradis and others a 23 page draft report titled "***Jones v. City of Los Angeles Class Action Members***."

139.    Significantly, Townsend was the senior-most LADWP IT official responsible for directing the LADWP's massive data mining effort to identify LADWP customers who were properly includable as class members in the settlement class in the *Jones v. City* Action.  *Id.*

140.    The 23-page report titled "***Jones v. City of Los Angeles Class Action Members***" authored by Townsend that Townsend emailed to Farkas, Dorny, Paradis and others on May 1, 2015 is a critical piece of evidence that irrefutably demonstrates that the City and its attorneys, including Annaguey and Agrusa, were actively pursuing the collusive litigation strategy with Landskroner and Libman – as Clark had personally authorized and directed.

141.    The fact that the City, City Attorney's Office, and outside defense counsel were actively pursuing the corrupt collusive litigation strategy and were working hand-in-glove to feed Landskroner and Libman confidential LADWP information that LADWP officials and the City's attorneys were using to

31

**SECOND AMENDED CLASS ACTION COMPLAINT**

determine class and sub-class membership in connection with the collusive *Jones* Settlement is readily confirmed by simply comparing three key documents.

142.   The three documents that irrefutably demonstrate that Annaguey and Agrusa were working with LADWP Assistant General Counsel Tom, Deputy City Attorney Dorny, Landskroner, Libman and a number of other attorneys and LADWP IT personnel as Clark had authorized and directed to implement and execute the City's collusive litigation strategy are the:

a.   **April 2, 2015 Settlement Demand Letter** sent to LADWP Assistant General Counsel Richard Tom and Deputy City Attorney Eskel Solomon by Landskroner and Libman;

b.   **May 1, 2015 23 page draft report titled "*Jones v. City of Los Angeles Class Action Members*"** authored by Townsend; and

c.   **June 3, 2015 draft of "*Defendant's Confidential Mediation Brief*"** in the matter captioned, ***Antwon Jones v. City of Los Angeles***, et al., that Agrusa personally emailed to Annaguey, LADWP Assistant General Counsel Richard Tom and Deputy City Attorney Dorny, Paradis and Farkas.

143.   The "Settlement Class Definition" listed on p. 2 of the Landskroner/Libman April 2, 2015 Settlement Demand Letter identifies the following sub-classes in the following order and states in relevant part:

The parties will stipulate to the certification of a class for settlement purposes only.  The Settlement Class will include the following sub-classes:

a.   The "**Incorrect Tier Billing Subclass**" - . . . .

b.   The "**Incorrect 'Trend Estimate' Billing Subclass**" - . . . .

32

SECOND AMENDED CLASS ACTION COMPLAINT

c.   The "**Closed Accounts with Un-Refunded Balances Subclass**" - . . . .

d.   The "**Estimated Bill / Leaking Water Meter Subclass**" - . . .

e.   The "**Solar Generated Power Subclass**" - . . . .

f.   The "**Late Charges on Incorrect Bills Subclass**" - . . . .

g.   The "**CC&B Omnibus Billing-Related Grievances Subclass**" - . . . .

144.   As Clark, Annaguey, Agrusa, Peters, Tom, Solomon, Dorny, Kiesel, Landskroner, Libman and many others who were involved knew, the *Jones* Settlement Demand Letter signed by Landskroner and Libman that was sent to Tom and Solomon on April 2, 2015 ***was not*** authored by Landskroner or Libman for one very simple reason.   Landskroner and Libman lacked access to the LADWP's customer billing system and data records that needed to be queried to identify the specific LADWP customers who qualified for membership in various sub-classes that comprised the *Jones* Settlement Class.   Landskroner and Libman also lacked the technological knowledge and skills necessary to write the algorithms that were used to query both LADWP's legacy billing system and its new CC&B billing system.

145.   Clark, Annaguey, Agrusa, Peters, Tom, Solomon, Dorny, Kiesel, Landskroner, Libman and many others involved knew that the Settlement Demand Letter signed by Landskroner and Libman that was sent to Tom and Solomon on April 2, 2015 was, in fact, authored by Paradis using the results of the massive data mining effort that had involved Annaguey, Agrusa, Farkas, Tom, Dorny, Paradis and others over the course of a more than three month-long period at the LADWP.

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

146.   Because Clark and all of these individuals were all knowingly and actively engaged in perpetrating the City's corrupt scheme and colluding directly with Landskroner and Libman, they knew that the sub-class names and definitions that Landskroner and Libman had used had, in fact, been identified and created by the City and LADWP.

147.   Because Clark possessed such knowledge and had personally reviewed and approved the draft of the Jones Settlement Demand letter *before* it was sent to Landskroner by Paradis, Clark never questioned how Landskroner and Libman – who were theoretically supposed to be adverse to the City – had come into possession of the City's confidential data and used this information in their April 2, 2015 Settlement Demand -- and Clark also never alerted Judge Berle or Mediator Tevrizian to this highly revealing fact.

148.   A cursory review of the Settlement Class definition beginning on p. 9 of the 23-page May 1 report titled "*Jones v. City of Los Angeles Class Action Members*" authored by Townsend demonstrates the collusion by and among Clark and these other individuals and states in relevant part:

> #1    **Incorrect Tier Billing (Emma)** . . . .
> #2    **Incorrect Trend Estimate (Emma)** . . . .
> #3    **Closed Accounts with Un-refunded Balances (Kathy)** . . . .
> #4    **Estimated Bill / Leaking Water Meter (Mahesh)** . . . .
> #5    **Solar Power NEM Banks Not Converted (Kathy)** . . . .
> #6    **Late Charges on Incorrect Bills (Emma)** . . . .
> #7    **Customers on Auto Pay Who Were Incorrectly Billed (Emma)** . . . .
> #8    **CC&B Omnibus Billing Related Grievances** . . . .

(Bold in original).

149.   Similarly, Agrusa's June 3, 2015 draft of "*Defendant's Confidential Mediation Brief*" – which the Liner LLP firm attorneys emailed to Clark -- also demonstrates this collusion and states in relevant part,

**A.    Categories of Claims.**

*Through its extensive internal investigation, the DWP has identified eight potential categories of potentially harmed customers* . . . *the*

eight categories are identified and briefly described below.

  1.  **Incorrect Tier Subclass** . . . .

  2.  **Incorrect Trend Estimate Subclass** . . . .

  3.  **Closed Accounts with Un-refunded Balances Subclass** . . . .

  4.  **Estimated Bill / Water Leak Subclass** . . . .

  5.  **Solar Power NEM Banks Not Converted Subclass** . . .

  6.  **Incorrectly Billed Automatic Payment Subclass** . . . .

  7.  **Late Payment Charge Defective Algorithm Subclass** . . . .

  8.  **Minimum Charge or Zero Consumption on Estimated Electric Bills Subclass** . . . .

(Italics added. Bold in original).

150. The fact that: (i) Landskroner/Libman's April 2, 2015 Settlement Demand Letter; (ii) Townsend's May 1, 2015 23 page draft report titled "***Jones v. City of Los Angeles Class Action Members***"; and (iii) Agrusa's June 3, 2015 draft of "***Defendant's Confidential Mediation Brief***" in the matter captioned, *Antwon Jones v. City of Los Angeles,* each contain the same sub-class definitions and that those sub-class definitions appear in exactly the same number order in all three documents conclusively demonstrates the extraordinary extent of the collusion among the parties and confirms that this collusive scheme was well known to and participated in by Clark, Annaguey, Agrusa, Peters, Tom, Solomon, Dorny, Kiesel, Landskroner, Libman and many others during this time period.

//

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

**5.** **Clark Personally Oversees and Directs The "Sham Mediation" Of the Jones v. City Action**

151. On June 11 and 12, 2015, Clark personally directed and supervised the mediation of the *Jones* Action that was conducted by retired United States District Judge Dickran Tevrizian.

152. ***At the time Clark did so, Clark had actual knowledge that the entire mediation itself was nothing more than "a charade or a staged event, or a sham" that was "being used as a subterfuge for collusion"*** as Judge Berle correctly ruled on July 25, 2019.

153. Simply stated, it was by and through this fraudulent "mediation" that Clark was able to ensure the success of the City's corrupt collusive plan and accomplish the City's objective of settling the *Jones* Action and all of the other related class actions on the terms and conditions dictated solely by the City.

154. Testimony provided by Agrusa concerning the June 2015 two-day mediation session conducted by Mediator Tevrizian that was led by Clark for the City is particularly revealing.

155. As Agrusa testified, Agrusa personally participated in the first day of the mediation sessions conducted by Mediator Tevrizian at the JAMS Los Angeles office with Clark, Peters, Dorny, Annaguey, Kiesel, Paradis, other City officials and Landskroner and Libman.  Because Agrusa attended the first day of mediation, Agrusa personally observed Paradis directing the mediation session as Paradis had been instructed to do by Clark.  In addition, Agrusa had actual knowledge that the entire process used to resolve the *Jones v. City* matter was collusive and not arm's-length.

156. When asked during her deposition to identify the outstanding issues to be resolved at the mediation of the multi-million-dollar class action that Agrusa was the Lead Defense Counsel for the City in, Agrusa testified, "***I can't tell you***" because "***most of the sessions I was excluded from.  Most of the sessions were***

**SECOND AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6

*small groups: Paul Paradis, Jim Clark and Judge Tevrizian.  Candidly, … it was
not my party*."  When asked to confirm that there were different small breakout
sessions throughout the course of the first day of the mediation and asked whether
Agrusa participated in any of these sessions, Agrusa testified, "*unfortunately, no*."
*See* Agrusa June 28, 2019 Deposition Transcript at 181:25 – 182:4. (Emphasis
added).

7
8
9
10
11
12

157.    Agrusa then testified that, despite being personally identified as the
City's Lead Defense Lawyer in Liner LLP's Engagement Letter with the City,
Agrusa did not return to or participate in the second consecutive day of mediation
because, "*I wasn't a necessary party to the efforts being undertaken.*"   *See*
Agrusa June 28, 2019 Deposition Transcript at 184:20 – 185:13. (Emphasis
added).

13
14
15
16
17
18
19
20
21
22
23
24
25
26

158.    Stated another way, Agrusa admitted under oath that, despite being
the City's Lead Defense Counsel in all of the consumer class actions involving the
LADWP – including the *Jones v. City* Action – *Agrusa did not participate in any
of the breakout session discussions with mediator Tevrizian or Chief Deputy City
Attorney Clark during the first day of the two-day long mediation and did not
even bother to return for the second day of mediation because, in Agrusa's
words, "I wasn't a necessary party to the efforts being undertaken"* because the
entirety of that mediation was run primarily by Paradis – an attorney who Agrusa
knew had never been retained by the City to represent the City in *any* of consumer
class actions brought by LADWP ratepayers.  *Agrusa's actions and testimony
make clear that Agrusa had actual knowledge of the City's collusive scheme but
failed to act to reveal this scheme to the Court or the California State Bar*.  *See*
Agrusa June 28, 2019 Deposition Transcript at 184:20 – 185:13. (Emphasis
added).

27
28

*//*

37

**SECOND AMENDED CLASS ACTION COMPLAINT**

6.   **Clark Admits The City Is "Buying" The Collusive *Jones* Settlement By "Paying Off" Plaintiffs' Class Counsel $19 Million In Attorneys' Fees**

159.   Following another mediation session that was conducted in late July 2015 for the purpose of determining the amount of attorneys' fees to be paid to plaintiffs' Class Counsel in connection with the settlement of the *Jones v. City* Action and Related Actions in July 2015, attorney Annaguey emailed Chief Deputy City Attorney Clark at 2:40 pm in the afternoon on Saturday, August 1, 2015.

160.   In Annaguey's Saturday afternoon email to Chief Deputy Clark, Annaguey expressed her views concerning the $19 million in attorneys' fees that Annaguey understood Clark was considering authorizing the City to pay to plaintiffs' Class Counsel in connection with the settlement of the *Jones v. City* Action. *Id*.

161.   Later that same afternoon, at 4:39 pm, Chief Deputy Clark replied to Annaguey's email and ***admitted to attorney Annaguey that the City of Los Angeles was corruptly buying the collusive settlement in the Jones v. City Action on terms and conditions that had secretly been dictated by the City by simply paying off plaintiffs' Class Counsel with $19 million in attorneys' fees*** (the "***Clark Quid Pro Quo Email***").

162.   Clark's explosive and highly incriminating email – that Clark sent only to Annaguey  – makes explicit that the $19 million in attorneys' fees paid to plaintiffs' Class Counsel in connection with the settlement of the *Jones v. City* Action was the "*quo*" being paid by the City in exchange for the "*quid*" being received by the City – namely the collusive settlement in the *Jones v. City* Action that reflected terms and conditions that had secretly been dictated only by the City. *Id*.

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

163.    Stated another way, **Clark's Quid Pro Quo Email** is indisputable "smoking gun" evidence that demonstrates that the City corruptly purchased the collusive settlement in the *Jones v. City* Action from plaintiffs' Class Counsel in exchange for the payment of $19 million in attorneys' fees that was paid out of public taxpayer dollars.

164.    The **Clark Quid Pro Quo Email** is also indisputable documentary evidence that, on August 1, 2015, both Chief Deputy City Attorney James Clark and the City's lead outside counsel, Maribeth Annaguey, had **actual knowledge** that the City was corruptly purchasing the collusive settlement in the *Jones v. City* Action from plaintiffs' Class Counsel using $19 million in public funds, and that both Clark and Annaguey committed perjury when they denied, under oath during their depositions, having knowledge of or participating in the City's "collusive litigation scheme" in the *Jones v. City* Action.  *Id.*

### 7.    Clark Admitted To His Knowledge Of And Involvement In The Collusive Litigation Scheme During His February 26, 2019 Deposition

165.    After having been designated as the City's PMQ witness in the *City v. PwC* Action by City Attorney Feuer, Clark appeared and testified on February 26, 2019.  The testimony provided by Clark on February 26, 2019 was, for the most part, truthful and accurate.

166.    During his February 26, 2019 testimony, Clark plainly admitted to his knowledge of and active participation in the "collusive litigation scheme."  During his testimony, Clark was asked and answered the following questions:

Q:    ***Prior to April 1, 2015, did anyone in the City Attorney's office or Special Counsel for the City in the LADWP versus PwC action know or expect that Mr. Jones would be filing the Jones v. City of Los Angeles***, No. BC 577267 (Los Angeles Superior Court filed April 1, 2015) ***Complaint***?

\*        \*        \*

A:    ***I'm sure we knew before April 1, yes***.

39

Q:   And did you understand that that time, immediately before April 1, 2015, that the Jones v LADWP Complaint was going to be filed and that there would be an immediate request to individuals in the City Attorney's office to settle the case?

A:   I think we were trying to settle the case, so I mean, I -- I don't know about immediate requests, but we were not – we were trying to settle the case on the basis I explained.

Q.   ***Did you understand that Mr. Landskroner, after he took over the last week of March 2015, was going to file a lawsuit and then immediately reach out to try to settle the case***?

A:   ***I think I did***.

*See* Clark February 26, 2019 Deposition Tr. at 110:18-111:17. (Emphasis added).

> **8.    Sworn Testimony Provided By Kiesel Corroborates Clark's February 26, 2019 Testimony That Clark Authorized and Directed the Collusive Litigation Scheme In the *Jones v. City* Action**

167.    When Kiesel was examined concerning an email sent by LADWP Assistant General Counsel Richard Tom to Los Angeles Chief Deputy City Attorney James Clark on March 5, 2019, Kiesel testified as follows:

Q:   Am I correct that ***by this time [March 5, 2015] you understood that there was going to be the filing of a case captioned Jones v. City of Los Angeles?***

A:   ***Yes***.

Q:   And to the best of your recollection ***as of March 5, 2015***, the day before the filing of the PwC case and two days after your exchange of (sic) Mr. Libman seeking his bar number, is it your recollection that ***Mr. Clark was aware of the plan to file the Jones v. City of Los Angeles case***?

A:   ***Yes***.

*See* Kiesel May 29, 2019 Tr. at 31:1 – 31:15. (Emphasis added).

//

//

SECOND AMENDED CLASS ACTION COMPLAINT

168.    When asked in more detail for a second time, Kiesel reaffirmed his previous testimony and once again testified under oath as follows:

Q.    [A]t some point after the tolling agreement and dismissal plan fell through and it was understood that that would not be a means by which the City could obtain dismissals of the various class actions against it, *the City proposed to you and Mr. Paradis a plan by which the Jones versus PwC complaint would be revised and made into a Jones versus City of Los Angeles suit; is that correct*?

A:    Partially.

Q:    Okay.  Tell me, explain please.

A:    To the best of my recollection, when the tolling agreement and dismissals without prejudice fell through, *the City asked Mr. Paradis if they could use Mr. Jones as a class representative to assert a claim against the City of Los Angeles so the City could resolve, as it wanted to do, all of the Department of Water and Power billing issues with the class*.

Q:    Who did that request come from?

A:    *To the best of my recollection it was a conversation that was Mr. Clark, Mr. Peters, with Mr. Paradis discussing that as an alternative*.

*See* Kiesel May 29, 2019 Tr. at 37:24 – 38:21. (Emphasis added).   *See also* Kiesel May 30, 2019 Tr. at 665:7 – 665:19. (Emphasis added).

169.    Finally, testimony provided by Kiesel makes clear that it was Clark who had "directed" the collusive litigation scheme:

Q:    *Was it your understanding that the City had given Mr. Paradis approval to file an action against the City if he wanted to do so or that he was being directed to do so after having raised the issue*?

A:    After having raised the issue with the City, *I believe he was directed to do so by the City.*

*See* Kiesel May 29, 2019 Tr. at 61:9 - 64:25. (Emphasis added).

//

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

1
2
3
4

    9. **After Having Made Numerous Damning Admissions Concerning His Own Involvement And Participation In The City's Corrupt Collusive Litigation Scheme, Clark Participates In the Cover-Up Led By The Brown George Ross Firm**

5
6

  170. At all times relevant hereto, and in February through April 2019, Clark was the Los Angeles Chief Deputy City Attorney.

7
8
9
10
11
12

  171. Clark was deposed by PwC's counsel as a PMQ ("person most qualified") witness in the *City v. PwC* Action on February 26, 2019 and, in large measure, testified truthfully and accurately during his deposition.  By doing so, however, Clark repeatedly admitted that the City, City Attorney personnel and its outside attorneys, including Annaguey, had, in fact, engaged in the corrupt collusive litigation scheme that PwC was accusing the City of having perpetrated.

13
14
15
16
17
18
19
20
21
22
23

  172. In furtherance of the City's ongoing fraudulent effort to cover-up the City's role and participation in the corrupt collusive litigation scheme that was perpetrated by Liner attorneys Annaguey, Agrusa and McCann to achieve the collusive settlement in the *Jones* Action and unwilling to tell the truth and face the severe consequences that were almost certain to flow from Clark's admissions, Annaguey, Brajevich, Tom, Solomon and Dorny met with Clark on March 8, 2019 and March 11, 2019 to persuade Clark to disavow the damaging admissions he made during his February 26, 2019 testimony and convinced Clark to commit perjury by changing numerous accurate answers he had given under oath during that deposition to false answers Clark provided in his March 14, 2019 errata (the " Clark Errata"). *See* Brajevich August 15, 2019 Tr. at 154:9 – 155:18.

24
25
26
27
28

  173. During the March 8, 2019 and March 11, 2019 meetings Clark had with Annaguey, Brajevich, Tom, Solomon and/or Dorny, Annaguey counseled and induced Clark to materially alter his sworn testimony in a manner known to all of them to be materially false by submitting an errata sheet that contained substantive changes to the testimony originally provided during Clark's February 26, 2019

**SECOND AMENDED CLASS ACTION COMPLAINT**

deposition.  According to Dorny's calendar, Annaguey planned to reward Dorny immediately for Dorny having aided Annaguey in suborning perjury by Clark by Annaguey purchasing tickets and taking Dorny to Los Angeles Clippers v. Boston Celtics basketball game at the Staples Center on the night of March 11, 2019.

174.    At the time Annaguey counseled and induced Clark to provide the errata sheet, both Clark and Annaguey had actual knowledge that the following changes made to Clark's original sworn testimony of February 26, 2019 were false and misleading for the reasons set forth below and were made for the purpose of assisting and furthering the City's ongoing effort to cover-up the City's role and participation in the corrupt collusive litigation scheme that was perpetrated to obtain the collusive settlement in the *Jones v. City* Action:

a.    **Page/Line**:        26:15-16
      **Stated Reason**:    "To conform to facts"
      **Change From**:      "December of 2014"
      **Change To**:        "February or March of 2013"

**Reason for Falsity**:        Paradis did not work with or otherwise become involved with the City of Los Angeles and had not yet met David Wright in February or March of 2013.  At the time Clark signed the errata on March 14, 2019 and Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of the foregoing and both therefore knew that the errata contained this materially false statement.

b.    **Page/Line**:        30:4
      **Stated Reason**:    "To conform to facts"
      **Change From**:      "I – I think so"
      **Change To**:        "He did not"

**Reason for Falsity:**        Paradis and Kiesel discussed the fact that they were counsel to Antwon Jones with Clark, Peters, Tom, Dorny and Solomon beginning in December 2014 and on numerous occasions thereafter prior

SECOND AMENDED CLASS ACTION COMPLAINT

to April 1, 2015.  On or about February 23, 2015, Clark personally authorized and directed Kiesel and Paradis to find counsel who would be friendly to the City to supposedly represent plaintiff Antwon Jones in a class-action lawsuit against the City. Clark, Peters, Kiesel and Paradis further agreed that, pursuant to this strategy, the forthcoming *Jones v. City of Los Angeles* lawsuit would be used as a vehicle to settle ***all*** existing LADWP-billing-related claims against the City on the City's desired terms, including those claims asserted in four other consumer class actions. *See* Kiesel May 28, 2019 Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10 – 200:23.  *See also* Kiesel May 30, 2019 Tr. at 658:2 – 659:21; 661:10 – 661:19; 663:1 – 664:9.   At the time Clark signed the errata on March 14, 2019 and Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of the foregoing and both therefore knew that the errata contained this materially false statement.

        c.     **Page/Line**:    30:17-18
                    **Stated Reason**:   "To conform to facts"
                    **Change From**:   "I believe so, for the same reasons I believe Mr. Tom was aware"
                    **Change To**:   "She tells me she did not"

                    **Reason for Falsity**:   Paradis and Kiesel discussed the fact that they were counsel to Antwon Jones with Clark, Peters, Tom, Dorny and Solomon beginning in December 2014 and on numerous occasions thereafter prior to April 1, 2015.  On or about February 23, 2015, Clark personally authorized and directed Kiesel and Paradis to find counsel who would be friendly to the City to supposedly represent plaintiff Antwon Jones in a class-action lawsuit against the City. Clark, Peters, Kiesel and Paradis further agreed that, pursuant to this strategy, the forthcoming *Jones v. City of Los Angeles* lawsuit would be used as a vehicle to settle ***all*** existing LADWP-billing-related claims against the City on the City's desired terms, including those claims asserted in four other consumer class actions.

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    *See* Kiesel May 28, 2019 Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10

2    – 200:23.  *See also* Kiesel May 30, 2019 Tr. at 658:2 – 659:21; 661:10 – 661:19;

3    663:1 – 664:9.   At the time Clark signed the errata on March 14, 2019 and

4    Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of

5    the foregoing and both therefore knew that the errata contained this materially

6    false statement.

7

8          d.   **Page/Line**:      31:8
             **Stated Reason**:   "To clarify the record"
9            **Change From**:    "I believe that was the case.  I don't know"
             **Change To**:      "I don't know"

10              **Reason for Falsity**:        Paradis and Kiesel discussed the fact

11   that they were counsel to Antwon Jones with Clark, Peters, Tom, Dorny and

12   Solomon beginning in December 2014 and on numerous occasions thereafter prior

13   to April 1, 2015.  On or about February 23, 2015, Clark personally authorized and

14   directed Kiesel and Paradis to find counsel who would be friendly to the City to

15   supposedly represent plaintiff Antwon Jones in a class-action lawsuit against the

16   City. Clark, Peters, Kiesel and Paradis further agreed that, pursuant to this strategy,

17   the forthcoming *Jones v. City of Los Angeles* lawsuit would be used as a vehicle to

18   settle ***all*** existing LADWP-billing-related claims against the City on the City's

19   desired terms, including those claims asserted in four other consumer class actions.

20   *See* Kiesel May 28, 2019 Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10

21   – 200:23.  *See also* Kiesel May 30, 2019 Tr. at 658:2 – 659:21; 661:10 – 661:19;

22   663:1 – 664:9.   At the time Clark signed the errata on March 14, 2019 and

23   Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of

24   the foregoing and both therefore knew that the errata contained this materially

25   false statement.

26

27   //

28

e.       **Page/Line**:         31:17
         **Stated Reason**:    "To conform to facts"
         **Change From**:      "I – I don't know"
         **Change To**:        "They say he did not"

**Reason for Falsity**:        Paradis and Kiesel discussed the fact that they were counsel to Antwon Jones with Clark, Peters, Tom, Dorny and Solomon beginning in December 2014 and on numerous occasions thereafter prior to April 1, 2015.  On or about February 23, 2015, Clark personally authorized and directed Kiesel and Paradis to find counsel who would be friendly to the City to supposedly represent plaintiff Antwon Jones in a class-action lawsuit against the City. Clark, Peters, Kiesel and Paradis further agreed that, pursuant to this strategy, the forthcoming *Jones v. City of Los Angeles* lawsuit would be used as a vehicle to settle ***all*** existing LADWP-billing-related claims against the City on the City's desired terms, including those claims asserted in four other consumer class actions. *See* Kiesel May 28, 2019 Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10 – 200:23.  *See also* Kiesel May 30, 2019 Tr. at 658:2 – 659:21; 661:10 – 661:19; 663:1 – 664:9.   At the time Clark signed the errata on March 14, 2019 and Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of the foregoing and both therefore knew that the errata contained this materially false statement.

f.       **Page/Line**:         73:17
         **Stated Reason**:    "To conform to facts"
         **Change From**:      "Dave Wright"
         **Change To**:        "Marcie Edwards and the DWP Board"

**Reason for Falsity**:        Clark is the City official who personally solicited and made the decision to hire Paradis and Kiesel to represent the City as Special Counsel to the City during the December 2014 meeting in Peter's City Hall East Office.  While Clark's decision was subject to approval by the LADWP Board of Commissioners, Clark is the individual who originally

46

conceived of hiring Kiesel and Paradis and who personally extended the offer to both Kiesel and Paradis during the December 2014 meeting in Peter's City Hall East Office.

At the time Clark signed the errata on March 14, 2019 and Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of the foregoing and both therefore knew that the errata contained this materially false statement.

g.  **Page/Line**:        104:25-105:1
   **Stated Reason**:  "To clarify the record"
   **Change From**:    "I don't – I think the City was informed of that once Mr. Paradis concluded he would have a conflict.  I assume somebody authorized it.  That wasn't – that wasn't me."
   **Change To**:       "I don't – I think the City was informed of that once Mr. Paradis concluded he would have a conflict."

**Reason for Falsity**:        On or about February 23, 2015, Clark personally authorized and directed Kiesel and Paradis to find counsel who would be friendly to the City to supposedly represent plaintiff Antwon Jones in a class-action lawsuit against the City. Clark, Peters, Kiesel and Paradis further agreed that, pursuant to this strategy, the forthcoming *Jones v. City of Los Angeles* lawsuit would be used as a vehicle to settle ***all*** existing LADWP-billing-related claims against the City on the City's desired terms, including those claims asserted in four other consumer class actions.  *See* Kiesel May 28, 2019 Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10 – 200:23.  *See also* Kiesel May 30, 2019 Tr. at 658:2 – 659:21; 661:10 – 661:19; 663:1 – 664:9.  At the time Clark signed the errata on March 14, 2019, Clark had actual knowledge that he had personally authorized and directed Paradis and Kiesel to bring in Messrs. Landskroner and

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    Libman to represent Antwon Jones in a class action against the City for the

2    purpose of suing the City so that the City could effectuate its collusive litigation

3    scheme.  At the time Clark signed the errata on March 14, 2019 and Annaguey

4    submitted it to PwC's counsel on April 4, 2019, both had knowledge of the

5    foregoing and both therefore knew that the errata contained this materially false

6    statement.

7

8            h.      **Page/Line**:         105:8-9
             **Stated Reason**:    "To clarify the record"
9            **Change From**:      "I remember him recommending Mr.
10                                   Landskroner"
             **Change To**:        "I remember learning of him recommending
11                                   Mr. Landskroner"

12           **Reason for Falsity**:        On or about February 23, 2015, Clark

13   personally authorized and directed Kiesel and Paradis to find counsel who would

14   be friendly to the City to supposedly represent plaintiff Antwon Jones in a class-

15   action lawsuit against the City. Clark, Peters, Kiesel and Paradis further agreed

16   that, pursuant to this strategy, the forthcoming *Jones v. City of Los Angeles* lawsuit

17   would be used as a vehicle to settle *all* existing LADWP-billing-related claims

18   against the City on the City's desired terms, including those claims asserted in four

19   other consumer class actions, and that Landskroner and Libman would serve as

20   counsel to Antown Jones in a consumer class action Landskroner and Libman

21   would file on Jones' behalf naming the City as a defendant.  *See* Kiesel May 28,

22   2019 Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10 – 200:23.  *See also*

23   Kiesel May 30, 2019 Tr. at 658:2 – 659:21; 661:10 – 661:19; 663:1 – 664:9.  At

24   the time Clark signed the errata on March 14, 2019, Clark had actual knowledge

25   that he had personally authorized and directed Paradis and Kiesel to bring in

26   Messrs. Landskroner and Libman to represent Antwon Jones in a class action

27   against the City for the purpose of suing the City so that the City could effectuate

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

its collusive litigation scheme.  At the time Clark signed the errata on March 14, 2019 and Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of the foregoing and both therefore knew that the errata contained this materially false statement.

|       |                    |                                                        |
|-------|--------------------|--------------------------------------------------------|
| i.    | **Page/Line**:     | 105:15                                                 |
|       | **Stated Reason**: | "To clarify the record"                                |
|       | **Change From**:   | "That's correct"                                       |
|       | **Change To**:     | "That's correct as to suing PwC, but not correct as to suing DWP." |

**Reason for Falsity**:       On or about February 23, 2015, Clark personally authorized and directed Kiesel and Paradis to find counsel who would be friendly to the City to supposedly represent plaintiff Antwon Jones in a class-action lawsuit against the City. Clark, Peters, Kiesel and Paradis further agreed that, pursuant to this strategy, the forthcoming *Jones v. City of Los Angeles* lawsuit would be used as a vehicle to settle *all* existing LADWP-billing-related claims against the City on the City's desired terms, including those claims asserted in four other consumer class actions. *See* Kiesel May 28, 2019 Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10 – 200:23. *See also* Kiesel May 30, 2019 Tr. at 658:2 – 659:21; 661:10 – 661:19; 663:1 – 664:9.  At the time Clark signed the errata on March 14, 2019, Clark had actual knowledge that he had personally authorized and directed Paradis and Kiesel to bring in Messrs. Landskroner and Libman to represent Antwon Jones in a class action against the City for the purpose of suing the City so that the City could effectuate its collusive litigation scheme.  At the time Clark signed the errata on March 14, 2019 and Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of the foregoing and both therefore knew that the errata contained this materially false statement.

j.    **Page/Line**:        107:7-18
      **Stated Reason**:    "To conform to facts"
      **Change From**:      "Okay.  My understanding, and this is mostly from outside counsel, the Liner people, who have been trying to deal with Mr. Blood, Mr. Himmelfarb, and I think there was another plaintiff's lawyer involved, too, that they were intransigent, couldn't – they wouldn't – didn't want to negotiate or propose things that were not – were not acceptable.  And I don't know if they were willing to do what DWP wanted, which was basically – there would have been overcharge repaid and have the – and have oversight of the system to correct it."
      **Change To**:        "I don't know what Mr. Paradis recommended to Mr. Jones."

**Reason for Falsity**:       On or about February 23, 2015, Clark personally authorized and directed Kiesel and Paradis to find counsel who would be friendly to the City to supposedly represent plaintiff Antwon Jones in a class-action lawsuit against the City. Clark, Peters, Kiesel and Paradis further agreed that, pursuant to this strategy, the forthcoming *Jones v. City of Los Angeles* lawsuit would be used as a vehicle to settle ***all*** existing LADWP-billing-related claims against the City on the City's desired terms, including those claims asserted in four other consumer class actions. *See* Kiesel May 28, 2019 Tr. at 67:2 – 72:6; 73:5 – 73:18; 194:11 – 195:4; 199:10 – 200:23.  *See also* Kiesel May 30, 2019 Tr. at 658:2 – 659:21; 661:10 – 661:19; 663:1 – 664:9.

During the 2015 through 2017 time period, Clark also repeatedly expressed personal disdain for attorneys Blood and Himmelfarb and, during a mediation conducted by Mediator Tevrizian with Himmelfarb and Himmelfarb's two co-counsel in the *Morski* case, Clark explained to LADWP General Manager David Wright and Paradis that the City had previously been a defendant in a class action lawsuit prosecuted by Blood involving the Department

of Sanitation and that Blood had done an extremely poor job as Class counsel and had not provided for a workable claims mechanism in connection with the settlement that the City had agreed to.  Clark further explained that Blood's failure to do so had caused many problems for the City and that, for this primary reason, Clark was unwilling to recognize Blood in any leadership capacity vis-à-vis the LADWP customer class actions.  In addition, Clark informed Wright and Paradis that Himmelfarb had long been known to Clark to be highly unpredictable and unwilling to keep his word when he made a verbal agreement.   Himmelfarb repeatedly demonstrated a pattern of highly erratic and nonsensical behavior during the mediation conducted in the *Morski* case by Judge Tevrizian which was attended and participated in by Clark, Wright, Agrusa, Annaguey, Wright and Paradis on behalf of the City and Himmelfarb and his two co-counsel.  Clark repeatedly cited Himmelfarb's behavior throughout that day of mediation and Mediator Tevrizian's harsh criticisms of Himmelfarb's behavior during the mediation as another reason Clark was justified in refusing to recognize Himmelfarb in any leadership capacity.

At the time Clark signed the errata on March 14, 2019, Clark had actual knowledge that Clark had personally authorized and directed Paradis and Kiesel to bring in Messrs. Landskroner and Libman to represent Antwon Jones in a class action against the City for the purpose of suing the City so that the City could effectuate its collusive litigation scheme.  At the time Clark signed the errata on March 14, 2019 and Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of the foregoing and both therefore knew that the errata contained this materially false statement.

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

k.    **Page/Line**:    108:1-2
        **Stated Reason**:   "To conform to facts"
        **Change From**:   "I know of no such understanding, but that was Mr. Paradis' recommendation"
        **Change To**:    "I know of no such understanding"

        **Reason for Falsity**:   Clark's testimony that "I know of no such understanding" concerning Landskroner having confirmed with Paradis that Landskroner would settle the *Jones* Action on the terms and conditions dictated by the City was known to Clark to be false at the time he gave this testimony because in late February and March 2015, Clark personally repeatedly asked both Paradis and Kiesel if Landskroner and Libman could be trusted by the City to live up to their unwritten agreements to settle the *Jones* Action on terms and conditions dictated by the City. Clark repeatedly informed Paradis and Kiesel that it was critical that Landskroner and Libman live up to their part of the agreement to settle the Jones Action immediately after filing the Jones Action on terms dictated by the City because as Clark testified, "**we wanted to do it [settle globally] fast**." During meetings with Kiesel, Paradis, Annaguey, Dorny and Tom, Clark repeatedly stressed the fact that he wanted the settlement with Landskroner done as quickly as possible. *See* Clark February 26, 2019 Tr. at 57:8.

        During Kiesel's May 29, 2019 deposition, PwC's counsel questioned Kiesel about the City's collusive litigation scheme and Kiesel testified under oath as follows:

Q.    [A]t some point after the tolling agreement and dismissal plan fell through and it was understood that that would not be a means by which the City could obtain dismissals of the various class actions against it, *the City proposed to you and Mr. Paradis a plan by which the Jones versus PwC complaint would be revised and made into a Jones versus City of Los Angeles suit; is that correct*?

A:    Partially.

Q:    Okay. Tell me, explain please.

A:    To the best of my recollection, when the tolling agreement and dismissals without prejudice fell through, *the City asked Mr. Paradis if they could use Mr. Jones as a class representative to*

**SECOND AMENDED CLASS ACTION COMPLAINT**

*assert a claim against the City of Los Angeles so the City could resolve, as it wanted to do, all of the Department of Water and Power billing issues with the class.*

Q: Who did that request come from?

A: To the best of my recollection it was a conversation that was Mr. Clark, Mr. Peters, with Mr. Paradis discussing that as an alternative.

*See* Kiesel May 29, 2019 Tr. at 37:24 – 38:21. (Emphasis added). *See also* Kiesel May 30, 2019 Tr. at 665:7 – 665:19. (Emphasis added).

Kiesel further confirmed Clark's knowledge of and participation in the collusive litigation scheme when Kiesel testified in relevant part,

Q: So at some point in February [2015], *the expectation that you had had based on at least one meeting with Mr. Clark, Mr. Peters, and Mr. Paradis was that the City was going to go ahead with the filing of* its action against PwC and there would be *a separate lawsuit in which Mr. Jones would serve as a class representative in a consumer class action against LADWP, correct*?

A: *Yes*, but those conversations may not have happened at the same time those conversations occurred . . . .

*See* Kiesel May 29, 2019 Tr. at 48:18 – 49:4. (Emphasis added).

Kiesel also testified in relevant part,

Q: Am I correct . . . that Mr. Landskroner was recruited into the plan to represent Mr. Jones in action against the City of Los Angeles before Mr. Libman was?

A: Yes.

Q: And Mr. Libman was recruited in part because Mr. Landskroner was from Ohio and not a member of the California bar, correct?

A: [I] would say Mr. Libman was suggested as local counsel for Mr. Landskroner since he was not a California lawyer.

Q: *You made the suggestion of Mr. Libman to serve as local counsel, correct?*

A: *I did*.

Q: *To whom did you make that suggestion*?

A: *[T]o the best of my recollection that suggestion occurred in a meeting where Mr. Clark was present, Mr. Peters was present, Mr. Paradis was present . . . .*

53

**SECOND AMENDED CLASS ACTION COMPLAINT**

Q:   *Do you recall what month that meeting occurred?*

A:   *It would have been February [2015] based upon the email trail we have here that meeting occurred.*

\*          \*          \*

Q:   Now at the time of the meeting that included at least Mr. Clark, Mr. Peters, Mr. Paradis and yourself at which the suggestion about Mr. Libman was made as of the time of that meeting had Mr. Landskroner already been asked to participate in an action against the City?

A:   I don't believe so.

Q:   Was Mr. Landskroner discussed at the same meeting that Mr. Libman was discussed?

A:   To the best of my recollection, yes.

*See* Kiesel May 29, 2019 Tr. at 42:23 – 43:23; 45:6 – 45:18.  (Emphasis added).

Kiesel succinctly summarized his knowledge of the City's corrupt collusive litigation scheme as of April 21, 2015 when Kiesel testified in relevant part:

Q:   What was your understanding of why the City felt it was in the City's interest to have at (sic) Libman [and] Landskroner firms potentially be in the lead position?

A:   My understanding is that Mr. Solomon's email confirms *what I understood the City wanted to do was to use the Jones matter as the vehicle to resolve the litigation*.  And so this is confirming they wanted the Jones lawyers to be in the possible lead position to resolve the case. . . . *And the City wanted to have the Landskroner and Libman lawyers be those lead counsel*.

\*          \*          \*

*I understood prior to the Jones action being filed with the court that the City of Los Angeles before it was filed wanted to use the Jones matter as the vehicle to resolve all of the class cases pending against them. This email confirms that after the fact of the filing, but this was in place before the filing even occurred*.

*See* Kiesel May 29, 2019 Tr. at 167:17 – 168:7; 169:13 – 169:18.  (Emphasis added).  *See also* Kiesel May 30, 2019 Tr. at 711:24 – 712:18; 736:2 – 737:8.

When Kiesel was asked to provide more detail about how closely City Attorney personnel and the City's lead outside counsel, Maribeth Annaguey, were

54

**SECOND AMENDED CLASS ACTION COMPLAINT**

monitoring the progress and status of getting the collusive *Jones v. City* action filed, Kiesel testified that these officials and attorney Annaguey received routine progress reports concerning the filing of the *Jones* Action.  In particular, Kiesel testified:

> Q: ***The first meeting that you spoke about that included at a minimum Mr. Clark, Mr. Peters, you and Mr. Paradis, you identified as occurring in the month of February [2015] correct?***
>
> A: It likely occurred in the month of February [2015].  If March 3 is the end date then ***it happen sometime between February 17 and March 3***.
>
> Q: And were there – ***was that the only meeting you had with anyone from the City Attorney's office during that time.  In the time period leading up to April 1, 2015?***
>
> A: ***No there were other meetings.***
>
> Q: And ***in any of those other meetings was the potential Jones versus City of Los Angeles suit discussed***?
>
> A: ***Yes.***
>
> Q: ***And during such meetings was there any report by Mr. Paradis as to where things stood in regard to the future filing of that action?***
>
> A: ***I believe he was reporting on the progress of preparing all that needed to be done procedurally to get the Jones action filed.***
>
>                      *      *      *
>
> Q: ***At any of the meetings*** between the first meeting you discuss that included at a minimum Mr. Clark, Mr. Peters, Mr. Paradis and yourself and April 1, 2015, any of the meetings other than those that were only about the LADWP versus PwC suit ***was there any presence by anyone from the Liner firm?***
>
> A: ***I seem to recall that Maribeth Annaguey was at least one of those meetings where there was a discussion about what the City was going to be doing with regard to the Jones versus City of Los Angeles in part because she was defending the cases that had already been brought against the City of Los Angeles so it was a part of that dynamic***.

*See* Kiesel May 29, 2019 Tr. at 78:7 – 80:3. (Emphasis added).

When asked whether Kiesel had ever told "anyone else about the fact that Mr. Antwon Jones was originally represented by Mr. Paul Paradis," Kiesel answered, "absolutely."  *See* Kiesel May 29, 2019 Tr. at 155:15 – 155:18.  When

**SECOND AMENDED CLASS ACTION COMPLAINT**

asked to explain, Kiesel testified:

> *Maribeth Annaguey and the lawyers defending the City of Los Angeles from the Liner firm were well aware of the fact that Antwon Jones was a prior client at least in their world of Paul Paradis.  And they were defending the City of Los Angeles in the Jones versus City of L. A. class action.*

*See* Kiesel May 29, 2019 Tr. at 114:5 – 114:17. (Emphasis added).

While being questioned about the chronological turn of events involving the filing of the collusive *Jones v. City* action in order to determine who among City Attorney personnel and the City's outside counsel had knowledge of -- and was involved in directing -- the City's corrupt collusive litigation scheme, Kiesel was asked and answered the following questions under oath.  Kiesel's testimony confirmed senior ranking personnel, including Chief Deputy City Attorney Clark and the City's lead outside counsel, Maribeth Annaguey, both had knowledge of and were intimately involved in the City's corrupt scheme ***nearly one month before the collusive Jones action was ever filed***.  When examined about Exhibit 83, an email sent by LADWP Assistant General Counsel Richard Tom to Los Angeles Chief Deputy City Attorney James Clark on March 5, 2019, Kiesel testified:

> Q:  Am I correct that ***by this time [March 5, 2015] you understood that there was going to be the filing of a case captioned Jones v. City of Los Angeles?***
>
> A:  *Yes*.
>
> Q:  And to the best of your recollection ***as of March 5, 2015***, the day before the filing of the PwC case and two days after your exchange of (sic) Mr. Libman seeking his bar number, is it your recollection that ***Mr. Clark was aware of the plan to file the Jones v. City of Los Angeles case***?
>
> A:  *Yes*.
>
> Q:  Is it your understanding that ***as of that date Mr. Thomas Peters was***

56

*aware of the plan to file the Jones v. City of Los Angeles case*?

A:    *Yes*.

*See* Kiesel May 29, 2019 Tr. at 31:1 – 31:15. (Emphasis added).

At the time Clark signed the errata on March 14, 2019, Clark had actual knowledge that Clark had personally authorized and directed Paradis and Kiesel to bring in Messrs. Landskroner and Libman to represent Antwon Jones in a class action against the City for the purpose of suing the City so that the City could effectuate its collusive litigation scheme.  At the time Clark signed the errata on March 14, 2019 and Annaguey submitted it to PwC's counsel on April 4, 2019, both had knowledge of the foregoing and both therefore knew that the errata contained this materially false statement because Clark clearly had actual knowledge of such an "understanding," which is precisely why Clark agreed to proceed with the collusive scheme.

B.    **Allegations from the First Amended Complaint**

175.    By January 1, 2015, if not earlier, Special Counsel Defendants had been retained by the City to serve as Special Counsel with regard to all disputes arising out of the performance of the CC&B billing issues.  Under the terms of the contract with the City, Special Counsel Defendants would be closely supervised by the Los Angeles City Attorney's Office, which would "supervise and retain final authority over all aspects of the Dispute Resolution Process and, if litigation is commenced, all aspects of the Litigation" and its approval was required before standard litigation tasks such as filing motions could be performed.  According to Clark, attorneys acting as special counsel are not distinct from the City itself. Clark has also stated that when special counsel are used, the public entity retaining them maintains ultimate control of the litigation and ultimate responsibility for the actions of special counsel resides with the City itself.  In addition, Special Counsel Defendants were required to ensure that the City Attorney was kept fully informed

**SECOND AMENDED CLASS ACTION COMPLAINT**

of all material case developments at all times and would provide the City Attorney with copies of all correspondence and pleadings related to the litigation.  Feuer has stated at a deposition that he was the one who ultimately approved of the hiring of Kiesel and Paradis.  He is also the individual who had the authority to fire them.  Clark has indicated that the special counsel reported directly to Peters.  On information and belief, LA Defendants supervised, ratified, and directed the conduct of Special Counsel Defendants, including the decision to file and settle *Jones* as a collusive class action.

176.    In or around 2014 Antwon Jones ("Jones") submitted a complaint on a website about his LADWP bill to a website he thought to be affiliated with a governmental agency, checking a box consenting to be contacted by counsel.

177.    The website that drew Jones's attention had been created by Paradis, and it was Paradis who contacted Jones by phone or email and was retained by him as counsel on December 8, 2014.  Mr. Jones explained in a sworn declaration submitted in Los Angeles Superior Court on May 5, 2017 that he had retained counsel to ***"conduct an investigation to determine whether I had any claims that could be brought against the LADWP and the City of Los Angeles*** to recover for the amounts that I had been overcharged by the LADWP for electricity."

178.    Paradis was overseeing remediation work on the CC&B system at LADWP when Jones retained him.  Apparently, within days of that retention by Jones, Paradis expanded his role for LADWP in mid-December 2014 to serve as "Special Counsel" to the City.

179.    On January 9, 2015, Paradis, purportedly acting as Jones's counsel, prepared a Complaint that was styled Jones versus PricewaterhouseCoopers and provided it to Jones.  In truth, according to his deposition testimony, it was Peters who directed Paradis to prepare this complaint, a decision that was highly unusual because, according to Peters, the City Attorney's Office is not authorized to file consumer class actions.  According to Peters, he devised the idea around late 2014

58

or early 2015 as a means for ratepayers to get compensation from PwC for the damages that arose from the billing problems they experienced. By implication, the purpose of this class action would have been that if ratepayers were refunded by PwC, then they would no longer have claims against the City. As Peters put it, "You can't get paid twice. You get it from one or the other. You don't get paid-you don't get it from both. And if it ain't coming from the City, then it's coming probably from PwC." Two weeks after the complaint was provided to Jones, on or around January 23, 2015, a draft complaint captioned "Jones v. PwC" – displaying Paradis and Kiesel as Jones's attorneys – was circulated within the City Attorney's Office, having been provided by Paradis. In addition to Peters, a number of other City Attorney/LADWP employees saw the draft complaint, including Richard Brown, general counsel for LADWP, and Richard Tom, assistant general counsel for LADWP, Eskel Solomon, and Clark. Clark has stated in deposition testimony that he reviewed the draft complaint. By this point, employees of the City were aware that Paradis represented Jones, not only because they were orally told this by Paradis, but because the draft complaint had Paradis' name on it as counsel. After the draft complaint was distributed to various employees of the City, LADWP employees met with City Attorneys and outside counsel to discuss the draft complaint.

180. In an email titled "Jones v. Pricewaterhouse Coopers, LLP (Consumer Class Action)" and addressed to Eskel Solomon, Richard Tom, and Deborah Dorny, three LADWP employees, Paradis thanked the three employees "for the opportunity to discuss the matter earlier this afternoon" and attached a "current confidential draft of the Consumer Class Action Complaint that we talked about." Many sections of this draft complaint were ultimately incorporated into the Jones class action that was ultimately filed against the City. In deposition testimony, Maribeth Annaguey, at the time an attorney at Liner LLP (the City's outside counsel), indicated that Liner received a draft of the PwC complaint at a February

59

11, 2015 meeting where she learned that Paradis and Kiesel were intending to file a consumer class action against PwC.  The conflict of interest could not be clearer: Paradis's draft complaint on behalf of his client Jones was provided to the City to evaluate it for filing based on whether it served the City's interests, not Jones's interests.  Clark has stated in a deposition that the City's outside counsel (Liner LLP) wrote a memorandum recommending against filing the Jones v. PwC complaint after it had been circulated for discussion ***because it "wasn't going to accomplish [the City's] goals."***  Significantly, the February 17, 2015 Liner memo, which was from Annaguey, warned that "PWC will undoubtably seek to join (and crossclaim against) the DWP in the PWC Class Suit."  In a section titled "Potential Conflicts," the memo warned that "Kiesel and Paradis Firms intend to represent both the DWP and separately a class of consumers in distinct federal lawsuits against PWC. The Blood Firm will also represent a putative consumer class against PWC in the *Bransford* suit.  This raises potential conflict issues that may result in those firms being disqualified from one or more of the lawsuits, and more importantly may result in any settlement or other dispositive result being disturbed or overturned.  Of course, these potential conflict issues may have already been identified and addressed, and we note them only out of an abundance of caution."  Ironically, this same warning would have applied with equal effect to the Jones complaint that was ultimately filed against the City.  In addition, the memo warned that "DWP will likely be joined in the PWC Class Suit. Once that happens, the Kiesel/Paradis Firms will represent the consumers in a lawsuit against PWC in which those consumers have claims against the DWP, while simultaneously representing the DWP in its separate lawsuit against PWC. This may present a conflict of interest."

181.   Peters has indicated in deposition testimony that the City did in fact read the Liner memo and that he and/or Mr. Clark decided "that it would be unwise for the City to retain the Kiesel firm and the Paradis firm to represent the City

60

against PwC if those firms – or either of them – were simultaneously representing ratepayers in an action against the same defendant." However, this decision was limited to deciding against filing a consumer class action against PwC. Instead, the focus shifted to having another law firm file a class action against the City. Peters has also indicated in his deposition testimony that he personally read the <u>Jones v PwC</u> complaint shortly after it was drafted.

182. Significantly, although the purported goal of the Jones v. PwC lawsuit would have been to refund ratepayers, Clark has admitted that the City was capable of providing 100% refunds to all ratepayers without litigation. As he has admitted, it was capable of refunding customers for overcharges even though there were several class actions pending against it. No court order was required to refund ratepayers or for LADWP to reform its own billing system. As Clark has acknowledged, the goal in the Jones v. LADWP case was to obtain a settlement broad enough to obtain a release that would cover as much as possible the claims of the other pending class actions.

183. Ultimately, the City decided that instead of filing a class action against PwC, Jones should file one against the City. As Kiesel testified at his deposition:

Q:      As I understand it . . . the City proposed to you and Mr. Paradis a plan by which the Jones versus PWC complaint would be revised and made into a Jones versus City of Los Angeles suit, is that correct?

A:      Partially. . .

***

To the best of my recollection , the City asked Mr. Paradis if they could use Mr. Jones as a class representative to assert a claim against the City of Los Angeles so the City could resolve, as it wanted to do, all of the Department of Water and Power billing issues with the class.

**SECOND AMENDED CLASS ACTION COMPLAINT**

\*\*\*

Based on my email of March 3 to Mr. Libman where I said that Paul Paradis was drafting the complaint, based upon my knowledge of Mr. Paradis then Mr. Paradis would have drafted the complaint Jones versus Department of Water and Power and sent that to Mr. Landskroner."

Q:      . . . was the potential Jones versus City of Los Angeles suit discussed?

A:      Yes.

Q:      . . . Was there any report by Mr. Paradis as to where things stood in regard to the future filing of that action?

A:      I believe he was reporting on the progress of preparing all that needed to be done procedurally to get the Jones action filed.

184.    Thus, it is clear that *the City* decided to cause the <u>Jones</u> class action to be filed against *the City*.  Kiesel and Paradis were not rogue agents acting outside of the scope of the special counsel agreement they had entered into with the City. They were following the express orders given to them by the City.

185.    By mid-March 2015, Jones instructed Paradis to file suit against the City. This outcome is not surprising because, as Jones indicated in his deposition, it was always his intention to sue LADWP if he were to bring a legal action. However, Jones has testified that he *also* wanted to sue PwC but was dissuaded from doing so by Paradis.  On information and belief, the reason why Paradis persuaded Jones to not sue PwC was because LA Defendants had determined such a lawsuit would not be in the interest of the City.

186.    Paradis, as Special Counsel to the City could not, of course, appear on a complaint against the City, and Jones has stated at his deposition that he would never have knowingly hired an attorney who worked for LADWP or the City. On or about March 26, 2015, Paradis introduced Landskroner as an expert in municipal lawsuits who should be added to Jones's legal team. Jones has testified

62

that he understood he was *adding* an attorney to his case-not switching attorneys-and never received any notification that Paradis would no longer be serving as his attorney in connection with his claims against LADWP.   According to his testimony in another action, although Jones began communicating with Landskroner beginning on March 26, 2015, he understood that Paradis was remaining involved as his counsel. Jones did not know that Paradis did not sign the complaint when the complaint was filed- indeed, he was unaware of that fact prior to being subpoenaed in another case. Although Jones did not know that Paradis was not going to be his counsel, Clark has indicated that the City was made aware that Landskroner would be filing the lawsuit on behalf of Jones against the City a number of days before the complaint was ultimately filed.  Moreover, he has stated that he assumes somebody authorized Paradis to bring in Landskroner for the purpose of suing the City.

187.   Jones's actions following the filing of the complaint are entirely consistent with his understanding that Paradis remained his lawyer in his suit against LADWP.  For example, Jones emailed **both** Paradis and Landskroner to complain that his power had been shut off in an apparent act of retaliation by LADWP to the April 1 filing of the case.  Jones further testified that Paradis had never sought to formally disengage from his representation of Jones's interests against LADWP.

188.   Thus, from mid-December 2014 onwards, Paradis was simultaneously representing two clients–Jones and the City–in regards to disputes arising from LADWP's rollout of the CC&B system, notwithstanding that Jones and the City had conflicting interests. Yet, according to Jones's deposition testimony, Paradis did not once disclose his affiliation with the City to Jones–not when Paradis first offered up his services as a class-action attorney, nor when he apparently performed a pre-suit investigation in early 2015, nor when he introduced Jones to Landskroner, nor even when Jones asked for Paradis's help to get LADWP to turn

63

1    his power back on after the complaint was filed.  To the contrary, Jones was kept

2    in the dark that Paradis was providing CC&B remediation management services

3    and testified that he would **not have consented** to be represented by an attorney

4    who was concurrently representing the City.

5         189.    Indeed, even Paradis's justification to Jones for adding Landskroner

6    to the case-that he had more specialized knowledge than Paradis- was

7    fundamentally misleading.  Clark made clear that Landskroner was brought in at

8    Paradis's recommendation to the City.  Paradis had been co-counsel with

9    Landskroner previously and Landskroner had been seen as an "advantage" to the

10   City and "in moving towards settlement," and because he was not likely to be "the

11   most zealous advocate available for Mr. Jones to pursue claims."  The City had no

12   interest in having Jones referred to other plaintiffs' class action lawyers, including

13   Timothy Blood and Alan Himmelfarb, who already had ratepayer cases pending on

14   the same subject matter, as they were viewed by the City, according to Clark, as

15   "unreasonable" attorneys who would be difficult to deal with as class counsel.

16   Consistent with what most advantaged the City's interests, Paradis introduced

17   Landskroner to Jones.  These other attorneys were, according to Clark, "just

18   intransigent, couldn't--they wouldn't--didn't want to negotiate or propose things

19   that were not—were not acceptable."  They were not attorneys who "were willing

20   to do what DWP wanted" i.e., they would not collusively settle the case with the

21   City and instead looked out for the interests of ratepayers.  As Clark has

22   acknowledged, Landskroner was not selected to be brought into the case because

23   he was viewed as someone who would be a zealous advocate for ratepayers.

24   Approximately six days later, Landskroner filed the class action <u>Jones v. City of</u>

25   <u>Los Angeles</u>, Los Angeles County Superior Court Case No. BC577267.

26        190.    Significantly, Kiesel was in correspondence with Libman in the days

27   before the filing of the <u>Jones</u> complaint.  In an email dated March 3, 2015, titled

28   "State Bar Number" that Kiesel sent to Libman, copying Paradis, Kiesel stated:

<div align="center">64</div>

<div align="center">**SECOND AMENDED CLASS ACTION COMPLAINT**</div>

"We are preparing the complaint for your review.  Can you send me your State Bar number for inclusion in the draft complaint?  I am including Paul Paradis, my cocounsel, who is drafting this complaint."  In an email dated March 24, 2015, Paradis sent Kiesel an email stating "The letter that we discussed is attached.  If you do not have any edits, please send it to Michael, have him put it on his letterhead and sign it and then send it back to me so that I can send it to Jack Landskroner for his signature.  Once it has been signed by both Michael and Jack Landskroner, I will have Jack serve it tomorrow."  Kiesel then forwarded this email to Libman the following day, adding "Call me when you get this."  The draft letter attached to this email was a Government Tort Claim demand letter, addressed to Holly Wolcott, Office of the City Clerk, City of Los Angeles and had unsigned signature blocks with the names, firms, addresses, and phone numbers of Libman and Landskroner at the end of the letter.  In an email dated March 25, 2015, Kiesel sent Libman an email stating "Don't forget" with the body stating "To sign and send the notice letter tonight.  Thanks."  In a subsequent part of the "Don't forget" email chain, Libman wrote, "I got the draft complaint from Jack Landskroner.  He is asking me to file it.  Costs?  Please call me.  Thanks."  Kiesel responded, "Good morning Michael.  How did the trial go?  Let's discuss the complaint.  Would like to get it on file today.  Happy to reimburse your cost."  The following day, on April 1, 2015 Libman sent an email to Kiesel titled "Jones v. City of Los Angeles" that stated "see attached."  This extensive email correspondence conclusively establishes that Kiesel and Paradis drafted the Jones complaint.  It also meant that even if Libman believed at the time he filed the Jones lawsuit that the lawsuit was legitimate and not collusive, at the very least he knew or should have known that this was not in fact the case when Kiesel and Paradis began to participate in settlement negotiations on the side of the City after having drafted the complaint for Libman.

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

191.     Around the same time that Kiesel was communicating with Libman about drafting the complaint, Kiesel and/or Paradis informed LADWP employees to expect the class action complaint.  Eskel Solomon, one of the City Attorneys assigned to the LADWP, has stated in deposition testimony that Kiesel and/or Paradis had indicated that they had worked with Landskroner before and knew that the class action was going to be filed.

192.     The case was assigned to Judge Elihu Berle ("Berle") and almost immediately entered into settlement negotiations.   On or around April 2, 2015, immediately after the <u>Jones</u> action was filed, Landskroner and Libman sent a confidential settlement proposal to Landskroner and Libman.  Landskroner and Libman addressed the letter to Solomon and Richard Tom even though they had no prior contact with either of them.  On information and belief, the reason why they knew they should contact these particular employees of the City is because Kiesel and Paradis instructed them as to which employees were the correct ones to direct the settlement proposal to.  The settlement proposal did not come as a surprise because, as Clark has testified at a deposition, the City was anticipating settlement negotiations to commence immediately after filing.

193.     Following several mediation sessions (with Clark and Paradis serving as attorneys for the City), on August 1, 2015 Annaguey sent an email to Tom, Solomon, and Deborah Dorny, all LA City Attorney's Office attorneys assigned to LADWP.   The email outlined some factors that Clark should consider while evaluating the mediator's proposal.  Among them was the fact that "[t]here will likely be higher scrutiny of Landskroner and Libman, individually, and their relationships with the LADWP and its counsel."  Building on this point, she noted that "Despite Landskroner's professed investigation into the CC&B system in Cleveland, he never pursued a lawsuit there" and "Kiesel and Libman apparently just tried a PI case together last week."  On information and belief, the reason this concern was raised was because Annaguey, her firm Liner, and attorneys with the

LA City Attorney's Office were all already aware of the collusive nature of the lawsuit i.e., that Kiesel and Paradis found Landskroner and Libman and had them bring the lawsuit against the City.  They were concerned that publicly available information, such as the fact that Kiesel and Landskroner had just tried a case together, could result in individuals piecing together the truth, thereby scuttling the class action and exposing the wrongdoing.

194.   Also significant is the fact that Annaguey acknowledged the true purpose of Landskroner.  She warned that "Landskroner may be unable to reign in the other attorneys, in which case any premium would be unwarranted but may nonetheless be guaranteed."  She also pointed out that LADWP had pointed out a back-billed accounts issue to Landskroner and offered a solution to him.

195.   What makes this total lack of disclosure about conflicted interests astonishing is that Paradis apparently attempted to influence Jones away from his initial inclination to sue the City in favor of a possible action against PwC, without disclosing that he (Paradis) was actively representing the City at that very time.  Although Paradis kept Jones in the dark about his representation of the City, Paradis fully informed the City about his representation of Jones, including by way of the Jones v. PwC complaint.  This reflects the "white knight approach" Solomon has stated at a deposition was explained to him by Kiesel and/or Paradis, where the defendant settles the claims of multiple class actions with one plaintiff.  In truth, this is simply a reverse auction, and in the case of Jones, an extremely egregious example of one because the "bidder" was actually a shill.  Defendants wished to incorporate as many claims as possible in the Jones settlement so that other attorneys, who were actually committed to adversarial litigation, would not need to be dealt with.

196.   Annaguey's email was forwarded to other City employees including Clark and Richard Brown, general counsel of LADWP.  Clark replied to the email

**SECOND AMENDED CLASS ACTION COMPLAINT**

and agreed that "[i]t superbly summarizes the many issues with the fee number Landskroner et al. have come up with."[1]

197.    Nor did Paradis make any effort to withdraw or disclose potential conflicts to Jones after it became clear–upon the filing of the *Jones* case–that Jones and LADWP had become adverse parties on opposing sides of the litigation. Instead, Special Counsel Defendants continued to play both sides of the caption. Mr. Clark testified that to the best of his recollection, at the June 2015 mediation of Jones's claims, the participants included Paradis-who had never terminated his relationship with plaintiff Jones but who was representing defendant LADWP "against" Jones, to the extent that there was any actual adversity between the parties.  And at subsequent hearings to approve the *Jones* settlement, Paradis stated that he had investigated, **on behalf of the City,** objections raised by other plaintiffs' attorneys while his co-counsel Kiesel urged ratification because the terms were fair to the Class.

198.    Unlike Jones, Judge Berle was not merely left in the dark; rather, he was actively misled regarding the development, conduct, and resolution of the *Jones* case. In particular, Judge Berle was persuaded to bless a settlement without being told necessary qualifying facts about the relationship between counsel for the adverse parties.    In petitioning the Court to approve the Jones settlement, Landskroner represented that "[t]he Parties' negotiations, although contentious, were undertaken in good faith and **at arms' length."**  Landskroner repeatedly touted transparency and independence in the parties' discussions, underscoring that the settlement was the product of "two full hard fought days of mediation in June 2015" and was "presumptively fair because it was reached following

---

[1] Strangely, this reply was sent from the email address JClark@retiredpartner.gibsondunn.com and not one affiliated with the City.  Gibson Dunn & Crutcher LLP was counsel for PwC in the City's lawsuit against it.

**SECOND AMENDED CLASS ACTION COMPLAINT**

protracted, and at times contentious, arms-length negotiations." Landskroner added that "[t]he fact that mediation was overseen by a neutral third party is proof of the noncollusive nature of the negotiations."

199. In fact, every one of those representations was misleading because Landskroner suppressed facts which materially qualified those statements regarding the independence of the parties and the adversarial nature of negotiations. It was not disclosed that Paradis (Special Counsel to the City in the simultaneously pending LADWP case over CC&B billing issues) represented the plaintiff, Jones, for over four months in the run-up to the filing of the complaint (and was Jones's sole attorney for the majority of that time). It was not disclosed that a lawyer for the City (Special Counsel Paradis) *introduced the putative Class Counsel* (Landskroner) to the ratepayer plaintiff-that too, a scant one week before the plaintiff's lengthy complaint was filed. And it was not disclosed that Landskroner began settlement overtures the day after the filing of the complaint, without Jones knowing until two months later that such discussions had begun. For its part, the City Attorney's Office knew or, at a minimum, was on notice of all those material qualifiers, but did not fulfill its duty of candor to the Court by correcting the misimpression that Landskroner created regarding "hard fought" settlement talks. As for the conclusory representation that the mediator's oversight sufficed to guarantee arms–length dealing, there is no evidence that the *mediator* was told anything about relationships between Paradis, Landskroner, and Jones either. In fact, on information and belief, the mediator had been hoodwinked into being used as a prop by the attorneys and was in fact under the belief that he was conducting a legitimate adversarial mediation session, when in fact he wasn't. In fact, the *Jones* complaint and friendly opposing counsel enabled the City to arrive at a settlement of all ratepayer litigation that worked to its own interests. When Judge Berle was asked to approve the settlement over objections of collusion, he did not have any of this information available. But such information would have

69

had immense relevance to Judge Berle's evaluation of whether Landskroner was an independent and adequate counsel to appropriately represent Jones and a Class that was releasing broad claims against the City.

200.   Tellingly, the only response Landskroner had to allegations of collusion between counsel for the City and counsel for Jones was itself misleading. In a February 2017 response to settlement objections, Landskroner swore that any "suggestion that the attorneys from the Landskroner Firm have an inappropriate relationship with any of the attorneys from … the Office of the City Attorney of Los Angeles is false" because "[p]rior to the Jones Action, ... the Landskroner Firm had never worked on any matter with ... the Office of the City Attorney of Los Angeles (defense counsel, here) either as co-counsel or as opposing counsel." Landskroner failed to tell Judge Berle that Special Counsel Paradis had previously represented Jones while representing the City, a fact well known to Landskroner, and brought Landskroner into the case based on Paradis's prior relationship with Landskroner.

201.   The *Jones* settlement was formulated collusively and not through adversarial negotiation, which enabled the parties to the scheme to include extraordinary elements for their respective benefit.  Landskroner, without taking or defending a single deposition, garnered the majority of $19 million in total fees divided among counsel, a significant portion of which appears attributable to work performed before he was even introduced to Jones. The City shoehorned in a remediation component never sought by the Class and used the Court's approval of that component to rush through contracts without competitive bidding. Ultimately, Special Counsel Paradis's law firm and a company formed by Paradis during the course of the *Jones* case were awarded no-bid contracts of some $30 million to provide project management services in connection with the remediation required by the *Jones* settlement.

//

**SECOND AMENDED CLASS ACTION COMPLAINT**

202.    In his declaration supporting the $19 million aggregate fee request, Landskroner stated that "[p]rior to and after the filing of the initial complaint, *Class Counsel conducted an extensive and very lengthy investigation* into the matters alleged in the initial complaint, which included, among other things, interviewing current and former LADWP employees and working closely with investigators."  Landskroner boasted that the "outstanding results provided by the Settlement" were achieved because "Class Counsel was able to leverage the information learned in connection with Class Counsel's pre-suit investigation." Landskroner repeated the same representations in the Settlement Agreement presented to Judge Berle, stating that "prior to filing the Complaint in the Action, Class Counsel initiated an extensive and very lengthy investigation."

203.    However, the timing of that "extensive and very lengthy [pre-suit] investigation" by Class Counsel Landskroner does not make sense.  Jones testified that the first time he was introduced to Landskroner by Paradis was March 26, 2015, and further testified that he had no other attorneys before that date for his potential suit against LADWP.  Thus, when Jones declared–also in support of the fee request–that his "counsel" conducted pre-suit work like investigating the claims, hiring experts, and preparing a draft complaint, Jones thought his declaration was referring to Paradis but, of course, there was no way for Judge Berle to know that given Paradis's status as Special Counsel to the City. Yet Landskroner passed off all that pre-March 26 activity as his own, demanding more than $500,000 (using a multiplier) for *355.75 hours of work he did before he had ever met his client.*  Landskroner and Special Counsel Defendants all knew that Landskroner was seeking fees for work performed during the time period in which Jones was, to his knowledge, represented only by Paradis.  None spoke up.

204.    But the fraud on the public extends further. The only relief sought by the *Jones* complaint was refunds of overcharges and imposition of a monitor to identify affected ratepayers while overseeing the refund process. Yet the City

71

inserted into the settlement a substantial remediation component for which there was no discernible reason or request by plaintiffs.  The City then presented that remediation order, bearing the court's imprimatur, to the LADWP Board of Commissioners as requiring immediate approval and implementation of no-bid contracts.  A company founded by Special Counsel Paradis (Aventador[2] Utility Solutions, LLC) was then awarded a ***$30 million contract on a no-bid basis*** (this in addition to the $6 million the Paradis Firm had already received for remediation-related services). Surprisingly, even though the contract was approved in June 2016, the company did not exist as a corporate entity until March 2017.

205.    When Defendants submitted their proposed settlement to Judge Berle for approval, they included draft notices to class members of the settlement.  As Defendants intended, these drafts formed the basis of the notices that Judge Berle ordered to be sent out to the *Jones* class members.  They opted to include such statements as "The Class Representatives and the attorneys that have been appointed by the Court to represent the Settlement Class believe that the Settlement is in the best interests of all Settlement Class Members."  They also included language stating that class members "have a lawyer in this case," namely Class Counsel Defendants, who the notice states "have been appointed by the Court to represent you and the other Settlement Class Members."  Nowhere in the draft notices did Defendants disclose the collusive relationship between Class Counsel Defendants and The City.   Judge Berle ordered that the notice be disseminated by email and mail to LADWP customers and published, among other places in *The Los Angeles Times* and *La Opinion* as well as on LADWP's website.

---

[2] Aventador is the name of a $400,000 Lamborghini supercar and is not a word with any other meaning in Italian or any other language.

**SECOND AMENDED CLASS ACTION COMPLAINT**

206.    Ultimately, Judge Berle issued his order granting final approval of the class action settlement and a final judgment on July 20, 2017.  Class Counsel Defendants were awarded $19,000,000 in attorneys' fees and an additional $2,741,003.99 in expenses.  These fees and reimbursement of expenses were ordered to be paid by The City to Defendants within 7 business days after entry of the order, with Class Counsel Defendants responsible for the allocation of fees and expenses among themselves.  On information and belief, The City did in fact disburse these fees to Class Counsel Defendants.  In addition, Class Counsel Defendants retained the right to make quarterly applications to the court for additional awards of attorneys' fees at a rate of 29% of all future recoveries by class members.

207.    On information and belief, Defendants Law Offices of Michael J. Libman and Michael J. Libman, by virtue of their role as local counsel in the *Jones* class action, were aware of and participated in Landskroner's and his firm's misconduct and were aware of Landskroner's connection to The City and Special Counsel Defendants as well as the fact that the *Jones* settlement was collusive. Based on his relationship with Kiesel, on information and belief, it was Kiesel who recruited Libman to participate in the scheme with Defendants and serve as Landskroner's local counsel.  That Libman was not being recruited to represent Jones and other ratepayers would have been immediately obvious because Kiesel, as an attorney licensed to practice law in California, could have served as local counsel for Landskroner.  At the very least, Libman and his firm would have been aware of the truth when they were given drafts of the complaint and other documents to file by Kiesel and Paradis, whose names did not appear on the captions of these documents.  In addition, once the Jones case was filed and related to The City's lawsuit against PwC, the truth would have been immediately apparent given the fact that Special Counsel Defendants were counsel for The City in that case, making their true nature as agents for The City, and not attorneys

73

representing the interests of Jones or other ratepayers, blatantly obvious.

208.    On information and belief, Peters and Clark, as the attorneys who would have directly dealt with Special Counsel and supervised and directed them, both personally participated in and were aware of the scheme to collusively settle the LADWP litigation.  In fact, Peters has admitted that he came up with the idea of drafting a Jones v. PwC complaint in late 2014 or early 2015.  Clark has also testified that he participated in meetings where the Jones v. PwC draft complaint was discussed.   Moreover, he has testified that he was aware that Paradis represented Jones.  Further, Clark has testified that he was aware that Paradis at a minimum provided Landskroner with copies of the other pending LADWP class actions.  Furthermore, Clark has testified that he was personally aware that once there was a conflict between Jones and The City, Paradis specifically recommended Landskroner as the attorney to sue The City.  He has also testified that he understood Landskroner's involvement would be to The City's advantage because he was "seen as a more reasonable ... person to deal with" over other plaintiff's attorneys involved in other LADWP actions.  According to Clark, these other attorneys were considered "intransigent" and might not do what LADWP wanted.  Clark has testified that he never considered whether it was ethical for Paradis to recommend the attorney to sue The City.  Clark had overall supervisory authority for The City's defense of the Jones litigation from 2015 to 2017 and has stated in deposition testimony that he was aware of the issues that came up in the case.  Therefore, he would have necessarily been aware of issues relating to Kiesel and Paradis recruiting Class Counsel Defendants to file the collusive class action.

209.    Given the fact that the Jones v PwC draft complaint contains large sections that were subsequently used in the complaint filed by Jones against The City, Clark, Feuer, and Peters all would have recognized the similarities between the two complaints, making it immediately apparent that the two complaints had been drafted by the same individuals, and that Special Counsel Defendants were

74

therefore behind the lawsuit filed by Jones.

210. Furthermore, on information and belief, Feuer, as the individual who Clark directly reported to, was aware of and ratified decisions made by Special Counsel. Among other things, Clark has testified that he would have shown Feuer the Jones v. PwC draft complaint. In addition, as City Attorney, Feuer's approval would have been necessary during the settlement of the *Jones* class action. Therefore, among other things, Feuer would have known that Special Counsel were listed on the Jones v. PwC draft complaint as counsel for Jones, but ultimately defended The City in a lawsuit brought by Jones. Therefore, when Feuer was involved in the settlement, he was aware of the improprieties that occurred, but nevertheless pressed forward with supporting the settlement of a case where improprieties that were obvious to anyone were present. Feuer was also the individual who was ultimately responsible for hiring Kiesel and Paradis and was also the one with the authority to fire them.

211. Finally, given the fact that Kiesel has admitted that The City directed the Jones v. PwC lawsuit be converted int to the Jones v. City of Los Angeles lawsuit and the fact that he has stated that Paradis was reporting on the progress of getting the lawsuit filed, Clark, Peters, and/or Feuer were the individuals who gave this order and/or were the individuals who received the progress reports for Paradis. No other attorneys within the City Attorney's Office would have had authority to supervise Kiesel and Paradis.

## III.   Defendants' Collusion Is Revealed.

212. While *Jones* was proceeding, The City was engaged in a parallel lawsuit against PwC. In the course of discovery, PwC's counsel noticed that a document identified as "Jones v. PwC–Initial Complaint–FINAL.DOC" was identified on a LADWP privilege log. PwC then moved to compel production of that document, and in doing so began a months-long saga culminating in 2019

75

1
2
3
4

with the public disclosure of the collusive nature of Defendants' settlement of *Jones*. Although the full scope of the fraud on the court and the ratepayers is as yet unknown, as is the identities of all those involved, it is apparent that each Defendant has engaged in severe wrongdoing.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

213.     Following this revelation, the Court appointed a new law firm as class counsel in <u>Jones</u>, who has determined that the <u>Jones</u> class members were not compensated for 100% of their damages. Rather than receiving a 100% refund as the Court and class members in <u>Jones</u> were led to believe, <u>Jones</u> class members actually lost out on a significant portion of damages because of the collusive settlement. The replacement class counsel's initial investigations have already discovered an additional $40 million that is owed to class members in addition to the $69 million that was purportedly refunded. This is to say nothing of other forms of damages that class members were not compensated for when they were tricked into acceding to the collusive settlement, including, but not limited to prejudgment interest. In addition, there are other issues related to uninvestigated claims that were waived in the <u>Jones</u> case. For example, because there has been no determination that pre-September 2013 billing records of LADWP customers were in fact accurate, any claims related to these billing records were improperly waived as a result of the collusive settlement. Furthermore, that Plaintiff and the Class have damages is obvious when The City's litigation position is considered. Simply put, Defendants' actions in conspiring to perpetrate this complex scheme for the benefit of The City were irrational unless The City in fact stood to benefit. Given the fact that The City could have simply fully refunded all members of Jones and could have voluntarily rectified the billing systems to prevent future errors from occurring without court intervention, any argument that Jones class members in fact received full refunds is ludicrous. Rather, there are only two possible explanations. First, The settlement allowed The City to avoid fully compensating Plaintiff and the Class for their damages. In the alternative,

76

Defendants (minus The City) were not acting for the The City's benefit.  Rather, they acted to enrich themselves and/or each other.  For example, Paradis was able to benefit from the no bid contract that was given to his company Aventador (in addition to the payment he received from The City for his services).   Peters worked for Kiesel before going to work for The City.

214.    In any event, even if Plaintiff and the Class did not suffer monetary damages (and they did suffer them), they would still be entitled to, at minimum, nominal damages. Importantly, a separate lawsuit is necessary for Plaintiff and the other <u>Jones</u> class members because it is impossible for them to obtain meaningful relief because <u>Jones</u> is a settled class action.

## IV.    <u>The Class Representative.</u>

215.    Plaintiff Dennis Bradshaw is the renter of a house in The City of Los Angeles and is an LADWP ratepayer who was a member of the *Jones* class and did not opt out of the *Jones* class action settlement.  Bradshaw received a credit to his December 2017 bill as part of the Jones *settlement*.  Like other class members in *Jones*, Bradshaw reasonably relied on the statements contained in the notice he received stating that Judge Berle had preliminarily approved of the settlement, that class counsel fairly and adequately protected class members, and that the settlement was superior to all other available methods for fairly and efficiently resolving the dispute with LADWP.  In addition, he was unaware that The City, acting through Special Counsel Defendants, had actually selected the class counsel in *Jones* and reasonably expected that Class Counsel Defendants would represent the interests of the class and had actually litigated the case, rather than quickly reaching a collusive settlement with The City.  Furthermore, like other class members, Plaintiff reasonably relied on Judge Berle's evaluation that the settlement was fair and reasonable.  Because of Defendants' actions, Plaintiff did not object or otherwise opt out of the settlement or take other action.

**SECOND AMENDED CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

## CLASS ACTION ALLEGATIONS

216.    Plaintiff brings this action on his own behalf, and as a class action on behalf of the Class defined herein, pursuant to, and properly maintainable under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3).  The Class is also maintainable as a class for declaratory relief under Fed. R. Civ. P. 23(b)(2).  Finally, the class is also maintainable as a limited fund class under Fed. R. Civ. P. 23(b)(1)(B).  The Class consists of hundreds of thousands of LADWP Settlement Class members victimized by Defendants' collusive and fraudulent settlement of <u>Jones v. City of Los Angeles</u>, Los Angeles County Superior Court Case No. BC577267.  Specifically, Plaintiff brings this suit on behalf of the following Class:

12

13

14

15

16

17

18

19

20

21

22

23

24

> The "**LADWP SETTLEMENT CLASS**":  All persons who were members of the Settlement Class in <u>Jones v. City of Los Angeles</u>, Los Angeles County Superior Court Case No. BC577267.  The class excludes all persons who timely exercised their right to opt out of the Settlement Class in <u>Jones v. City of Los Angeles</u> as well as all named plaintiffs and defendants in cases that were related to <u>Jones</u> under California Rules of Court, Rule 3.300.  The class also excludes counsel representing the class and all persons employed by said counsel, governmental entities, City of Los Angeles, Michael Feuer, James Clark, Thomas Peters, The Landskroner Law Firm, LTD., Jack Landskroner, Law Offices Of Michael J Libman APC, and Michael J. Libman, any entity in which Defendants City of Los Angeles, Michael Feuer, James Clark, Thomas Peters, The Landskroner Law Firm, LTD., Jack Landskroner, Law Offices Of Michael J Libman APC, and Michael J. Libman have a controlling interest, Defendants City of Los Angeles, The Landskroner Law Firm, LTD., and Law Offices Of Michael J Libman APC,   officers, directors, affiliates,   legal   representatives,   employees,   co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.

25

26

27

28

> The   "LADWP   Settlement   Class"   shall   contain   the following subclass:
> The "**RESIDENTIAL CUSTOMER SUBCLASS**":  All persons   who   are   residential   LADWP   customers   and members of the "LADWP Settlement Class."

78

**SECOND AMENDED CLASS ACTION COMPLAINT**

217.    With regards to a limited fund class, the following class definition may be appropriate instead of the one above:

> The "**LADWP SETTLEMENT CLASS**":  All persons who were members of the Settlement Class in <u>Jones v. City of Los Angeles</u>, Los Angeles County Superior Court Case No. BC577267.  The class excludes all persons who timely exercised their right to opt out of the Settlement Class in <u>Jones v. City of Los Angeles</u>.

> The "LADWP Settlement Class" shall contain the following subclass:
> The "**RESIDENTIAL CUSTOMER SUBCLASS**":  All persons who are residential LADWP customers and members of the "LADWP Settlement Class."

218.    Plaintiff shall serve as class representative of both the LADWP Settlement Class and the Residential Customer Subclass.

219.    Defendants subjected Plaintiff and the Class to the same wrongdoing and harmed them in the same manner. Now, Plaintiff and the Class seek to enforce the same rights and remedies pursuant to the same legal theories: violation of 42 U.S.C. § 1983, unjust enrichment, breach of fiduciary duty, professional malpractice, affirmative misrepresentation, negligent misrepresentation, fraudulent concealment, violation of the Consumer Legal Remedies Act, violation of the Unfair Competition Law, declaratory judgment, and violation of the Racketeer Influenced and Corrupt Organizations Act.

220.    <u>Numerosity</u>: The proposed class and subclass are so numerous that individual joinder of all their members is impracticable. While the exact number and identities of the Class Members are unknown at this time, such information can be ascertained through appropriate investigation and discovery. It is estimated that both the "LADWP Settlement Class" and "Residential Customer Subclass" consist of hundreds of thousands of members. The disposition of the claims of these Class Members in a single class action will provide substantial benefits to all parties and to the Court.

**SECOND AMENDED CLASS ACTION COMPLAINT**

221.   <u>Typicality</u>: Plaintiff's claims are typical of the claims of his respective Class in that his claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory as their claims.

222.   <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has further retained the undersigned counsel, who have substantial experience in prosecuting complex lawsuits and class action litigation. Plaintiff and undersigned counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests adverse to the Class.

223.   <u>Superiority of Class Action and Impracticability of Individual Actions</u>: Plaintiff and the members of the Class suffered harm as a result of Defendants' unlawful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of all members of the Class is impractical. Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by the Defendants' common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class Members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class Members. Adjudication of individual Class Members' claims with respect to Defendants would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and could substantially impair or impede the ability of other Class Members to protect

their interests.

224.   <u>Common Questions of Law and Fact Predominate</u>: In addition, the requirements of Federal Rule of Civil Procedure 23 are satisfied by questions of law and fact common to the claims of Plaintiff and of each member of the LADWP Settlement Class and Residential Customer Subclass and which predominate over any question of law or fact affecting only individual members of the LADWP Settlement Class and Residential Customer Subclass. Common questions of law and fact include, but are not limited to, the following:

1.   Did Special Counsel Defendants recruit Class Counsel Defendants to be class counsel in the *Jones* class action?

2.   Did Class Counsel Defendants misrepresent their relationship with The City in the Jones class action to Judge Berle?

3.   Did Class Counsel Defendants omit material information about their relationship to The City in the Jones Class action to Jones Class members?

4.   Did the LA Defendants supervise, direct, and/or ratify the conduct of Special Counsel Defendants in recruiting Class Counsel Defendants?

5.   Did the LA Defendants and Special Counsel Defendants violate the 14th Amendment Rights of members of the LADWP Settlement Class?

6.   Did the LA Defendants and Special Counsel Defendants violate 42 U.S.C. § 1983?

7.   Did Class Counsel Defendants violate the California Rules of Professional Conduct?

8.   Did Class Counsel Defendants unjustly enrich themselves at the expense of the LADWP Settlement Class?

9.   Does the severe ethical misconduct by Class Counsel

81

SECOND AMENDED CLASS ACTION COMPLAINT

Defendants require disgorgement by them of all attorneys' fees and costs received in the Jones class action?

10. Did Class Counsel Defendants, as class counsel in the Jones class action, owe fiduciary duties to the LADWP Settlement Class?

11. Did Class Counsel Defendants breach the fiduciary duties they owed to the LADWP Settlement Class?

12. Did Special Counsel Defendants aid and abet the breach of fiduciary duty by the Class Counsel Defendants owed to the LADWP Settlement Class?

13. Did Class Counsel Defendants owe a duty of reasonable care to Plaintiff and the LADWP Settlement Class in Jones?

14. Did Class Counsel Defendants commit professional malpractice with regards to their representation of the LADWP Settlement Class in Jones?

15. Did Special Counsel Defendants aid and abet professional malpractice by the Class Counsel Defendants as against the LADWP Settlement Class?

16. Did Class Counsel Defendants make affirmative misrepresentations to Plaintiff and the Class?

17. Did Class Counsel Defendants make misrepresentations to Plaintiff and the Class?

18. Did Special Counsel Defendants aid and abet the misrepresentations by the Class Counsel Defendants towards the Plaintiff and the Class?

19. Did Special Counsel Defendants conspire with Class Counsel Defendants when Class Counsel Defendants made misrepresentations to the Plaintiff and the Class?

20. Did Class Counsel Defendants fraudulently conceal material

82

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    facts from Plaintiff and the Class?

2    21.    Did Special Counsel Defendants aid and abet the fraudulent

3    concealment by the Class Counsel Defendants towards the Plaintiff

4    and the Class?

5    22.    Did Special Counsel Defendants conspire with Class Counsel

6    Defendants when Class Counsel Defendants committed fraudulent

7    concealment towards the Plaintiff and the Class?

8    23.    Are Plaintiff and the Residential Customer Subclass

9    consumers within the meaning of Civ. Code, § 1761(d)?

10    24.    Are Class Counsel Defendants persons within the meaning of

11    Civ. Code, § 1761(c)?

12    25.    Did Class Counsel Defendants provide services to Plaintiff and

13    the Residential Customer Subclass within the meaning of Civ. Code,

14    § 1761(b)?

15    26.    Did Class Counsel Defendants misrepresent the source,

16    sponsorship, approval, or certification of legal services by

17    misrepresenting and/or concealing from Plaintiff and the Residential

18    Customer Subclass as well as Judge Berle that they did not in fact

19    represent the interests of ratepayers in Jones, when they instead

20    were plotting with Special Counsel Defendants and The City to

21    reach a collusive class action settlement?

22    27.    Did Class Counsel Defendants misrepresent their affiliation,

23    connection, or association with another by misrepresenting and/or

24    concealing from Plaintiff and the Class as well as Judge Berle that

25    they did not in fact represent the interests of the ratepayer in Jones,

26    when they instead were plotting with Special Counsel Defendants

27    and The City to reach a collusive class action settlement?

28    28.    Did Class Counsel Defendants represent that their legal

83

**SECOND AMENDED CLASS ACTION COMPLAINT**

services have sponsorship, approval, characteristics, ingredients, uses or benefits that they did not have, or that they had a sponsorship, approval, status, affiliation or connection that they do not have, by misrepresenting and/or concealing from Plaintiff and the Class as well as Judge Berle that they did not in fact represent the interests of ratepayers in Jones, when they instead were plotting with Special Counsel Defendants and The City to reach a collusive class action settlement?

29.     Did Class Counsel Defendants represent that their legal services are of a particular standard, quality, or grade, or that they are of a particular style or model, when they were in fact of another by misrepresenting and/or concealing from Plaintiff and the Class as well as Judge Berle that they did not in fact represent the interests of ratepayers in Jones, but that they were instead plotting with Special Counsel Defendants and The City to reach a collusive class action settlement?

30.     Did Class Counsel Defendants violate the Consumer Legal Remedies Act?

31.     Did Class Counsel Defendants violate the Unfair Competition Law?

32.     Did Defendants engage in mail fraud?

33.     Did Defendants engage in wire fraud?

34.     Did Defendants violate the Racketeer Influenced and Corrupt Organizations Act?

35.     Are Plaintiff and the Class entitled to compensatory damages?

36.     Are Plaintiff and the Class entitled to disgorgement of fees received by Class Counsel Defendants?

37.     Are Plaintiff and the Class entitled to nominal damages?

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    38.    Are Plaintiff and the Class entitled to punitive damages?

2    39.    Are Plaintiff and the Class entitled to an award of attorneys'

3         fees?

4    225.    Notice: Notice can be provided via internet publication, published

5    notice and/or through mail and paid for by the Defendants.

6

7                    **FIRST CLAIM FOR RELIEF**

8              **VIOLATION OF 42 U.S.C. § 1983**

9    **(By All Plaintiffs Against the LA Defendants and Special Counsel Defendants)**

10   226.    The allegations of paragraphs 1 through 225 are re-alleged and

11   incorporated herein by reference, and Plaintiff alleges as follows a cause of action

12   on behalf of himself and the class of similarly situated LADWP Settlement Class

13   members.

14   227.    LA Defendants acted under color of law.

15   228.    Special Counsel Defendants were either acting under color of state

16   law because they served as Special Counsel for The City and served in roles

17   equivalent to attorneys within the City Attorney's Office or alternatively are liable

18   as private parties because they conspired with LA Defendants to violate the

19   constitutional rights of Plaintiff and the Class.

20   229.    The acts of LA Defendants and Special Counsel Defendants deprived

21   Plaintiff and the Class of their rights under the Due Process Clause of the

22   Fourteenth Amendment of the United States Constitution.

23   230.    Specifically, LA Defendants directed, supervised, and/or ratified the

24   conduct of Special Counsel Defendants and, together with Special Counsel

25   Defendants, conspired to and in fact did deprive Plaintiff and the Class of their due

26   process rights in the *Jones* class action.  Both Clark and Peters authorized Special

27   Counsel Defendants to draft the sham Jones complaint and have Class Counsel

28   Defendants file the lawsuit against the City.  To the extent that one of LA

85

**SECOND AMENDED CLASS ACTION COMPLAINT**

Defendants or Special Counsel Defendants did not personally violate the rights of Plaintiff and the Class, they are still liable because of their participation in the overall conspiracy. The conduct at issue here was the City's policy, as it was the result of the decisions of the three most senior attorneys within the City Attorney's Office: Feuer, Clark, and Peters. There was no higher authority within The City responsible for making the decisions relevant here and, in the case of Feuer, he was elected by voters to make litigation decisions. In addition, the City Attorney's Office must approve of contracts before they are entered into by the City, and in fact did so with regards to the contract to hire Special Counsel Defendants.

231. LA Defendants and Special Counsel Defendants disregarded every norm of the American common law adversarial legal system by selecting the attorneys who would represent the opposing party in the LADWP rate litigation. In so doing, they prevented Plaintiff and the Class from being represented by counsel who would represent their interests and deprived them of meaningful access to the courts. That this conduct constituted due process violations was clearly established as demonstrated by both Ninth Circuit and Supreme Court case law at the time it occurred. Numerous cases have identified the due process concerns particular to class actions as well as those related to the government interfering with a party's counsel and effective access to the courts. Because all Defendants in this action aside from The City are attorney or law firms, they could not have reasonably believed that their conduct was permissible. To the contrary, they would have sufficient knowledge of constitutional law to realize that they could not act in the manner that they did without violating the due process rights of Plaintiff and the Class.

232. As a result of LA Defendants' and Special Counsel Defendants' conduct, Class Counsel Defendants, together with Special Counsel Defendants, negotiated a collusive settlement that was approved by Judge Berle, who was unaware of the collusion.

**SECOND AMENDED CLASS ACTION COMPLAINT**

233.   Plaintiff and the Class, who were also unaware of the true nature of the settlement, had no reason to object or exclude themselves from the *Jones* class and thus lost their ability to obtain fair and adequate compensation for their claims.

234.   Had the truth come to light, Judge Berle would not have and could not have approved of the *Jones* settlement, and any class action settlement would have been entered into by adequate class counsel, would have been made at arm's-length, and would have reflected the full value of the case.

235.   As a result of LA Defendants' and Special Counsel Defendants' conduct, Plaintiff and the Class have suffered damages.

236.   In addition, because LA Defendants and Special Counsel Defendants acted with evil motive or intent and/or reckless or callous indifference to the constitutional rights of the *Jones* class members, Plaintiff and the Class are entitled to punitive damages in an amount according to proof at trial.

## SECOND CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY
### (By All Plaintiffs Against Class Counsel Defendants)

237.   The allegations of paragraphs 1 through 236 are re-alleged and incorporated herein by reference, and Plaintiff alleges, as follows, a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

238.   Class Counsel Defendants owed Plaintiff and the Class a fiduciary duty because they were in "attorney-client" relationships with Plaintiff and the Class.  Their fiduciary duty included to follow the California Rules of Professional Conduct and other authorities regulating attorney behavior.

239.   These ethical duties include, but are not limited to, California Rules of Professional Conduct Rule 3-310's restrictions on the representation of adverse interests.  Class Counsel Defendants failed to disclose to Plaintiff and the Class

87

and to Judge Berle that they had a relationship with Special Counsel Defendants and were in fact selected by them to be class counsel in the LADWP class action. Moreover, they failed to disclose that they were engaged in simultaneous representation of both The City and the ratepayers in *Jones*.

240.   In pursuing the interests of The City and their own interests in making a quick profit, and by putting those interests ahead of their clients' interests and reaching a quick and collusive settlement with The City, Class Counsel Defendants also violated their fiduciary duty of loyalty that all attorneys owe to their clients.

241.   Through false representations and material omissions to the Court regarding, among other things, their independence, that they had reached a settlement in *Jones* through arm's length negotiations, and the amount of hours they had spent working on the case, Class Counsel Defendants also violated California Rules of Professional Conduct Rule 5-200's requirement that attorneys employ "such means only as are consistent with truth" and the prohibition that they may not "seek to mislead the judge ... by an artifice or false statement of fact."   For the same reasons, Class Counsel Defendants violated Business and Professions Code section 6068(d)'s requirement that an attorney "employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."

242.   Class Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

243.   In addition, a constructive trust must be imposed on the *Jones* attorneys' fees and any other revenue generated as a result of Class Counsel Defendants' participation in *Jones*.

**SECOND AMENDED CLASS ACTION COMPLAINT**

244.   Class Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

245.   Class Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

246.   Class Counsel Defendants intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.  These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

247.   Therefore, Class Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## THIRD CLAIM FOR RELIEF
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (By All Plaintiffs Against Special Counsel Defendants)

248.   The allegations of paragraphs 1 through 247 are re-alleged and incorporated herein by reference, and Plaintiff alleges, as follows, a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

249.   Class Counsel Defendants owed Plaintiff and the Class a fiduciary duty because they were in "attorney-client" relationships with Plaintiff and the Class.  Their fiduciary duty included to follow the California Rules of Professional Conduct and other authorities regulating attorney behavior.

250.   These ethical duties include, but are not limited to, California Rules of Professional Conduct Rule 3-310's restrictions on the representation of adverse

89

1
2
3
4
5

interests.  Class Counsel Defendants failed to disclose to Plaintiff and the Class and to Judge Berle that they had a relationship with Special Counsel Defendants and were in fact selected by them to be class counsel in the LADWP class action. Moreover, they failed to disclose that they were engaged in simultaneous representation of both The City and the ratepayers in *Jones*.

6
7
8
9
10

251.    In pursuing the interests of The City and their own interests in making a quick profit, and by putting those interests ahead of their clients' interests and reaching a quick and collusive settlement with The City, Class Counsel Defendants also violated their fiduciary duty of loyalty that all attorneys owe to their clients.

11
12
13
14
15
16
17
18
19
20
21
22

252.    Through false representations and material omissions to the Court regarding, among other things, their independence, that they had reached a settlement in *Jones* through arm's-length negotiations, and the amount of hours they had spent working on the case, Class Counsel Defendants also violated California Rules of Professional Conduct Rule 5-200's requirement that attorneys employ "such means only as are consistent with truth" and the prohibition that they may not "seek to mislead the judge ... by an artifice or false statement of fact."  For the same reasons, Class Counsel Defendants violated Business and Professions Code section 6068(d)'s requirement that an attorney "employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."

23
24
25
26

253.    Special Counsel Defendants knew that Class Counsel Defendants were breaching and/or going to breach their fiduciary duties owed to Plaintiffs and the Class by virtue of their recruitment of Class Counsel Defendants to file a collusive class action against The City.

27
28

254.    Special Counsel Defendants gave substantial assistance and/or encouragement to Class Counsel Defendants.  Among other things, they recruited

90

Class Counsel Defendants to become counsel for Jones and the other ratepayers and provided them with drafts of documents to file.

255.    Special Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

256.    Special Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

257.    Special Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

258.    Special Counsel Defendants aided and abetted Class Counsel Defendants when they intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.   These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

259.    Therefore, Special Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## FOURTH CLAIM FOR RELIEF
## PROFESSIONAL MALPRACTICE
### (By All Plaintiffs Against Class Counsel Defendants)

260.    The allegations of paragraphs 1 through 259 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

91

SECOND AMENDED CLASS ACTION COMPLAINT

261.   Class Counsel Defendants were in attorney-client relationships with Plaintiff and the Class.

262.   Accordingly, Class Counsel Defendants owed Plaintiff and the Class the duty of all attorneys to use such skill, prudence, and diligence as members of their profession commonly possess and exercise.

263.   In addition, Class Counsel Defendants are required to comply with their ethical duties as attorneys.  These ethical duties include, but are not limited to, California Rules of Professional Conduct Rule 3-310's restrictions on the representation of adverse interests.  Class Counsel Defendants failed to disclose to Plaintiff and the Class and to Judge Berle that they had a relationship with Special Counsel Defendants and were in fact selected by them to be class counsel in the LADWP class action.  Moreover, they failed to disclose that they were engaged in simultaneous representation of both The City and the ratepayers in *Jones*.

264.   Class Counsel Defendants also violated their fiduciary duty of loyalty that all attorneys owe to their clients. They did so by reaching a quick and collusive settlement with The City and pursuing the interests of The City and their own interests in making a quick profit rather than pursuing the interests of Plaintiff and the Class.

265.   Through false representations and material omissions to the Court regarding, among other things, their independence, that they had reached a settlement in *Jones* through arm's-length negotiations, and the amount of hours they had spent working on the case, Class Counsel Defendants also violated California Rules of Professional Conduct Rule 5-200's requirement that attorneys employ "such means only as are consistent with truth" and the prohibition that they may not "seek to mislead the judge ... by an artifice or false statement of fact."  For the same reasons, Class Counsel Defendants violated Business and Professions Code section 6068(d)'s requirement that an attorney "employ, for the purpose of maintaining the causes confided to him or her those means only as are

consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."

266.   Class Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

267.   In addition, a constructive trust must be imposed on the *Jones* attorneys' fees and any other revenue generated as a result of Class Counsel Defendants' participation in *Jones*.

268.   Class Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

269.   Class Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

270.   Class Counsel Defendants intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.  These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

271.   Therefore, Class Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

### FIFTH CLAIM FOR RELIEF
### AIDING AND ABETTING PROFESSIONAL MALPRACTICE
#### (By All Plaintiffs Against Special Counsel Defendants)

272.   The allegations of paragraphs 1 through 271 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action

93

on behalf of himself and the class of similarly situated LADWP Settlement Class members.

273.    Class Counsel Defendants were in attorney-client relationships with Plaintiff and the Class.

274.    Accordingly, Class Counsel Defendants owed Plaintiff and the Class the duty of all attorneys to use such skill, prudence, and diligence as members of their profession commonly possess and exercise.

275.    In addition, Class Counsel Defendants are required to comply with their ethical duties as attorneys.  These ethical duties include, but are not limited to, California Rules of Professional Conduct Rule 3-310's restrictions on the representation of adverse interests.  Class Counsel Defendants failed to disclose to Plaintiff and the Class and to Judge Berle that they had a relationship with Special Counsel Defendants and were in fact selected by them to be class counsel in the LADWP class action.  Moreover, they failed to disclose that they were engaged in simultaneous representation of both The City and the ratepayers in *Jones*.

276.    Class Counsel Defendants also violated their fiduciary duty of loyalty that all attorneys owe to their clients. They did so by reaching a quick and collusive settlement with The City and pursuing the interests of The City and their own interests in making a quick profit rather than pursuing the interests of Plaintiff and the Class.

277.    Through false representations and material omissions to the Court regarding, among other things, their independence, that they had reached a settlement in *Jones* through arm's-length negotiations, and the amount of hours they had spent working on the case, Class Counsel Defendants also violated California Rules of Professional Conduct Rule 5-200's requirement that attorneys employ "such means only as are consistent with truth" and the prohibition that they may not "seek to mislead the judge ... by an artifice or false statement of fact."  For the same reasons, Class Counsel Defendants violated Business and

94

Professions Code section 6068(d)'s requirement that an attorney "employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."

278.    Special Counsel Defendants knew that Class Counsel Defendants were breaching and/or going to commit professional malpractice against Plaintiffs and the Class by virtue of their recruitment of Class Counsel Defendants to file a collusive class action against The City.

279.    Special Counsel Defendants gave substantial assistance and/or encouragement to Class Counsel Defendants.  Among other things, they recruited Class Counsel Defendants to become counsel for Jones and the other ratepayers and provided them with drafts of documents to file.

280.    Special Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

281.    Special Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

282.    Special Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

283.    Special Counsel Defendants aided and abetted Class Counsel Defendants when they intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.  These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

**SECOND AMENDED CLASS ACTION COMPLAINT**

284.   Therefore, Special Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## SIXTH CLAIM FOR RELIEF
## AFFIRMATIVE MISREPRESENTATION
### (By All Plaintiffs Against Class Counsel Defendants)

285.   The allegations of paragraphs 1 through 284 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

286.   Class Counsel Defendants represented to Plaintiff and the Class as well as to the Court that they would represent the interests of the *Jones* class members and had entered into a fair settlement with The City.  They made these representations by, among other methods, in-court filings and orally in *Jones* to Judge Berle.  This included the draft notice they prepared, which formed the basis for the notice that Judge Berle ordered to be sent out to members of the *Jones* class.

287.   Class Counsel Defendants' representations were false.  In fact, Class Counsel Defendants had been selected as class counsel by and were colluding with The City to settle the LADWP claims and were acting in violation of the California Rules of Professional Conduct and other regulations that govern the legal profession.

288.   Class Counsel Defendants either knew that their representations were false when they made them or made the representations recklessly and without regard for their truth.

289.   Class Counsel Defendants intended that Plaintiff and the Class rely on the representations.

290.   Plaintiffs and the Class reasonably relied on Class Counsel Defendants' representations.

291.   Class Counsel Defendants' conduct was a substantial factor in causing Plaintiff and the Class injury and Plaintiff and the Class are therefore entitled to damages.

292.   Class Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

293.   Class Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

294.   Class Counsel Defendants intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.  These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

295.   Therefore, Class Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## SEVENTH CLAIM FOR RELIEF
## AIDING AND ABETTING AFFIRMATIVE MISREPRESENTATION
### (By All Plaintiffs Against Special Counsel Defendants)

296.   The allegations of paragraphs 1 through 294 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

SECOND AMENDED CLASS ACTION COMPLAINT

297.   Class Counsel Defendants represented to Plaintiff and the Class as well as to the Court that they would represent the interests of the *Jones* class members and had entered into a fair settlement with The City.  They made these representations by, among other methods, in-court filings and orally in *Jones* to Judge Berle.  This included the draft notice they prepared, which formed the basis for the notice that Judge Berle ordered to be sent out to members of the *Jones* class.

298.   Class Counsel Defendants' representations were false.  In fact, Class Counsel Defendants had been selected as class counsel by and were colluding with The City to settle the LADWP claims and were acting in violation of the California Rules of Professional Conduct and other regulations that govern the legal profession.

299.   Class Counsel Defendants either knew that their representations were false when they made them or made the representations recklessly and without regard for their truth.

300.   Class Counsel Defendants intended that Plaintiff and the Class rely on the representations.

301.   Plaintiffs and the Class reasonably relied on Class Counsel Defendants' representations.

302.   Special Counsel Defendants knew that Class Counsel Defendants were making and/or going to make affirmative misrepresentations to Plaintiffs and the Class by virtue of their recruitment of Class Counsel Defendants to file a collusive class action against The City.

303.   Special Counsel Defendants gave substantial assistance and/or encouragement to Class Counsel Defendants.  Among other things, they recruited Class Counsel Defendants to become counsel for Jones and the other ratepayers and provided them with drafts of documents to file.

304.   Special Counsel Defendants' conduct was a substantial factor in

**SECOND AMENDED CLASS ACTION COMPLAINT**

causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

305.   Special Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

306.   Special Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

307.   Special Counsel Defendants aided and abetted Class Counsel Defendants when they intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.   These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

308.   Therefore, Special Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## EIGHTH CLAIM FOR RELIEF
## CONSPIRACY TO COMMIT AFFIRMATIVE MISREPRESENTATION
### (By All Plaintiffs Against Special Counsel Defendants)

309.   The allegations of paragraphs 1 through 308 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

310.   Class Counsel Defendants represented to Plaintiff and the Class as well as to the Court that they would represent the interests of the *Jones* class members and had entered into a fair settlement with The City.   They made these

99

**SECOND AMENDED CLASS ACTION COMPLAINT**

representations by, among other methods, in-court filings and orally in *Jones* to Judge Berle. This included the draft notice they prepared, which formed the basis for the notice that Judge Berle ordered to be sent out to members of the *Jones* class.

311.    Class Counsel Defendants' representations were false. In fact, Class Counsel Defendants had been selected as class counsel by and were colluding with The City to settle the LADWP claims and were acting in violation of the California Rules of Professional Conduct and other regulations that govern the legal profession.

312.    Class Counsel Defendants either knew that their representations were false when they made them or made the representations recklessly and without regard for their truth.

313.    Class Counsel Defendants intended that Plaintiff and the Class rely on the representations.

314.    Plaintiffs and the Class reasonably relied on Class Counsel Defendants' representations.

315.    Special Counsel Defendants knew that Class Counsel Defendants were making and/or going to make affirmative misrepresentations to Plaintiffs and the Class by virtue of their recruitment of Class Counsel Defendants to file a collusive class action against The City.

316.    Special Counsel Defendants agreed with Class Counsel Defendants and intended that Class Counsel Defendants make affirmative misrepresentations to Plaintiffs and the Class.

317.    Class Counsel Defendants' and Special Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

318.    Class Counsel Defendants and Special Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the

**SECOND AMENDED CLASS ACTION COMPLAINT**

interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

319.    Class Counsel Defendants and Special Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

320.    In the course of their conspiracy with Special Counsel Defendants, Class Counsel Defendants intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.   These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

321.    Therefore, Special Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## NINTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION
### (By All Plaintiffs Against Class Counsel Defendants)

322.    The allegations of paragraphs 1 through 321 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

323.    Class Counsel Defendants represented to Plaintiff and the Class as well as to the Court that they would represent the interests of the *Jones* class members and had entered into a fair settlement with The City.   They made these representations by, among other methods, in-court filings and orally in *Jones* to Judge Berle.   This included the draft notice they prepared, which formed the basis for the notice that Judge Berle ordered to be sent out to members of the *Jones*

**SECOND AMENDED CLASS ACTION COMPLAINT**

class.

324.   Class Counsel Defendants' representations were false.  In fact, Class Counsel Defendants had been selected as class counsel by and were colluding with The City to settle the LADWP claims and were acting in violation of the California Rules of Professional Conduct and other regulations that govern the legal profession.

325.   Regardless of whether Class Counsel Defendants honestly believed that the representations were true, Class Counsel Defendants had no reasonable grounds for believing the representations were true when they made them.

326.   Class Counsel Defendants intended that Plaintiff and the Class rely on these representations.

327.   Plaintiff and the Class reasonably relied on Class counsel Defendants' representations.

328.   Class Counsel Defendants' conduct was a substantial factor in causing Plaintiff and the Class injury and Plaintiff and the Class are therefore entitled to damages.

329.   Class Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

330.   Class Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

331.   Class Counsel Defendants intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.  These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

332.   Therefore, Class Counsel Defendants, and each of them, acted with

oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## TENTH CLAIM FOR RELIEF
## AIDING AND ABETTING NEGLIGENT MISREPRESENTATION
### (By All Plaintiffs Against Special Counsel Defendants)

333.   The allegations of paragraphs 1 through 332 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

334.   Class Counsel Defendants represented to Plaintiff and the Class as well as to the Court that they would represent the interests of the *Jones* class members and had entered into a fair settlement with The City.  They made these representations by, among other methods, in-court filings and orally in *Jones* to Judge Berle.  This included the draft notice they prepared, which formed the basis for the notice that Judge Berle ordered to be sent out to members of the *Jones* class.

335.   Class Counsel Defendants' representations were false.  In fact, Class Counsel Defendants had been selected as class counsel by and were colluding with The City to settle the LADWP claims and were acting in violation of the California Rules of Professional Conduct and other regulations that govern the legal profession.

336.   Regardless of whether Class Counsel Defendants honestly believed that the representations were true, Class Counsel Defendants had no reasonable grounds for believing the representations were true when they made them.

337.   Class Counsel Defendants intended that Plaintiff and the Class rely on these representations.

338.   Plaintiff and the Class reasonably relied on Class counsel Defendants'

**SECOND AMENDED CLASS ACTION COMPLAINT**

representations.

339.    Special Counsel Defendants knew that Class Counsel Defendants were making and/or going to make negligent misrepresentations to Plaintiffs and the Class by virtue of their recruitment of Class Counsel Defendants to file a collusive class action against The City.

340.    Special Counsel Defendants gave substantial assistance and/or encouragement to Class Counsel Defendants.  Among other things, they recruited Class Counsel Defendants to become counsel for Jones and the other ratepayers and provided them with drafts of documents to file.

341.    Special Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

342.    Special Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

343.    Special Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

344.    Special Counsel Defendants aided and abetted Class Counsel Defendants when they intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.  These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

345.    Therefore, Special Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

**SECOND AMENDED CLASS ACTION COMPLAINT**

**ELEVENTH CLAIM FOR RELIEF**

**CONSPIRACY TO COMMIT NEGLIGENT MISREPRESENTATION**

**(By All Plaintiffs Against Special Counsel Defendants)**

346.    The allegations of paragraphs 1 through 345 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

347.    Class Counsel Defendants represented to Plaintiff and the Class as well as to the Court that they would represent the interests of the *Jones* class members and had entered into a fair settlement with The City.  They made these representations by, among other methods, in-court filings and orally in *Jones* to Judge Berle.  This included the draft notice they prepared, which formed the basis for the notice that Judge Berle ordered to be sent out to members of the *Jones* class.

348.    Class Counsel Defendants' representations were false.  In fact, Class Counsel Defendants had been selected as class counsel by and were colluding with The City to settle the LADWP claims and were acting in violation of the California Rules of Professional Conduct and other regulations that govern the legal profession.

349.    Regardless of whether Class Counsel Defendants honestly believed that the representations were true, Class Counsel Defendants had no reasonable grounds for believing the representations were true when they made them.

350.    Class Counsel Defendants intended that Plaintiff and the Class rely on these representations.

351.    Plaintiff and the Class reasonably relied on Class counsel Defendants' representations.

352.    Special Counsel Defendants knew that Class Counsel Defendants were making and/or going to make negligent misrepresentations to Plaintiffs and

105

**SECOND AMENDED CLASS ACTION COMPLAINT**

the Class by virtue of their recruitment of Class Counsel Defendants to file a collusive class action against The City.

353.    Special Counsel Defendants agreed with Class Counsel Defendants and intended that Class Counsel Defendants make affirmative misrepresentations to Plaintiffs and the Class.

354.    Class Counsel Defendants' and Special Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

355.    Class Counsel Defendants and Special Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

356.    Class Counsel Defendants and Special Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

357.    In the course of their conspiracy with Special Counsel Defendants, Class Counsel Defendants intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.   These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

358.    Therefore, Special Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.


//


//

**SECOND AMENDED CLASS ACTION COMPLAINT**

**TWELFTH CLAIM FOR RELIEF**

**FRAUDULENT CONCEALMENT**

**(By All Plaintiffs Against Class Counsel Defendants)**

359.   The allegations of paragraphs 1 through 358 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

360.   Plaintiff and the Class were in fiduciary and attorney-client relationships with Class Counsel Defendants.

361.   Moreover, Class Counsel Defendants intentionally failed to disclose certain facts that were known only to them, namely that Class Counsel Defendants had been handpicked by the City and its Special Counsel Defendants to bring a class action against it and then quickly and collusively settle the class action for less than the claims' true value.

362.   Plaintiff and the Class did not know that Class Counsel Defendants had been handpicked by the City and its Special Counsel Defendants to bring a class action against it or that they intended to quickly and collusively settle the class action for less than the claims' true value.

363.   Class Counsel Defendants intended to deceive Plaintiff and the Class by concealing the facts.

364.   Had the omitted information been disclosed, Plaintiff and the Class reasonably would have behaved differently.

365.   Class Counsel Defendants' conduct was a substantial factor in causing Plaintiff and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

366.   Class Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

107

**SECOND AMENDED CLASS ACTION COMPLAINT**

367.   Class Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

368.   Class Counsel Defendants intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.  These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

369.   Therefore, Class Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## THIRTEENTH CLAIM FOR RELIEF
## AIDING AND ABETTING FRAUDULENT CONCEALMENT
### (By All Plaintiffs Against Special Counsel Defendants)

370.   The allegations of paragraphs 1 through 369 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

371.   Plaintiff and the Class were in fiduciary and attorney-client relationships with Class Counsel Defendants.

372.   Moreover, Class Counsel Defendants intentionally failed to disclose certain facts that were known only to them, namely that Class Counsel Defendants had been handpicked by the City and its Special Counsel Defendants to bring a class action against it and then quickly and collusively settle the class action for less than the claims' true value.

373.   Plaintiff and the Class did not know that Class Counsel Defendants had been handpicked by the City and its Special Counsel Defendants to bring a

108

class action against it or that they intended to quickly and collusively settle the class action for less than the claims' true value.

374.    Class Counsel Defendants intended to deceive Plaintiff and the Class by concealing the facts.

375.    Had the omitted information been disclosed, Plaintiff and the Class reasonably would have behaved differently.

376.    Special Counsel Defendants knew that Class Counsel Defendants were concealing and/or going to fraudulently conceal material information to Plaintiffs and the Class by virtue of their recruitment of Class Counsel Defendants to file a collusive class action against The City.

377.    Special Counsel Defendants gave substantial assistance and/or encouragement to Class Counsel Defendants.  Among other things, they recruited Class Counsel Defendants to become counsel for Jones and the other ratepayers and provided them with drafts of documents to file.

378.    Special Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

379.    Special Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

380.    Special Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

381.    Special Counsel Defendants aided and abetted Class Counsel Defendants when they intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.  These misrepresentations and concealment were directed to Plaintiff and the Class as

well as to Judge Berle, which constitutes fraud.

382.   Therefore, Special Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## FOURTEENTH CLAIM FOR RELIEF
## CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT
### (By All Plaintiffs Against Special Counsel Defendants)

383.   The allegations of paragraphs 1 through 382 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

384.   Plaintiff and the Class were in fiduciary and attorney-client relationships with Class Counsel Defendants.

385.   Moreover, Class Counsel Defendants intentionally failed to disclose certain facts that were known only to them, namely that Class Counsel Defendants had been handpicked by the City and its Special Counsel Defendants to bring a class action against it and then quickly and collusively settle the class action for less than the claims' true value.

386.   Plaintiff and the Class did not know that Class Counsel Defendants had been handpicked by the City and its Special Counsel Defendants to bring a class action against it or that they intended to quickly and collusively settle the class action for less than the claims' true value.

387.   Class Counsel Defendants intended to deceive Plaintiff and the Class by concealing the facts.

388.   Had the omitted information been disclosed, Plaintiff and the Class reasonably would have behaved differently.

389.   Special Counsel Defendants knew that Class Counsel Defendants

110

SECOND AMENDED CLASS ACTION COMPLAINT

were concealing and/or going conceal fraudulently conceal material information to Plaintiffs and the Class by virtue of their recruitment of Class Counsel Defendants to file a collusive class action against The City.

390.   Special Counsel Defendants agreed with Class Counsel Defendants and intended that Class Counsel Defendants make affirmative misrepresentations to Plaintiffs and the Class.

391.   Class Counsel Defendants' and Special Counsel Defendants' conduct was a substantial factor in causing Plaintiffs and the Class injury and Plaintiffs and the Class are therefore entitled to damages.

392.   Class Counsel Defendants and Special Counsel Defendants acted in conscious disregard for the rights of others and put their own interests ahead of the interests of Plaintiff and the Class when representing the class in *Jones*, which constitutes malice.

393.   Class Counsel Defendants and Special Counsel Defendants engaged in despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

394.   In the course of their conspiracy with Special Counsel Defendants, Class Counsel Defendants intentionally misrepresented and/or concealed material information regarding their relationship with The City, their adequacy as class counsel, and that they were actually representing The City's interests.   These misrepresentations and concealment were directed to Plaintiff and the Class as well as to Judge Berle, which constitutes fraud.

395.   Therefore, Special Counsel Defendants, and each of them, acted with oppression, fraud, and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

*//*

**FIFTEENTH CLAIM FOR RELIEF**

**DECLARATORY JUDGMENT**

**(By All Plaintiffs Against Class Counsel Defendants)**

396.    The allegations of paragraphs 1 through 395 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the class of similarly situated LADWP Settlement Class members.

397.    An actual controversy has arisen and now exists between Plaintiff and the Class and Class Counsel Defendants as set forth above, for which Plaintiffs desire a declaration or rights.

398.    A declaratory judgment is necessary and proper in that Plaintiffs contend that due to their severe ethical violations, Class Counsel Defendants must forfeit the attorneys' fees and costs they have collected in *Jones*, resulting in the creation of a constructive trust for the benefit of Plaintiff and the Class.    On information and belief, Class Counsel Defendants will argue that they are entitled to retain the attorneys' fees and costs they have collected.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

Plaintiffs seek to recover the following damages and obtain the following relief from Defendants:

(a)    Economic loss and damages suffered by Plaintiff and the Class;

(b)    Restitution;

(c)    Creation of a constructive trust;

(d)    Punitive damages;

(e)    All reasonable and necessary attorneys' fees;

(f)    Court costs;

(g)    Pre and post-judgment interest;

112

**SECOND AMENDED CLASS ACTION COMPLAINT**

(h)  A declaratory judgment as to Class Counsel Defendants' non-entitlement to attorneys' fees in *Jones*;

(j)  Nominal damages;

(k)  And such other relief to which Plaintiffs may show themselves justly entitled.


DATED: August 10, 2023        **THE X-LAW GROUP, P.C.**


By:_____
FILIPPO MARCHINO, ESQ.,
Attorneys for Plaintiff


**JURY DEMAND**


Plaintiff hereby demands a trial by jury on all issues so triable.


DATED: August 10, 2023        **THE X-LAW GROUP, P.C.**


By:_____
FILIPPO MARCHINO, ESQ.,
Attorneys for Plaintiff

113

**SECOND AMENDED CLASS ACTION COMPLAINT**